# July 15, 2025

# Affidavit of John Svorcek

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-MKST, THE RR INTEREST OWNER AND THE FUTURE ADVANCE LENDER, | Civil Action No.   23-CV-00146-NIQA |

       Plaintiff,

   v.

NG 1500 MARKET ST., LLC,

       Defendant,

---

### AFFIDAVIT IN SUPPORT OF RECEIVER'S MOTION FOR CONTEMPT

I, **JOHN SVORCEK**, being duly sworn, declare and say:

1.     I am a Real Estate Manager with CBRE, Inc. ("Receiver").  As to the facts in this Affidavit, I know them to be true (i) of my own knowledge because I am the lead property manager with the Receiver in charge of managing the Property (defined below), and (ii) from my review of the Receiver's business records.  All such business records were created and maintained in the ordinary course of Receiver's business and in accordance with normal business practices.  If called upon to testify as to the matters set forth in this Affidavit, I could and would competently testify thereto because the facts set forth herein are known to me to be true.

2.     I submit this Affidavit in support of the Receiver's Motion for Contempt ("Motion").

3.      On January 13, 2023, Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender ("Plaintiff") filed a complaint to foreclose on commercial property commonly known as 1500 Market Street, Philadelphia, Pennsylvania (the "Property").[1]  In its complaint, the Plaintiff alleges that, as of January 6, 2023, the balance due in connection with its loan ("Loan") exceeded $375 million.[2]

4.      The current value of the Property is below $375 million and therefore only the Plaintiff will recover proceeds from any sale of the Property; the Defendant NG 1500 Market St., LLC ("Defendant") will not have any recovery.

5.      By Order entered on April 14, 2023 ("Receiver Order"), the Court appointed the Receiver over the Property.[3]  A true and correct copy of the Receivership Order is attached hereto as **Exhibit A**.

6.      The Receiver Order provides specific parameters with respect to the collection and use of funds received and/or collected with respect to the Property.  For example, the Receiver Order provides that the Receiver shall:

> collect (by causing the same to be paid into the Clearing Account) the rents, issues, account receivables, insurance claim proceeds, real estate tax refunds, utility deposits, and profits from the Property for any time period (but, in each of the foregoing cases, excluding any amounts in the Clearing Account or the Cash Management Account, including, but not limited to, any Reserve Funds, ***and excluding any amounts*** (i) received by Borrower prior to the occurrence of a Cash Sweep Period, ***(ii) received by Borrower (with Lender's permission) from the Cash Management Account during the duration of a Cash Sweep Period and used (or being used) to pay Property related expenditures approved by the Lender*** or ***(iii) received by Borrower from the City of Philadelphia on account of refunds of Philadelphia Use and***

---

[1]      ECF No. 1-2.
[2]      ECF No. 1-2, paragraph 38.
[3]      ECF No. 20.

> *Occupancy payments to tenants as a result of the successful tax appeal of a prior year's real estate tax assessment and used (or being used) to either make refunds to tenants of such Philadelphia Use and Occupancy tax payments or (to the extent of any amounts not needed for such purpose) to pay Property related expenditures approved by the Lender* (the amounts received by Borrower referenced in preceding clauses (i), (ii) and (iii) collectively "**Permitted Borrower Cash Receipts**"), and to collect and disburse security deposits.

(Receivership Order, Section 1(b)) (emphasis added).

7.     Funds which do not fall under the criteria set forth after the "excluding any amounts" clause have been ordered to be collected by the Receiver.

8.     In early 2023, while reviewing financials related to the Property, I became aware of (a) a deposit account controlled by the Defendant which had a balance of $140,219.14 (the "Cash Balance") and (b) a refund of Philadelphia Use and Occupancy taxes related to the Property in the amount of $747,883.20 which the Defendant received and possessed (the "Tax Refund").

9.     The Cash Balance implicated Section 1(b)(ii) of the Receiver Order, as the funds were received by the Defendant during a Cash Sweep Period.

10.    The Tax Refund implicated Section 1(b)(iii) of the Receiver Order, as the Receiver Order specifically contemplates and directs the treatment of refunds of Philadelphia Use and Occupancy payments, which are to be refunded to tenants of the Property, unless and to the extent that such amounts are not needed for that purpose.

11.    Based on the information available to me, it appeared that the Defendant may have received and retained the Cash Balance and the Tax Refund in violation of the Receiver Order.

12.    Through counsel, inquiries about the Cash Balance and Tax Refund were made in late 2023. By correspondence dated October 18, 2023 (the "October 2023 Letter"), the Receiver (through counsel) informed the Defendant and its counsel that the Receiver was aware of the Cash

3

Balance and the Tax Refund, and requested an accounting to ensure compliance with the Receivership Order. A copy of the October 2023 Letter is attached hereto as **Exhibit B**.

13.    By email dated August 14, 2024 (the "Responsive Email"), the Defendant's counsel responded to the October 2023 Letter on behalf of the Defendant to the effect that: (a) $74,674.91 of the Cash Balance was used for Property operating expenses, with the remaining $65,544.23 being retained by Defendant; and (b) $486,469.01 of the Tax Refund was used for Property operating expenses, with the remaining $262,070.82 being retained by Defendant.[4] A copy of the Responsive Email is attached hereto as **Exhibit C**.

14.    It is my view that, based on the Receiver Order under which I am authorized to act as court-appointed receiver over the Property: (a) the Defendant's retention of $65,544.23 of the Cash Balance is improper and violates the terms of the Receiver Order; and (b) with respect to the Tax Refund, both the use of $486,469.01 and the retention by Defendant of the remaining $262,070.82 are improper and violate the terms of the Receiver Order, as these amounts should have been refunded to tenants of the Property.

15.    Because $65,544.23 of the Cash Balance and all of the Tax Refund do not fall under the criteria following the "excluding any amounts" clause of Section 1(b) of the Receiver Order, these amounts were required to be collected by the Receiver.

16.    By correspondence dated May 23, 2025 (the "May 2025 Letter"), Receiver's counsel again indicated that the Receiver demands immediate turnover of the $813,427.43 which has been at issue for over a year now, and previewed for Defendant's counsel that Receiver would

---

[4]    The Defendant alleges that the portion of the Tax Refund that was retained by Defendant was applied to pay outstanding management fees of Defendant's affiliates (Nightingale Realty LLC and Nitesky Management LLC). Even if there were circumstances present which did not require that the Tax Refund be refunded to Property tenants (which is not the case), such funds may then only be used for Lender approved Property operating expenses; paying Defendant's affiliates' prior management fees does not satisfy this criteria.

pursue a motion for contempt if the funds were not promptly returned. A true and correct copy of the May 2025 Letter is attached hereto as **Exhibit D**.

17.    As of the date of this filing, the Defendant has failed to return the identified funds, nor has the Defendant made contact with the Receiver or counsel to further discuss the matter.

18.    Based on the foregoing, the Receiver respectfully requests that the Court enter an Order finding the Defendant, Nightingale Realty LLC and Nitesky Management LLC and any officer or employee of the foregoing limited liability companies who actively participated in diverting funds in violation of the Receiver Order (the "Contempt Parties") in contempt of the Receiver Order and requiring of them, jointly and severally (a) prompt turnover of the subject funds in the amount of no less than $813,427.43; (b) reimbursement of Receiver's attorneys' fees incurred in connection with the pursuit of the subject funds; (c) assessment of a daily fine of $1,000, as a means to compel compliance, should the foregoing amounts not be promptly remitted; and (d) the right of the Receiver to apply to the Court (i) for additional attorneys' fees incurred in connection with future efforts and proceedings related to the Contempt Parties; and (ii) imprisonment of any or all of the Contempt Parties.

_____
JOHN SVORCEK

COMMONWEALTH OF PENNSYLVANIA    )
                                )
COUNTY OF ALLEGHENY             )


On the 15th day of July in the year 2025, before me, the undersigned, personally appeared **John Svorcek**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual or the person(s) upon behalf of which the individual acted, executed the instrument.

Notary Public

My Commission Expires:  8/31/2028

4864-5269-3183, v. 1

Commonwealth of Pennsylvania - Notary Seal
Tara D. Klingensmith, Notary Public
Allegheny County
My commission expires August 31, 2028
Commission number 1194688
Member, Pennsylvania Association of Notaries

6

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WELLS FARGO BANK,** | : | CIVIL ACTION |
| **NATIONAL ASSOCIATION, AS** | : | |
| **TRUSTEE, FOR THE BENEFIT OF** | : | NO. 23-146 |
| **REGISTERED HOLDERS OF J.P.** | : | |
| **MORGAN CHASE COMMERCIAL** | : | |
| **MORTGAGE SECURITIES TRUST** | : | |
| **2020-MKST COMMERCIAL** | : | |
| **MORTGAGE PASS-THROUGH** | : | |
| **CERTIFICATES, SERIES 2020-** | : | |
| **MKST, THE RR INTEREST** | : | |
| **OWNER AND THE FUTURE** | : | |
| **ADVANCE LENDER** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NG 1500 MARKET ST. LLC** | : | |
| *Defendant* | : | |

# CONSENT ORDER APPOINTING RECEIVER
# PURSUANT TO MOTION OF PLAINTIFF

**AND NOW**, this 14th day of April 2023, upon consideration of the *motion for appointment of receiver* filed by Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender, [ECF 5], Defendant's responses thereto, [ECF 13, 14, 15, 16], and parties' Stipulation consisting of the Consent Order appointing Receiver, [ECF 17], it is hereby **ORDERED** that the *motion for appointment of receiver*, [ECF 5], is **GRANTED**, and the *Stipulation for the Consent Order* is **APPROVED**, as submitted as follows:

Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial

Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender ("**Lender**") is the holder of a certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated to be effective as of December 6, 2019, and recorded with the Department of Records of Philadelphia County, Pennsylvania on December 12, 2019, as Document No. 53604614 (as assigned to Lender by that certain Assignment of Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated to be effective as of February 19, 2020, and recorded with the Department of Records of Philadelphia County, Pennsylvania on April 30, 2020, as Document No. 53662686, and at any time modified, the "**Mortgage**; the Mortgage and the other loan documents with respect to the Property executed by Defendant and relating to the loan (the "**Loan**") referenced in the Mortgage, the "**Loan Documents**").

Lender has filed a Motion for Appointment of a Receiver (the "**Motion**"), seeking the appointment of a receiver to take possession of, secure, and administer certain real property located at 1500 Market Street, Philadelphia, Pennsylvania 19102 and the improvements thereon as described with particularity in the Mortgage (collectively, the "**Real Property**") and the personal property (excluding cash) owned by Defendant (described with particularity in the Mortgage and collectively, to the extent subject to the security interest of the Mortgage hereinafter called the "**Personal Property**"; and together with the Real Property, the "**Property**").

 The Court, being fully advised and informed on the above-captioned matter and for good cause shown, hereby FINDS that:

A.      Defendant NG 1500 Market St. LLC ("**Borrower**") is a Delaware limited liability company doing business in Philadelphia County, Pennsylvania.

B.      This Court has jurisdiction over the subject matter of this case and personal jurisdiction over the parties. Venue is proper in this Court.

C.      Borrower and Lender have consented to the entry of this Order.

D.      This Court is authorized to appoint a receiver for the Property under Fed. R. Civ. P. 66.

E.      CBRE, Inc. (the "**Receiver**") is an experienced and qualified real estate property management company and, through its employee, John Svorcek, is willing to serve as receiver for the Property.

F.      Just cause has been shown that the Motion should be granted and that the Receiver should be appointed for the Property.

G.      Although this Order is effective immediately, the term of the receivership contemplated by this Order shall not commence until 12:01 a.m. on the Turnover Date. The term "**Turnover Date**" shall mean the fifth (5th) business days from the date of entry of this Order, but if such fifth (5th) business day is within 10 calendar days from the end of the month, then the "**Turnover Date**" shall mean the later of (i) 5 business days from the date of entry of this order or (ii) the first day of the calendar month which immediately succeeds the date of entry of this Order.

H.      Pursuant to the terms of a Cash Management Agreement dated December 6, 2019 (the "**Cash Management Agreement**") executed in connection with the Loan, all rents, revenues and income from the Property are initially deposited into a "**Clearing Account**" (also referred to as the "**Lockbox Account**" in Section 2.6.1 of the Loan Agreement) and are then swept (less any minimum balance required to be maintained in the Clearing Account) into a "**Cash Management Account**." Funds are disbursed from the

3

Cash Management Account on a monthly basis to Borrower to pay Operating Expenses (as defined in the Loan Agreement) in accordance with an approved annual budget as well as certain other Extraordinary Expenses (as defined in the Loan Agreement) approved by Lender. The Cash Management Agreement also provides (i) for the creation of certain reserve and escrow subaccounts (including, without limitation, a certain Tax and Insurance Escrow Account) and for the payment or disbursement by Lender from these subaccounts for their intended purposes (the amounts in such subaccounts, the "**Reserve Funds**") and (ii) for the application by the "**Deposit Bank**" of funds on deposit in the "**Deposit Bank Account**" towards "**Deposit Bank Fees**."

I.     It is the intention of the Lender and Borrower that during the term of the receivership created by this Order, all rents, revenues and income from the Property shall continue to be initially deposited into the Clearing Account and then swept (less any minimum balance required to be maintained in the Clearing Account) into the Cash Management Account but that any funds otherwise payable to Borrower for Operating Expenses or Extraordinary Expenses under the terms of the Cash Management Agreement shall be delivered to the Receiver (instead of being delivered to Borrower), with Lender disbursing funds held in escrow for taxes and insurance as requested by the Receiver and in order to protect and preserve the Property, and with Lender generally being obligated to provide funds to the Receiver in order to enable the Receiver to pay Operating Expenses in accordance with a preapproved budget, all as set forth in more detail below in this Order.

J.     The portion of the Property which is comprised of the Real Property and the tangible personal property (excluding cash) owned by Borrower and located within or about the Real Property is hereinafter called "**1500 Market**."

IT IS THEREFORE ORDERED THAT:

1.     Effective on the Turnover Date, the Receiver shall have possession of the Property (subject to the rights of tenants and licensees and subject to the right of Borrower to retain copies of its files and records and documents, including contracts, pertaining to the Property and to otherwise engage in activities with respect to the same as may be specifically authorized by this Order), the right to receive copies of documents and information as provided for in Sections 6 and 7 below and full power and authority to operate and manage 1500 Market and to conserve the Property. Without limiting the foregoing, the Receiver shall have the power and authority to, upon the Turnover Date, and without further approval of the Court:

(a)     secure tenants and execute, modify, and terminate leases for 1500 Market, the duration and terms of which are reasonable and customary for the type of use involved, and such leases shall have the same effect as if made by the Borrower (except that Borrower shall have no liability with respect to any action or omission by the Receiver related to the securing of tenants or the execution, modification or termination of leases from or after the Turnover Date, however, it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents);

(b)     collect (by causing the same to be paid into the Clearing Account) the rents, issues, account receivables, insurance claim proceeds, real estate tax refunds, utility deposits, and profits from the Property for any time period (but, in each of the foregoing cases, excluding any amounts in the Clearing Account or the Cash Management Account, including, but not limited to, any Reserve Funds, and excluding any amounts (i) received by Borrower prior to the occurrence of a Cash Sweep Period, (ii) received by Borrower (with Lender's permission)

5

from the Cash Management Account during the duration of a Cash Sweep Period and used (or being used) to pay Property related expenditures approved by the Lender or (iii) received by Borrower from the City of Philadelphia on account of refunds of Philadelphia Use and Occupancy payments to tenants as a result of the successful tax appeal of a prior year's real estate tax assessment and used (or being used) to either make refunds to tenants of such Philadelphia Use and Occupancy tax payments or (to the extent of any amounts not needed for such purpose) to pay Property related expenditures approved by the Lender (the amounts received by Borrower referenced in preceding clauses (i), (ii) and (iii) collectively "**Permitted Borrower Cash Receipts**"), and to collect and disburse security deposits;

(c)    maintain appropriate insurance for the Property against loss by fire or other casualty, which shall include but is not limited to the following coverages, from any insurer or prospective insurer: property, liability (and excess liability), auto liability, workers compensation, employment practices liability, employer liability, employee dishonesty, business interruption, boiler and machinery, builders risk, construction bonding, environmental, terrorism, other bonding, professional liability, and errors and omissions, in such amounts and with such coverage as are required under the Loan Documents. The Receiver is authorized to continue any current insurance policies in place that are in accordance with the requirements of the Loan Documents, and the Receiver may be added as an additional insured on such policy during the term of the receivership. With Lender's prior written approval, the Receiver may purchase such insurance as the Receiver deems appropriate and that is in accordance with the requirements of the Loan Documents.  All such insurance policies (i) shall name Lender as an additional insured, as mortgagee, and as loss payee with respect to all casualty policies, and with respect to any insurance purchased by the Receiver, and shall also name Borrower and any other person or

6

entity named on Borrower's existing insurance policies as an insured or additional insured as appropriate. The existing insurance policies maintained by Borrower may be cancelled by Borrower upon delivery to Borrower of evidence of insurance obtained by the Receiver (including a certificate of insurance), replacing the existing insurance policies, and only to the extent that the Receiver obtains new insurance coverage that in the Receiver's reasonable discretion and with Lender's reasonable approval covers the same risks and potential loss as were covered by the insurance policies maintained by Borrower prior to the entry of this Order (and, if it does not, Borrower shall only have the right to cancel such coverages, if any, which in the Receiver's and in the Lender's reasonable discretion are duplicative);

(d)     employ construction managers, general contractors, subcontractors, architects, engineers, consultants, title companies, environmental consultants, asset managers, property managers, leasing agents, administrative support, attorneys, security companies, custodians, janitors, maintenance workers, repairman, contractors, assistants, agents, accountants, and other employees reasonably deemed necessary, appropriate, or desirable to assist the Receiver in diligently executing the duties imposed upon the Receiver by this Order, including the maintenance and operation of 1500 Market;

(e)     pay taxes which may have been or may be levied against the Property and, if the Receiver deems appropriate, contest or appeal any real estate tax assessment or bill relating to the Property;

(f)     establish segregated bank accounts and utilize the tax identification number of the Borrower in so doing so long as Borrower continues to own 1500 Market;

(g)     receive, on Borrower's behalf, all disbursements of funds which are otherwise payable to Borrower from the Cash Management Account as contemplated by Recital I above;

(h)     hire or retain any agents necessary or appropriate to do any of the duties listed above without further approval of this Court, including accountants, attorneys, environmental consultants and personnel, brokers, leasing agents, and property managers (including the leasing and property management divisions of CBRE, Inc.);

(i)     operate 1500 Market under any and all existing agreements currently in place between Borrower and any third party, as the Receiver may determine in the Receiver's discretion (except that the existing property management agreement with Nightingale Realty, LLC, as property manager, shall be terminated as of the time immediately preceding the Turnover Date [which termination, for the avoidance of doubt, has been consented to by Lender] and a replacement property manager shall be retained by the Receiver) and Borrower shall have no liability for any obligations accruing under such existing agreements that the Receiver has assumed from and after the Turnover Date (the liability for the same being limited to the assets of the receivership created by this Order, and it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents);

(j)     terminate or enter into vendor or other contracts pertaining to the Property as Receiver may determine in its reasonable judgment are necessary, with no further obligation or liability on the part of Borrower or the Receiver (including but not limited to not having to pay any termination fees or severance benefits to any laid off or terminated employee) under, or related to, any terminated contract, except that the contracts listed on Schedule A attached hereto

shall be assumed by the Receiver and shall not be terminated (it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents);

       (k)    procure or maintain utility services for 1500 Market, to include but not be limited to, gas, steam, electric, water, sewer, trash, phone, cable, internet, and snow removal, without suffering, regardless of the internal policies of any utility provider, the termination of such service or refusal to authorize any new account based upon previous unpaid bills for services rendered prior to the appointment of the Receiver or during the term of the Receiver, with any and all accounts to be opened in the Receiver's name (and any existing accounts shall be closed or be retitled in the name of the Receiver and Borrower shall be removed from any further obligation thereunder on account of services rendered or utilities furnished from and after the Turnover Date, with recourse therefor for utility service rendered from and after the Turnover Date to be limited to the assets of the receivership created by this Order) but still utilizing the Borrower's tax identification number, if applicable.

       (l)    in accordance with Section 18 of this Order, take possession of all cash and funds derived from the Property belonging to or for the benefit of Borrower in bank accounts (no matter from what time period), whether in the name of 1500 Market Street, Borrower or its agents or employees, but excluding in each of the foregoing cases any amounts in the Clearing Account or Cash Management Account, including, but not limited to, any Reserve Funds, and excluding Permitted Borrower Cash Receipts, and to open bank accounts in the Receiver's name (segregated with respect to the Property) but still utilizing the Borrower's federal employer identification number;

(m)     manage, operate, lease, and market for lease 1500 Market;

(n)     if directed by the Lender, engage a sales broker and sell the Property (in each case with the prior approval of the Court and on such terms as may be set out in a separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order); and

(o)     take such other actions as may be reasonably necessary or prudent to manage and operate 1500 Market and to conserve the Property or as otherwise authorized by the Court (but the Receiver shall in no event have authority to cause the imposition of obligations or liabilities on Borrower).

2.     From and after the Turnover Date, the Receiver is authorized, without further leave of the Court, to defend or institute and prosecute suits or summary proceedings related to the Property or the duties imposed upon the Receiver by this Order (exclusive of the institution of suits or summary proceedings against Borrower or its property manager, other than for violations of this Order—it being understood that the Borrower's retention and use of Permitted Borrower Cash Receipts shall not constitute a violation of this Order), including, without limitation, proceedings: (a) for the collection of rents, income, and other amounts (which includes but is not limited to tenants who have vacated their space); (b) for the removal of: (i) any tenant or tenants in default (whether for failure to pay rent or other amounts when due, or otherwise, including violation of the property rules), (ii) any tenant or tenants whose terms have expired and have not been renewed, or (iii) any other person(s) or entity(ies) unlawfully in possession of the Property; or (c) otherwise related to the Property or the duties imposed upon

10

the Receiver by this Order. This Order shall act as notice to all tenants of 1500 Market that 1500 Market is now under the control of the Receiver.

3. From and after the Turnover Date, the Receiver may, without an order of the Court, delegate managerial functions to a person in the business of managing real estate of the kind involved who is financially responsible and prudently selected (including CBRE, Inc.). To the extent the Receiver receives sufficient receipts from the Property, and except to the extent ordered otherwise by the Court, the Receiver, from and after the Turnover Date:

(a) shall maintain the existing casualty and liability insurance required in accordance with the Loan Documents at the time the Receiver took possession, or shall find more cost-effective replacement insurance of comparable coverage with replacement insurers in compliance with the provisions of Section 1(c) above;

(b) shall use reasonable efforts to maintain 1500 Market in at least the same condition as existed at the time the Receiver took possession, excepting reasonable wear and tear and damage by any casualty, and shall cause compliance with the landlord's obligations under the leases of 1500 Market;

(c) shall apply receipts in accordance with the provisions of this Order;

(d) shall make other repairs and improvements necessary to comply with building, life-safety and other similar codes or with such other contractual obligations as affect 1500 Market, however, Receiver must obtain Lender's prior written approval (not to be unreasonably withheld, delayed or conditioned, except as to amounts described clause (iii) next following) for (i) any such single cost in excess of $5,000.00 not set forth in the Budget (as defined in Section 10 below), (ii) costs exceeding $15,000.00 in the aggregate not set forth in the Budget, and (iii) payment of unsecured indebtedness for borrowed money);

11

(e) may hold receipts (to the extent remitted from the Cash Management Account to the Receiver) as reserves reasonably required for the foregoing purposes;

(f) may take such other actions as may be reasonably necessary or prudent to manage and operate 1500 Market and to conserve the Property, or as otherwise authorized by the Court, provided sufficient funds are available and further provided that (i) in no event may the Receiver incur any obligations on behalf of the Borrower pursuant to the terms of this Order, recourse for all such obligations being limited to the assets of the receivership estate created by this Order, and (ii) no acts or omissions of the Receiver with respect to the receivership or this Order, or any obligations incurred or created by the Receiver, shall expose the Borrower to any personal liability notwithstanding anything to the contrary in the Loan Documents or this Order (and the Lender shall have no right to pursue Borrower on account of the same, however, it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents); and

(g) may in its discretion pay any or all other outstanding obligations to suppliers or vendors as of the Turnover Date incurred in arm's length transactions who, prior to the Turnover Date, supplied materials, business supplies or labor to or for the benefit of the Property, but only to the extent the Receiver shall determine, in its sole judgment, that it is prudent to do so in order to maintain the business relationships with such suppliers or vendors for the benefit of the Property, provided sufficient funds are available from the Property, and without, by so doing, making the Receiver liable for any other antecedent debts relating to the Property.

4.      Irrespective of whether the Receiver decides to continue the services of any current employees, agents or other personnel with respect to the Property, neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be liable for any claims of any nature whatsoever of such employees, agents, or other personnel that arose prior to the Turnover Date or relate to agreements (which have not been assumed by the Receiver) entered into by the Borrower with its employees, agents or other personnel dated prior to the Turnover Date, which claims include severance payments, unpaid but accrued wages, unpaid but accrued sick time, unpaid but accrued vacation time, unpaid but accrued overtime, and any other liabilities related to unemployment or worker's compensation claims.  Notwithstanding the above, and for the avoidance of doubt, any leasing commission payment obligations of the Borrower which were earned before the Turnover Date, but which are payable after the Turnover Date, shall be paid by the Receiver.

5.      Except as provided in Section 24 below, the liability of the Receiver is and shall be limited to the assets of the receivership, and neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be personally liable for any duly authorized actions properly and lawfully taken pursuant to this Order.

6.      Within 10 business days of the entry of this Order unless otherwise indicated, Borrower and its agents shall provide or make available to the Receiver the following, to the extent such items and things exist and are in Borrower's possession or control:

(a)      Borrower's federal, state, and municipal employer and tax identification numbers;

(b)      Copies of any and all service contracts pertaining to the Property which are currently in effect;

(c)    Copies of any and all existing leases pertaining to 1500 Market and lease abstracts with respect to such existing leases;

(d)    A list of any and all bank accounts in the name of the Property, Borrower or 1500 Market Street (excluding the Cash Management Account and the Clearing Account), including the name or names of the institutions in which the accounts are located, any and all account numbers for each account, and monthly statements for each such account;

(e)    Prior to the Turnover Date, a complete set of keys and all security and access codes and cards to 1500 Market, and a schedule (including full contact information) identifying, to Borrower's knowledge, each person or entity (including security companies, municipal and governmental agencies and utility companies), who currently has one or more keys or access cards to 1500 Market or who has knowledge of any access codes thereto;

(f)    The lap top computers currently used in the management office at the Real Property by employees below the level of general manager and all copiers currently used in the management office at the Real Property;

(g)    (i) balance sheets, income statements and general ledgers relating to the Property for the last 3 years; (ii) access to the preventative maintenance and work order data maintained in the Angus system (subject to any required consent being obtained from the licensor of such Angus system); and (iii) all electronic data for all common area maintenance, operating expense and/or real estate tax reconciliations for each tenant for the past three years including, without limitation, all workbooks, calculations, spreadsheets and other supporting documentation; and

(h)    As soon as practicable and within such period of time as agreed to by the Receiver and Borrower, any and all other documents relating to the Property as specifically and

reasonably requested by the Receiver which may be necessary or pertinent to the Receiver's management, maintenance, operation or leasing of the Property (to the extent not subject to the attorney/client privilege or other privilege and to the extent not containing Confidential Information).

Borrower's obligation to make available information under Section 6(f) above shall be continuing until the earlier of (i) six (6) months from the Turnover Date or (ii) the date of a receiver's sale, foreclosure sale, other execution sale or the acceptance of a deed in lieu of foreclosure with respect to 1500 Market.

7.  Within 15 business days of the entry of this Order unless otherwise indicated, Borrower and its agents shall provide or make available to the Receiver the following, to the extent such items and things exist and are in Borrower's possession or control:

(a)  All open invoices for services or goods relating to 1500 Market;

(b)  In addition to the materials identified above, to the extent not subject to the attorney/client privilege or other privilege and to the extent not constituting information Confidential Information as hereinafter defined, (i) copies of any material agreements to which the Property is or may be subject (excluding documents relating to the Loan), (ii) a summary of amounts received from the tenants of 1500 Market, from the time Borrower took ownership of 1500 Market to the date of entry of this Order, (iii) copies of documents evidencing all liens or other monetary encumbrances on the Property (exclusive of the liens or encumbrances related to the Loan), (iv) current property tax bills, current assessment notices, and pleadings relating to any pending tax appeals (and appraisals submitted to the relevant taxing authorities or the applicable municipal body or court in connection with current pending tax appeals), (v) certificates and/or policies with respect to current insurance of all types for Borrower and tenants

15

(including but not limited to liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance and workmen's compensation) related to 1500 Market, (vi) copies of all current maintenance and service contracts to which Borrower or Nightingale Realty, LLC is a party relating to 1500 Market, (vii) copies of all outstanding invoices for services at 1500 Market, (viii) copies or originals of all tenant files with respect to existing leases, including but not limited to correspondence, leases, lease abstracts, CAM billing statements with respect to those leases from the time Borrower took ownership of 1500 Market to the date of entry of this Order, in each of the foregoing cases to the extent not subject to the attorney/client privilege or other privilege and to the extent not constituting Confidential Information, (ix) a current and accurate copy of all electronic information for items related to tenant escalations/reconciliations from the time Borrower took ownership of 1500 Market to the date of entry of this Order, (x) the current rent roll utilized by the Borrower in the operation of its business, and (xi) all marketing information (in hard copy and electronic format) currently used by Borrower in the operation of its business, including but not limited to brochures, photographs (including aerial), maps, and signage; notwithstanding the above, to the extent Borrower is subject to certain confidentiality agreements with respect to certain financial information concerning certain tenants and tenant guarantors at 1500 Market (the "**Confidential Information**"), Borrower will deliver such Confidential Information to Lender and Lender shall keep such Confidential Information confidential and use such Confidential Information only for the benefit of the Property.

(c)     Any and all insurance loss histories since Borrower acquired ownership of 1500 Market and documentation relating to any currently unresolved insurance claims with

respect to the Property (to the extent not subject to the attorney/client privilege or other privilege and to the extent not constituting Confidential Information).

8.     Borrower shall, at all times after the entry of this Order until the earliest of (i) termination of this Order, (ii) mutual agreement of Lender and Borrower or (iii) six (6) months from the Turnover Date:  (a) reasonably cooperate with the Receiver in the transition of the management of 1500 Market to the Receiver on the Turnover Date (including, without limitation, by cooperating with the Receiver's efforts to obtain 3rd party access to the Borrower's Philadelphia Use and Occupancy Tax account through the Philadelphia Tax Center) and (b) timely respond to all reasonable requests for information in its possession or under its control relating to the management, leasing or operation of the Property made by the Receiver, except to the extent that any request represents information subject to the attorney/client privilege, other privilege or such information is Confidential Information.  Furthermore, Borrower shall remain responsible to complete all 2022 common area maintenance, operating expense and real estate tax reconciliations under existing tenant leases at the Property (which shall be completed no later than April 30, 2023). The Receiver shall be responsible for such reconciliations for calendar year 2023 and thereafter during the term of the receivership.

9.     If the Lender or the Receiver desire Borrower's cooperation in the carrying out of the duties of the Receiver under this Order, and such cooperation is not already provided for in Sections 6 through 8 above, the Receiver or Lender may request that the Court order such cooperation, through a separate and subsequent order of the Court on such terms as may be set out in such separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order.

10.     Lender shall arrange for the disbursement of funds from the Cash Management Account to the Receiver in accordance with the budget for the calendar year 2023 which has been previously approved by Lender, pursuant to Section 5.1.11(d) of the Loan Agreement, and the Receiver, a copy of which is attached hereto as **Exhibit 1**, as increased to reflect the Receiver's compensation provided for in this Order (the "**Budget**"). So long as any part of the Property remains in the Receiver's possession, the Receiver is directed to prepare and file with the Court, within 75 business days after the last day of the first month of the entry of this Order (and on or prior to each anniversary of such 75th day) a proposed 12-month budget for the operation of 1500 Market, which budget shall supersede and replace the budget on Exhibit 1 hereto. The budgets proposed by the Receiver shall be subject to the prior written approval of Lender, not to be unreasonably withheld. Lender shall arrange for the disbursement of funds from the Cash Management Account to the Receiver in accordance with the Budget; however, Lender shall not have any obligation to advance additional funds beyond those provided for in the Budget or to make protective advances to the receivership (it being understood and agreed that any such protective advances are discretionary by Lender and are authorized under Section 12 of this Order and that disbursements from the Cash Management Account are not considered protective advances). Any party having an objection to the Receiver's Budget shall file a written objection with the Court no later than the later of (i) 15 business days after the date of the Receiver's filing of the Budget, or (ii) 15 business days after the date the Budget is served upon such party if such party is required to be served with the Budget. The Receiver is further directed to serve copies of the Budget on (i) the attorneys of record for Lender, (ii) the attorney of record for Borrower and (iii) the Borrower at the address provided to the Receiver by the Borrower, and any other party to this lawsuit who submits a written request to the Court and the

18

Receiver, with such copies to be served within 15 calendar days following the filing of the Budget with the Court. Any objection not filed within the time prescribed by this Order shall be deemed waived. Notwithstanding the above, Lender and the Receiver may agree to amend the Budget in their sole discretion and as reflected in a supplemental report filed with the Court. To the extent Borrower objects to the amended Budget, Borrower shall file a written objection with the Court no later than the later of (i) 15 business days after the date of the Receiver's filing of the amended Budget, or (ii) 15 business days after the date the amended Budget is served upon Borrower. Any objection not filed within the time prescribed by this Order shall be deemed waived. Nothing in this Order is intended to limit the right of Lender to approve the funding of Extraordinary Expenses from the Cash Management Account or to restrict the Receiver from requesting Lender's approval of such Extraordinary Expenses pursuant to the terms of the Loan Agreement. To the extent such approval is obtained then the Budget shall be deemed modified to reflect such approval. To the extent Lender requires compliance with Section 3.6 of the Cash Management Agreement with respect to any period from and after the Turnover Date, the Receiver shall be responsible for such compliance.

11.     So long as any part of the Property remains in the Receiver's possession, the Receiver is directed to prepare and file with the Court, within 75 business days after the last day of the first month of the entry of this Order and no less frequently than every month thereafter, and within 90 days after termination of the receivership, a full and complete report, under oath, setting forth: (i) all receipts, disbursements, cash flow, and all changes in the assets in the Receiver's charge, or interests in or claims against the assets, that have occurred during the preceding month; (ii) (a) detailed rent roll showing the name of each tenant, and for each tenant, the space occupied, the lease commencement/expiration date, the rent payable, aged accounts

19

receivables, the rent paid to date, and the security deposit (if any) being held for said tenant, a comparative sales report for each tenant (with per square foot sales), if applicable under the leases, and a leasing activity report, each in reasonable detail, (b) an aged payables report and an aged receivables report, (c) a capital expenditures report including the type and amount of each capital expenditure made or proposed during the reporting period, and (d) bank statements with monthly reconciliations for the reporting month; (iii) the condition of 1500 Market; (iv) any recommendations as to actions needed to preserve and protect the Property or to otherwise carry out the Receiver's duties; (v) marketing and leasing efforts; (vi) the current status of all licenses, permits, and other governmental entitlements or approvals; (vii) a balance sheet, statement of income and expenses, statement of cash flows, and budget vs. actual comparison report; and (viii) any other information the Receiver determines is relevant to the receivership or the Property. The Receiver is further directed to serve copies of each report on (i) the attorneys of record for Lender, (ii) the attorney of record for Borrower and (iii) the Borrower at the address provided to the Receiver by the Borrower, and any other party to this lawsuit who submits a written request to the Court and the Receiver, with such copies to be served within 30 calendar days following the end of each calendar month. Any party having an objection to the Receiver's report shall file a written objection with the Court no later than the later of (i) 15 business days after the date of the Receiver's filing of the report or (ii) 15 business days after the date such report is served upon such party if such party is required to be served with such report. Any objection not filed within the time prescribed by this Order shall be deemed waived.

12. In the event Lender advances funds (other than disbursements from the Cash Management Account) pursuant to the terms of the Loan Documents (the "**Advances**") to the Receiver during the pendency of the receivership to enable the Receiver to perform its duties

hereunder, such Advances shall be considered part of the indebtedness secured by the lien of the Mortgage.

13.     The Receiver may at any time file a motion requesting that it be exonerated, discharged, and released from all its appointments as Receiver.

14.     The Receiver shall not have any responsibility for the preparation or filing of any tax return of any kind for Borrower or its direct or indirect members other than with respect to the Philadelphia Use and Occupancy Taxes applicable to 1500 Market (which the Receiver shall promptly prepare and timely file and accurately and timely report thereon any tenant delinquencies so as to avoid subjecting the landlord to liability for the applicable taxes) commencing with the report due on the 25th day of the calendar month in which the Turnover Date occurs, but shall, if so asked by Borrower, provide to Borrower within a reasonable time, at Borrower's expense, with information within Receiver's possession or control so that Borrower or its direct or indirect members may prepare and file any such returns.  The Receiver shall earmark all amounts collected with respect to the Philadelphia Use and Occupancy Taxes applicable to 1500 Market and the Receiver shall remit such amounts to the appropriate authorities in accordance with applicable law.

15.     From and after the Turnover Date, neither Borrower nor anyone associated therewith or acting under Borrower's authority or control shall:

(a)     possess or manage 1500 Market in any way or interfere with the activities of the Receiver authorized by this Order;

(b)     collect, withdraw, or transfer, in any way, funds or revenue derived from operation of the Property from and after the Turnover Date;

(c)     remove or destroy any tangible personal property from 1500 Market;

21

(d)        terminate or cause to be terminated any (i) license, (ii) permit, (iii) lease, (iv) contract relating to the maintenance, operation, leasing or management of 1500 Market, (v) insurance policy, or (v) agreement relating to the maintenance, operation, leasing or management of 1500 Market except as otherwise expressly provided in this Order and except that Borrower shall have the right to terminate, and be permitted to terminate, any license, permit, contract or insurance policy or agreement as to which (i) the Receiver (and Lender, to the extent its consent is required under the Loan Documents as to the termination of the same) have agreed, in writing, shall not be assumed by the Receiver (Receiver agreeing to confirm to Borrower in writing within the later of (A) 30 days of the entry of this Order or (B) 10 business days following the request of Borrower whether the license, permit, contract or insurance policy or agreement at issue is being assumed by the Receiver) or (ii) the Receiver does not pay any amounts payable with respect thereto accruing from and after the Turnover Date as and when due; or

(e)        otherwise interfere with Receiver's possession or operation of 1500 Market or the other activities of the Receiver authorized by this Order.

16.        Receipts received from the operation of the Property by the Receiver shall be applied in the following order of priority (unless expressly provided to the contrary elsewhere in this Order):

(a)        to payment of the Receiver's fees as to which the Receiver is entitled to payment pursuant to the terms of this Order;

(b)        to payment of authorized insurance premiums and to the payment of taxes and Center City District assessments on 1500 Market (to the extent the same are not paid directly by the Lender)[1];

---

[1] Lender, at its option, may fund the monthly payments contemplated by the Budget for these items (a) into a reserve maintained by the Receiver which shall be used to pay these items when due or (b) into the Tax and Insurance

(c)     to payment of reasonable and necessary expenditures associated with the Property that have accrued after the Turnover Date (including, without limitation, any parking taxes on parking revenue generated by the University of Pennsylvania Health System or its affiliates which are not the responsibility of the tenant under the Parkway lease for the parking garage) and any other amounts which the Receiver is entitled to incur, or be reimbursed for, under the terms of this Order which are not described in subsections (a) through (b) above;

(d)     to payment of the obligations owed to Lender under the Loan Documents for the Property, to the extent funds remain after payment of the foregoing; and

(e)     To the extent all amounts due and owing to Lender under the Loan Documents have been paid in full, any excess funds shall be held by the Receiver for payment to the Borrower upon termination of the receivership;

17.     Borrower, its agents and employees, shall turn over to the Lender, within 10 business days from the Turnover Date, all cash security deposits made under any lease of 1500 Market or any portion thereof and all letters of credit which secure obligations of any tenant under a lease for 1500 Market or any portion thereof.  Upon turning over such cash security deposits  and letters of credit to the Lender, Borrower shall not have any liability to the respective tenants for the remittance of the security deposits if and when the respective tenants are entitled to the return of the same pursuant to their leases and Borrower shall not have liability for any draw by the Lender or the Receiver on any such letter of credit, but only to the extent such cash security deposits or letters of credit have been turned over to the Lender (it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the

24

Escrow Account (as defined in the Cash Management Agreement), which shall be used by the Lender to pay these items when due.

terms of the Loan Documents).   Upon receiving the cash security deposits and letters of credit referenced in this Section, Lender shall turn them over to the Receiver.

18.     Without duplication of Section 17 above, Borrower, its agents and employees, shall turn over to the Receiver, within 10 business days from the date this Order is entered, all sums (which are not Permitted Borrower Cash Receipts) in existence on or before the Turnover Date and held by Borrower or for the benefit of Borrower as of the Turnover Date and were derived from the Property, including, without limitation: (a) all cash in hand; (b) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments, which shall be endorsed to the Receiver without recourse); and (c) all sums held in accounts in any financial institutions, including (i) deposits held in escrow for any purpose (exclusive of tenant security deposits, which are addressed in Section 17 above), such as for payment of real estate taxes and insurance premiums, (ii) proceeds of insurance maintained for, or pertaining to, the Property, (iii) rent or prepaid rent, (iv) funds designated or intended for capital improvements, repairs, or renovations to, or in connection with, the Property, and (v) all other sums of any kind relating to the use, enjoyment, possession, improvement, or occupancy of all or any portion of the Property, but excluding in each of the foregoing cases Permitted Borrower Cash Receipts. Borrower hereby represents and warrants that as of April 10, 2023 it is holding $0 in cash or other sums or proceeds derived from the Property (excluding Permitted Borrower Cash Receipts) and expressly agrees to turn over such amounts to the Receiver within 10 business days from the date this Order is entered.  For the avoidance of doubt, the provisions of this Section 18 shall not apply to amounts held in the Clearing Account or in the Cash Management Account, including, but not limited to, any Reserve Funds, and shall also not apply to Permitted Borrower Cash Receipts.

19. The Receiver shall post a bond of $ _____(zero if left blank), the cost of which shall be an expense of the receivership.

20. The Receiver shall be paid a one-time fee of $25,000.00 for transition of the Property to the Receiver and a monthly fee for receivership services of $2,000.00. Any property manager acting under Receiver's control shall be paid a monthly fee for property management services calculated at the greater of 1.35% of gross revenue from the operations of 1500 Market or $42,500.00 per month, plus payroll reimbursement for all personnel acting under the Receiver's control at 1500 Market. Any leasing agent acting under Receiver's control shall be paid as reflected on Schedule B attached hereto except that if Newmark is retained as leasing agent by the Receiver pursuant to the existing Exclusive Right Agreement with Newmark, the fee schedule in that agreement with Newmark shall govern and control during the term of that agreement. The Receiver shall also be responsible for paying any amounts due to tenant broker's or tenant representatives pursuant to existing agreements as of the Turnover Date with respect to transactions effectuated from and after the Turnover Date. The Receiver may also be reimbursed from the receivership estate for the cost of the receiver's bond required hereunder and for any out-of-pocket costs and expenses which are set forth in the Budget and incurred outside the ordinary course and scope of operating, leasing and managing the Property. The compensation set forth in this paragraph shall be the sole compensation payable to the Receiver and any property manager acting under its control without further order of the Court, notwithstanding any amount of monies that may be distributed by the Receiver to Lender or any other person or entity in the course of the receivership.

21. Payment of the amounts set forth in the immediately preceding paragraph may be made utilizing funds derived from operations of the Property or from any funds that may be

27

advanced by Lender (in its sole discretion) as reasonable and necessary costs for maintaining and preserving the Property pursuant to the Mortgage.

22.     No person or entity may file suit against the Receiver, in its capacity as Receiver, or the Receiver's agents, acting in such capacity, unless otherwise authorized in advance by this Court; provided, however, that no prior Court order is required to file a motion in this action to enforce the provisions of this Order or any other order of this Court.

23.     The Receiver, and those agents and any property manager and leasing agent acting under its control, shall have no liability in connection with any obligations owed by Borrower to its creditors on account of obligations accruing prior to the Turnover Date, and no creditor of Borrower, other than Lender, shall seize or attempt to seize any property, including the Property, delivered to the Receiver hereunder and no creditor, including any utility company, shall act to terminate any existing service either (a) as a means of attempting to collect an obligation of Borrower which accrued prior to the Turnover Date or (b) on account of an obligation of Borrower accruing prior to the Turnover Date.

24.     The Receiver, and those agents, and any property manager and leasing agent acting under its control, shall have no personal liability in connection with their conduct in the course of this receivership, except for claims due to their gross negligence, gross or willful misconduct or malicious acts.

25.     The Receiver may be removed upon 15 calendar days written notice by Lender that Lender desires such removal, with a copy of such notice lodged with the Court and Borrower, or upon an order of the Court, in which event the Court shall appoint a substitute receiver to be recommended by Lender and approved by Borrower (such approval not to be unreasonably withheld).

26.     Nothing contained in this Order shall be construed as obligating the Receiver to advance its own funds in order to pay the costs and expenses of the receivership that have been approved by Lender and the Court.

27.     The Receiver may apply at any time to the Court, with notice to all other parties in this case, for further instruction and for further power necessary to enable the Receiver to properly fulfill its duties.

28.     If there are any bonds, they shall be canceled, and the Receiver shall be discharged, upon the termination of this receivership and the Court's approval of the Receiver's final accounting.

29.     Except to the extent, if any, provided by the express terms of this Order, the entry of this Order shall not in any manner prejudice any of the other rights and remedies of Lender, Borrower (or any guarantor of the Loan) under the Loan Documents or under applicable law. For the avoidance of doubt, all holders of the notes secured by the Mortgage shall be bound by, and subject to the terms of, this Order applicable to the Lender.

30.     The entry of this Order shall not in any manner preclude any consensual resolution that may be reached between Lender and Borrower, and the Receiver shall abide by the terms of any such consensual resolution.

31.     Any action of the Receiver authorized in this Order shall require the consent of Lender if and when such action, if undertaken by Borrower, would require Lender's consent or authorization under any of the Loan Documents.

32.     Lender shall not become a mortgagee-in-possession as a result of this Order, and neither Lender nor the Receiver shall become responsible for any debts or obligations relating to the Property incurred prior to the Turnover Date, including assessments, real estate taxes,

environmental obligations, or any other obligations (unless, in each of the foregoing cases, otherwise expressly provided by this Order). Lender is not required to advance monies to cover operating deficits (it being understood that the release or disbursement of funds from the Cash Management Account shall not constitute an "advance" for this purpose), and the Receiver does not assume any personal liability for any obligations of the Property or Borrower or any of its respective agents except as provided in Section 24.

33. Any utility company providing services to 1500 Market, including gas, electricity, water, sewer, trash collection, telephone, communications, or similar services, is prohibited from discontinuing service to 1500 Market based upon unpaid bills incurred by Borrower for service rendered prior to the Turnover Date. Further, such utilities are prohibited from demanding that the Receiver deposit funds in advance to secure such services.

34. Except to the extent, if any, provided by the express terms of this Order, nothing set forth herein is intended and shall not be deemed to modify, limit, release, reduce, or waive any of Lender's or Borrower's (or any other party's) rights, remedies, or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved, including any rights or remedies Lender may have to foreclosure of the Property.

35. The receivership created by this Order shall terminate upon entry of an order of the Court terminating the receivership, and, without limiting other grounds on which this receivership estate may be wound up and terminated, if Borrower pays in full all amounts due and owing to Lender under the Loan Documents, then the receivership estate shall be wound up and terminated within a reasonable time after such payment in full.

Consent is given to the form and
entry of the within Consent Order:


MAX L. LIEBERMAN & ASSOCIATES, P.C.    COZEN O'CONNOR

By: */s/ Max L. Lieberman*_____        By: */s/ Robert V. Dell'Osa*_____
   Max L. Lieberman, Esquire               Robert V. Dell'Osa (44281)
   Attorney I.D. No. 15344                 Erica Pulford (330878)
   591 Skippack Pike, Suite 400            1650 Market Street, Suite 2800
   Blue Bell, PA 19422-2160                Philadelphia, PA 19103
   (610) 397-1820                          rdellosa@cozen.com
                                           epulford@cozen.com
                                           (215) 665-2745


*Attorneys for Plaintiff*                  *Attorneys for Defendant*



       **APPROVED BY THE COURT:**

       /s/ *Nitza I. Quiñones Alejandro*_____
       **NITZA I. QUIÑONES ALEJANDRO**
       *Judge, United States District Court*

**Exhibit 1**

(Budget for Calendar Year 2023)

Database: NIGHTINGALE  
ENTITY: 150MKT  
Accrual Tax Basis

**Budget Report**  
Nightingale Properties  
NG 1500 Market Street LLC  
Budget amounts from 01/23 to 12/23

Page: 1  
Date: 1/19/2023  
Time: 9:36 AM

| Account | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | |
| Base Rent Income | 3,234,385 | 3,234,385 | 3,208,423 | 3,217,240 | 3,234,844 | 3,283,794 | 3,276,699 | 3,277,291 | 3,303,780 | 3,315,734 | 3,338,323 | 3,117,707 | 39,042,606 |
| CAM-Operating Exp | 32,504 | 32,504 | 31,731 | 31,731 | 31,693 | 31,693 | 31,814 | 31,814 | 31,814 | 31,814 | 31,814 | 30,553 | 381,476 |
| CAM - Real Estate Taxes | 77,230 | 77,230 | 76,747 | 76,747 | 76,658 | 76,658 | 76,612 | 76,612 | 76,612 | 76,612 | 76,612 | 73,886 | 918,211 |
| CAM - Overhead | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 12,166 |
| CAM - Utilities | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 5,701 |
| Prior Year CAM | | | | -244,191 | | | | | | | | | -244,191 |
| Prior Year RET | | | | -4,815 | | | | | | | | | -4,815 |
| Storage Income | 20,835 | 20,835 | 19,622 | 19,798 | 19,798 | 19,798 | 19,798 | 19,798 | 19,798 | 19,942 | 19,942 | 16,188 | 238,007 |
| Roof/Antenna Income | 38,097 | 17,932 | 17,966 | 17,968 | 18,148 | 18,148 | 18,148 | 18,148 | 18,148 | 18,148 | 18,348 | 16,348 | 237,846 |
| Utility Reimbursements (E | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 132,600 |
| Water & Sewer Reimb | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Electrical Svcs Income | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 3,840 |
| Janitorial Svcs Income | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Trash Removal Income | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 39,600 |
| Lighting Income | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,075 | 1,075 | 1,075 | 1,075 | 13,500 |
| Access Cards Income | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 13,500 |
| Keys/Locksmith Svcs Inc | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Security Services Income | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Plumbing Svcs Income | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Maintenance Svcs Income | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 3,660 |
| U&O Income | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 1,025 |
| Other Income | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 1,798,706 |
| Interest Earned on Accounts | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 208,799 |
| | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **EFFECTIVE GROSS INCOME** | 3,590,884 | 3,571,019 | 3,542,323 | 3,302,311 | 3,569,273 | 3,617,923 | 3,610,903 | 3,611,795 | 3,637,909 | 3,649,863 | 3,672,885 | 3,444,440 | 42,821,539 |
| **EXPENSES** | | | | | | | | | | | | | |
| Utilities-Electricity | 165,741 | 150,563 | 139,089 | 141,251 | 157,282 | 185,351 | 202,998 | 192,503 | 167,528 | 150,311 | 148,436 | 158,385 | 1,959,456 |
| Utilities-Steam | 476,514 | 357,498 | 177,962 | 123,546 | 86,211 | 15,403 | 17,410 | 17,514 | 15,610 | 78,988 | 143,435 | 225,260 | 1,735,352 |
| Utilities-Water & Sewer | 9,691 | 9,193 | 7,991 | 9,628 | 15,906 | 19,488 | 24,274 | 20,547 | 15,285 | 11,998 | 14,130 | 9,113 | 167,244 |
| Utilities-Telephone | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 45,123 |
| Utilities-Tel (Mobile) | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 17,337 |
| Electrical-R&M | 3,500 | | 800 | | | 800 | | | 800 | | | 800 | 6,700 |
| Electrical (Exterior)-R&M | 1,500 | 2,500 | | 3,500 | 1,500 | | 9,800 | 2,500 | 40,000 | 1,500 | 1,500 | | 64,300 |
| Electrical-Supplies | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Meter Reading Service | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 14,412 |
| Elevator Contract | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 56,335 | 56,335 | 654,354 |
| Elevator-R&M | | 750 | | 6,600 | 750 | 750 | 11,500 | 12,250 | 5,950 | 5,550 | 4,475 | 11,500 | 40,656 |
| Elevator-Inspections | | | | 4,950 | | | | | | | | | 10,100 |
| HVAC Contract | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 266,170 |

Database: NIGHTINGALE
ENTITY: 1500MKT

**Budget Report**
**Nightingale Properties**
**NG 1500 Market Street LLC**

Budget amounts from 01/23 to 12/23

Accrual Tax Basis

Page: 2
Date: 1/19/2023
Time: 9:36 AM

| Account | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HVAC-R&M | 79,500 | 9,050 | 67,000 | 13,000 | 4,500 | 29,000 | 70,000 | 64,500 | 9,800 | 0 | 4,500 | 0 | 321,850 |
| HVAC-Supplies | 29,000 | 0 | 0 | 1,500 | 0 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 61,000 |
| System Chemical Treatment | 3,409 | 3,409 | 3,409 | 0 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 40,907 |
| Plumbing-R&M | 30,000 | 13,000 | 12,000 | 6,650 | 3,000 | 3,000 | 9,500 | 7,400 | 12,000 | 11,500 | 3,000 | 3,000 | 108,050 |
| Janitorial Contract-Offic | 195,762 | 230,093 | 230,093 | 196,203 | 196,203 | 196,203 | 196,203 | 196,203 | 230,093 | 196,135 | 202,385 | 245,859 | 2,511,810 |
| Janitorial-Supplies | 7,000 | 11,845 | 11,845 | 7,000 | 7,000 | 9,000 | 7,000 | 9,700 | 7,000 | 7,545 | 7,000 | 7,000 | 94,090 |
| Window Cleaning | 4,307 | 0 | 3,162 | 17,636 | 0 | 0 | 37,133 | 8,707 | 7,020 | 7,020 | 0 | 7,000 | 74,803 |
| Trash Removal Contract | 2,212 | 3,212 | 2,449 | 2,212 | 2,212 | 2,412 | 2,212 | 2,212 | 4,162 | 2,212 | 2,212 | 2,412 | 30,844 |
| Landscape Maint. Contract | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 24,581 |
| Interior Plant Contract | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 1,584 |
| Interior Contract-Off | 3,872 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 2,449 | 30,844 |
| Exterminator Contract-Off | 508 | 508 | 508 | 508 | 508 | 852 | 852 | 852 | 852 | 852 | 508 | 508 | 8,518 |
| Security Systems-R&M | 76,292 | 76,292 | 92,283 | 76,292 | 76,292 | 76,292 | 76,292 | 76,292 | 76,292 | 76,292 | 76,292 | 80,492 | 983,663 |
| Security-Other | 5,775 | 5,975 | 53,215 | 50,542 | 5,975 | 274,088 | 10,443 | 5,975 | 8,275 | 27,891 | 5,975 | 7,075 | 461,210 |
| Fire & Life Safety Contra | 767 | 167 | 767 | 167 | 767 | 167 | 167 | 167 | 167 | 167 | 767 | 767 | 5,600 |
| Bldg Interior Maint-R&M | 13,820 | 13,820 | 13,820 | 19,820 | 13,820 | 15,820 | 15,820 | 28,820 | 60,820 | 13,820 | 13,820 | 13,820 | 235,844 |
| Bldg Exterior Maint-R&M | 3,756 | 2,256 | 4,456 | 15,756 | 5,256 | 23,863 | 5,106 | 3,756 | 71,766 | 2,256 | 5,256 | 4,456 | 128,529 |
| Glass/Windows-R&M | 2,400 | 1,200 | 6,923 | 38,450 | 5,200 | 0 | 23,863 | 0 | 101,623 | 0 | 5,200 | 8,923 | 193,782 |
| Signage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000 |
| Seasonal Decorations | 0 | 2,500 | 0 | 0 | 0 | 0 | 2,500 | 0 | 0 | 0 | 0 | 0 | 5,000 |
| Roof-R&M | 0 | 0 | 0 | 2,000 | 0 | 0 | 0 | 5,000 | 2,000 | 950 | 1,000 | 33,421 | 33,421 |
| Snow Removal Svcs & Suppl | 6,601 | 2,579 | 2,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11,679 |
| General Maintenance-R&M | 150 | 3,100 | 1,250 | 150 | 3,500 | 1,250 | 3,250 | 0 | 1,250 | 150 | 150 | 1,500 | 15,300 |
| Uniforms-Contract | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 16,314 |
| Property Insurance | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 584,640 |
| Real Estate Taxes | 473,756 | 473,756 | -989,290 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 4,222,028 |
| U&O Passtru | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 7,611 |
| Business & Occupation Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48,336 |
| *Salaries | 55,773 | 55,773 | 55,773 | 48,336 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 110,773 | 724,282 |
| Salaries - Maintenance | 126,740 | 129,033 | 153,167 | 129,033 | 129,033 | 153,167 | 153,167 | 129,033 | 153,167 | 129,033 | 129,761 | 208,895 | 1,699,094 |
| Management Fees | 63,421 | 62,877 | 62,877 | 63,053 | 63,403 | 64,382 | 64,241 | 64,253 | 64,396 | 64,635 | 65,087 | 60,395 | 763,565 |
| Office Rent | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 163,575 |
| IT Repairs & Maint | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Office Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 900 |
| Postage & Delivery | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 1,613 |
| Computer Equipment Exp. | 633 | 633 | 1,443 | 1,443 | 633 | 1,443 | 633 | 633 | 1,443 | 633 | 633 | 1,443 | 10,839 |
| Computer Softare Purch & | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27,034 |
| Office Equipment-Contract | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Rght Software Fees | 2,642 | 2,642 | 2,642 | 3,417 | 2,642 | 2,487 | 2,642 | 2,642 | 2,487 | 3,417 | 2,642 | 2,487 | 40,564 |
| Website Expense | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 8,100 |
| Marketing/Advertising Exp | 0 | 0 | 0 | 0 | 5,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,500 |

Case 2:23-cv-00146-NIQA   Document 20   Filed 04/14/23   Page 35 of 37

Database: NIGHTINGALE
ENTITY: 150MKT

**Budget Report**
Nightingale Properties
NG 1500 Market Street LLC

Page: 3
Date: 1/19/2023
Time: 9:36 AM

Accrual Tax Basis

Budget amounts from 01/23 to 12/23

| | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tenant Relations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 1,500 |
| Meals & Entertainment | 0 | 0 | 1,325 | 0 | 0 | 1,325 | 0 | 0 | 1,325 | 0 | 0 | 1,325 | 5,300 |
| Travel | 0 | 0 | 875 | 0 | 0 | 875 | 0 | 0 | 875 | 0 | 0 | 875 | 3,500 |
| Dues & Subscriptions | 4,310 | 1,200 | 1,450 | 1,195 | 200 | 200 | 200 | 1,450 | 200 | 200 | 4,900 | 1,700 | 17,205 |
| Bank Fees | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 |
| RE/E Tax Consultant Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500 | 0 | 0 | 500 |
| Accounting | 0 | 0 | 0 | 57,850 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 57,850 |
| Legal Recoverable | 289,769 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 289,769 |
| Administrative-Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Bldg Exterior Maint-R&M-N | 0 | 0 | 6,500 | 0 | 30,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36,500 |
| U&O Passthru-NPT | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 163,350 |
| U&O tax-NPT | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 1,645,897 |
| Mgmt Software Fees - NPT | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 15,986 |
| Marketing/Advertising-NPT | 1,000 | 4,500 | 1,000 | 1,000 | 1,000 | 1,000 | 4,500 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 19,000 |
| Tenant Relations-NPT | 0 | 3,400 | 200 | 0 | 0 | 200 | 3,500 | 0 | 200 | 0 | 0 | 15,200 | 22,700 |
| Space Planning Fees-NPT | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Legal Fees-NPT | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 140,000 |
| LLC Fees-NPT | 0 | 0 | 1,859 | 1,200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,059 |
| Tenant Work Order Expense | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 55,000 |
| **TOTAL EXPENSES** | 2,467,443 | 1,925,873 | 473,891 | 1,907,541 | 1,882,757 | 2,003,179 | 1,769,929 | 1,725,488 | 1,932,765 | 1,657,349 | 1,726,192 | 2,016,176 | 21,288,613 |
| **NET OPERATING INCOME** | 1,123,441 | 1,645,146 | 3,068,433 | 1,394,770 | 1,886,517 | 1,614,744 | 1,840,974 | 1,886,307 | 1,705,113 | 1,992,514 | 1,946,704 | 1,428,264 | 21,532,926 |

## Schedule A

(Service Contracts to be Assumed)

| NAME OF CONTRACT | PARTIES | DATE OF CONTRACT | TYPE OF CONTRACT |
|---|---|---|---|
| Veolia Energy Philadelphia, Inc. Steam Service Agreement | Veolia Energy Philadelphia, Inc. ("Company")<br><br>Nightingale Realty, LLC ("Customer") | 3/1/20 | Steam Purchase Agreement |
| Aggressive Energy Electricity Sales Agreement | Aggressive Energy, LLC ("Seller")<br>NG 1500 Market St., LLC ("Buyer") | 3/26/20 | Electric Supply Purchase Agreement |
| Nightingale Realty Service Agreement | Schindler Elevator Corporation ("Contractor")<br><br>Nightingale Realty, LLC ("Manager") on behalf of NG 1500 Market Street, LLC ("Owner") | 10/1/18 | Elevator Maintenance Contract |
| Comcast Business Service Order Agreement | Comcast Business<br><br>Nightingale Realty LLC AAF NG 1500 Market St LLC ("Customer") | 9/22/22 | Building Phone IP Address Contract |
| Lumen | Centurylink Communications, LLC D/B/A Lumen Technologies Group ("Lumen")<br><br>1500 Market Street, Philadelphia, PA | 10/21/22 | Building Phone System Circuits Contract |
| Ooma Quote Summary | Ooma Enterprise<br><br>Nightingale Realty LLC As Agent for NG 1500 Market St. LLC ("Customer") | 9/22/22 | Building Phone System Contract |
| Nightingale Realty Service Agreement | The Arthur Jackson Company ("Contractor")<br><br>Nightingale Realty, LLC ("Manager" on behalf of Borrower) | 6/6/19 | Janitorial Services Contract |
| Nightingale Realty Service Agreement | Universal Protection Services, LP n/k/a Allied Universal ("Contractor")<br><br>Nightingale Realty, LLC ("Manager" on behalf of Borrower) | 6/10/19 | Building Security Contract |
| Nightingale Realty Service Agreement | ABM Industry Groups, LLC ("Contractor")<br><br>Nightingale Realty, LLC ("Manager" on behalf of Borrower) | 2/1/18 | HVAC Maintenance, Repair, and Service Contract |

## Schedule B

(Leasing Agent Commission)

| **OFFICE:** | | **% of Base Rent** |
|---|---|---|

**New Lease and Expansions:**

| With a Cooperating Broker: | Years 1-10 | 4% to the Cooperating Broker 2% over-ride to Listing Broker |
|---|---|---|
| | Years 11-15 | 2% to the Cooperating Broker 1% over-ride to Listing Broker |

**New Lease and Expansions:**

| Direct Deal Without Cooperating Broker | Years 1-10 | 4% to Listing Broker |
|---|---|---|
| | Years 11-15 | 2% to Listing Broker |

**For Renewals:**

| With a Cooperating Broker: | Years 1-10 | 4% to the Cooperating Broker 2% over-ride to Listing Broker |
|---|---|---|
| | Years 11-15 | 2% to the Cooperating Broker 1% over-ride to Listing Broker |
| Direct Deal Without Cooperating Broker | Years 1-10 | 2% to Listing Broker |
| | Years 11-15 | 1% to Listing Broker |

| **RETAIL:** | | **% of Gross Rent** |
|---|---|---|

**New Lease and Expansions:**

| Direct Deal Without Cooperating Broker | Years 1-15 | 4% to Listing Broker |
|---|---|---|
| With a Cooperating Broker: | Years 1-15 | 6% to Listing Broker (shared per separate agreement with tenant's broker) |

# Exhibit B

# Buchanan

**Christopher P. Schueller**
412 562 8432
christopher.schueller@bipc.com

Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA  15219-4413

T 412 562 8800
F 412 562 1041

October 18, 2023

<u>**VIA OVERNIGHT DELIVERY**</u>

NG 1500 Market St, LLC
c/o The Nightingale Group
1430 Broadway, Suite 1605
New York, NY 10018

Nightingale Group, LLC
512 West 22nd Street, 8th Floor
New York, NY 10011

      **Re:  1500 Market Street (the "Property")**, NG 1500 Market St, LLC
      ("**Borrower**") and Nightingale Group, LLC ("**Manager**")

Dear Sir or Madam:

      We represent CBRE, Inc. who was appointed receiver ("**Receiver**") under an Order dated April 14, 2023 ("**Receivership Order**") in a case in the United States District Court for the Eastern District of Pennsylvania, entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG Market St. LLC*, Case Number 2:23-cv-00146-NIQA.

      Under Section 1(b) of the Receivership Order, the Receiver has the power to:

      collect (by causing the same to be paid into the Clearing Account) the rents, issues, account receivables, insurance claim proceeds, real estate tax refunds, utility deposits, and profits from the Property for any time period (but, in each of the foregoing cases, excluding any amounts in the Clearing Account or the Cash Management Account, including, but not limited to, any Reserve Funds, and excluding any amounts (i) received by Borrower prior to the occurrence of a Cash Sweep Period, (ii) received by Borrower (with Lender's permission) from the Cash Management Account during the duration of a Cash Sweep Period and used (or being used) to pay Property related expenditures approved by the Lender or (iii)

October 18, 2023
Page - 2 -

received by Borrower from the City of Philadelphia on account of refunds of Philadelphia Use and Occupancy payments to tenants as a result of the successful tax appeal of a prior year's real estate tax assessment and used (or being used) to either make refunds to tenants of such Philadelphia Use and Occupancy tax payments or (to the extent of any amounts not needed for such purpose) to pay Property related expenditures approved by the Lender (the amounts received by Borrower referenced in preceding clauses (i), (ii) and (iii) collectively "**Permitted Borrower Cash Receipts**"), and to collect and disburse security deposits.

The Receiver has identified in the Borrower's April 2023 financial statements that Permitted Borrower Cash Receipts included a cash deposit account containing $140,219.14. In addition, the Receiver has a record of a deposit made by the Borrower in connection with a refund of Philadelphia Use and Occupancy taxes ("**Tax Refund**") in the amount of $747,883.20. Under the Receivership Order, the Borrower and Manager are required to either (i) reimburse tenants their pro rata share of the Tax Refund, or (ii) use the Tax Refund and other Permitted Borrower Cash Receipts for Property related expenses.

To ensure Borrower and Manager compliance with the Receivership Order, please provide an accounting of the above referenced Permitted Borrower Cash Receipts no later than November 1, 2023. If the Borrower and Manager fail to provide an accounting of the Permitted Borrower Cash Receipts by November 1, 2023, you will be considered in contempt of the Receivership Order and the Receiver will pursue contempt sanctions against you.

This letter is not an attempt to enumerate all claims that the Receiver may have against the Borrower and Manager. The Receiver has not agreed to forbear from exercising any of its rights and remedies, but rather reserves the right to take such action at such time as the Receiver deems necessary and appropriate in order to protect its interests. The Receiver hereby expressly reserves all of its rights and remedies in this matter.

Very truly yours,

*/s/ Christopher P. Schueller*
Christopher P. Schueller

CPS/st

cc:  Leena Daniel (by electronic mail only at *ldaniel@thenggroup.com*)
77942-9

4855-6185-3831, v. 1

# Exhibit C

**From:** Silverman, Robert A. <rsilverman@cozen.com>
**Sent:** Wednesday, August 14, 2024 9:10 AM
**To:** Christopher Schueller <christopher.schueller@bipc.com>
**Subject:** 1500 Market-Response to October 18, 2023 Request for Information from Chris Schueller

Good morning Chris. In response to the request for information in your October 18, 2023 letter (copy attached), I received the following explanation (together with the other attachments to this e-mail).

The $140,219.42 shown on the April 2023, Financial Statement was for payment of Operating Expenses, please see attached bank statements showing the activity in the account from May through closure. WF issued a Cashier's Check to NG when the account was closed in the amount of $ 65,544.23.

The $747,683.20 in question was deposited into an Owner maintained (Insurance) Reserve Account. Those funds were then used to fund the shortfall in the SD account of $486,469.01 as funds from the SD account were needed and used to fund Operating Expenses of the property. WF issued a Cashier's Check to NG when the account was closed in the amount of $262,070.82.

The $65k and $262k above were then applied to outstanding amounts due NG (see details below)

| NGRLTY LLC | | | |
|---|---|---|---|
| Nightingale Realty LLC | | | |
| 150MKT_00013 | 2/15/2023 | 150MKT01/23 Management Fee | 64,636.26 |
| 150MKT_00014 | 3/16/2023 | 150MKT02/23 Management Fee | 72,903.20 |
| Vendor NGRLTY | | | |
| Totals: | | | 137,539.46 |
| NITE1A | | | |
| Nitesky Management LLC | | | |
| 150MKT_00001 | 4/13/2023 | 150MKT03/23 Management Fees | 77,007.63 |
| 1500MKT0423P | 4/17/2023 | 150MKT FE 4/30/23 - 2022 Holiday Part | 556.00 |
| 150MKT_00002 | 5/5/2023 | 150MKT04/23 management fees | 61,061.59 |
| Vendor NITE1A | | | |
| Totals: | | | 138,631.22 |
| Totals: | | | 276,170.68 |

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

# Exhibit D

# Buchanan

**Christopher P. Schueller**
412 562 8432
christopher.schueller@bipc.com

Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413

T 412 562 8800
F 412 562 1041

**BORROWER IS IN CONTEMPT OF COURT AND UNLESS BORROWER TURNS PROPERTY OVER TO THE RECEIVER IMMEDIATELY THE RECEIVER WILL FILE A CONTEMPT MOTION AGAINST BORROWER TO PUNISH BORROWER'S CONTEMPT OF COURT. IF THIS HAPPENS, THE COURT MAY THEN ISSUE A PUNISHMENT AGAINST BORROWER WHICH MAY CONSIST OF A FINE OR IMPRISONMENT, OR BOTH, ACCORDING TO LAW.**

May 23, 2025

**BY OVERNIGHT COURIER**

Robert Silverman, Esq.
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103

Re:     *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG Market St. LLC*, Case Number 2:23-cv-00146-NIQA

Dear Mr. Silverman:

We represent CBRE, Inc. in its capacity as receiver ("**Receiver**") in the above-captioned litigation proceeding concerning, among other things, property in the City of Philadelphia commonly known as 1500 Market Street (the "**Property**"). The Court appointed the Receiver pursuant to an order dated April 14, 2024 ("**Receivership Order**"). I enclose a copy of the Receivership Order. For the reasons discussed below, NG 1500 Market St, LLC ("**Borrower**") and its officers, employees and agents are currently in contempt of the Receivership Order.

As has been addressed in my prior correspondence, under Section 1(b) of the Receivership Order, the Receiver has the power, among other things, to:

> collect (by causing the same to be paid into the Clearing Account) the rents, issues, account receivables, insurance claim proceeds, real estate tax refunds,

May 23, 2025
Page - 2 -

utility deposits, and profits from the Property for any time period (but, in each of the foregoing cases, excluding any amounts in the Clearing Account or the Cash Management Account, including, but not limited to, any Reserve Funds, and excluding any amounts (i) received by Borrower prior to the occurrence of a Cash Sweep Period, (ii) received by Borrower (with Lender's permission) from the Cash Management Account during the duration of a Cash Sweep Period and used (or being used) to pay Property related expenditures approved by the Lender or (iii) received by Borrower from the City of Philadelphia on account of refunds of Philadelphia Use and Occupancy payments to tenants as a result of the successful tax appeal of a prior year's real estate tax assessment and used (or being used) to either make refunds to tenants of such Philadelphia Use and Occupancy tax payments or (to the extent of any amounts not needed for such purpose) to pay Property related expenditures approved by the Lender (the amounts received by Borrower referenced in preceding clauses (i), (ii) and (iii) collectively "**Permitted Borrower Cash Receipts**"), and to collect and disburse security deposits.

(Receivership Order, Section 1(b)).

The Receiver, through counsel, previously identified (and called to the Borrower and counsel's attention) in the Borrower's April 2023 financial statements that Permitted Borrower Cash Receipts included a cash deposit account containing $140,219.14 (the "**Cash Deposit**"). In addition, the Receiver has a record of a deposit made by the Borrower in connection with a refund of Philadelphia Use and Occupancy taxes related to the Property (the "**Tax Refund**") in the amount of $747,883.20.

## The Cash Deposit

With respect to the Cash Deposit, your client's previous response indicated that the majority of the Cash Deposit was used for Property related operating expenditures; however, a remaining balance of $65,544.23 (the "**Account Closure Proceeds #1**") was issued to Borrower when the relevant account was closed. Borrower has provided no explanation or evidence that the Account Closure Proceeds #1 were used in a manner consistent with the Receivership Order. The Receiver also lacks any information or records regarding the use or whereabouts of the Account Closure Proceeds #1. As a result, the Account Closure Proceeds #1 have been handled by Borrower in violation of the Receivership Order and must be immediately turned over to the Receiver.

## The Tax Refund

With respect to the Tax Refund, your client's previous response indicated that the majority of the Tax Refund was used for Property related operating expenditures ($486,469.01); however,

May 23, 2025
Page - 3 -

a balance of $262,070.82 (the "**Account Closure Proceeds #2**") was issued to Borrower when the relevant account was closed.  Borrower has explained that the Account Closure Proceeds #2 were then used to pay Borrower and/or its affiliates' management fees.

The Receivership Order prohibits all of the foregoing with respect to the Tax Refund.  First, the Receivership Order requires that *all* of the Tax Refund be refunded to tenants of the Property. The Borrower has not identified, nor is the Receiver aware of, any explanation or evidence as to why the Tax Refund would constitute funds "not needed for [the tenant refund] purpose."  As a result, there was no basis to use the Tax Refund for Property related operating expenditures. Further, with respect to Account Closure Proceeds #2, nothing in the Receivership Order nor in any instructions from the Lender authorized the Borrower to retain and apply such funds to pay management fees.  As a result, the entire Tax Refund has been handled by Borrower in violation of the Receivership Order and must be immediately turned over to the Receiver.

### Demand for Turnover

The Receiver hereby demands that the Borrower pay to the Receiver $813,427.43 which represents the amounts improperly diverted by the Borrower and its agents in violation of the Receivership Order.  If the Receiver does not receive this payment within ten (10) days of the date of this letter, the Receiver will proceed with a contempt motion against Borrower and its officers, employees and agents.

Very truly yours,

*/s/ Christopher P. Schueller*
Christopher P. Schueller

CPS/st
Enclosure
77942-9

4933-0707-3606, v. 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WELLS FARGO BANK,** | : | **CIVIL ACTION** |
| **NATIONAL ASSOCIATION, AS** | : | |
| **TRUSTEE, FOR THE BENEFIT OF** | : | **NO. 23-146** |
| **REGISTERED HOLDERS OF J.P.** | : | |
| **MORGAN CHASE COMMERCIAL** | : | |
| **MORTGAGE SECURITIES TRUST** | : | |
| **2020-MKST COMMERCIAL** | : | |
| **MORTGAGE PASS-THROUGH** | : | |
| **CERTIFICATES, SERIES 2020-** | : | |
| **MKST, THE RR INTEREST** | : | |
| **OWNER AND THE FUTURE** | : | |
| **ADVANCE LENDER** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NG 1500 MARKET ST. LLC** | : | |
| *Defendant* | : | |

## CONSENT ORDER APPOINTING RECEIVER
## PURSUANT TO MOTION OF PLAINTIFF

**AND NOW**, this 14th day of April 2023, upon consideration of the *motion for appointment of receiver* filed by Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender, [ECF 5], Defendant's responses thereto, [ECF 13, 14, 15, 16], and parties' Stipulation consisting of the Consent Order appointing Receiver, [ECF 17], it is hereby **ORDERED** that the *motion for appointment of receiver*, [ECF 5], is **GRANTED**, and the *Stipulation for the Consent Order* is **APPROVED**, as submitted as follows:

Plaintiff Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial

Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender ("**Lender**") is the holder of a certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated to be effective as of December 6, 2019, and recorded with the Department of Records of Philadelphia County, Pennsylvania on December 12, 2019, as Document No. 53604614 (as assigned to Lender by that certain Assignment of Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated to be effective as of February 19, 2020, and recorded with the Department of Records of Philadelphia County, Pennsylvania on April 30, 2020, as Document No. 53662686, and at any time modified, the "**Mortgage**; the Mortgage and the other loan documents with respect to the Property executed by Defendant and relating to the loan (the "**Loan**") referenced in the Mortgage, the "**Loan Documents**").

Lender has filed a Motion for Appointment of a Receiver (the "**Motion**"), seeking the appointment of a receiver to take possession of, secure, and administer certain real property located at 1500 Market Street, Philadelphia, Pennsylvania 19102 and the improvements thereon as described with particularity in the Mortgage (collectively, the "**Real Property**") and the personal property (excluding cash) owned by Defendant (described with particularity in the Mortgage and collectively, to the extent subject to the security interest of the Mortgage hereinafter called the "**Personal Property**"; and together with the Real Property, the "**Property**").

 The Court, being fully advised and informed on the above-captioned matter and for good cause shown, hereby FINDS that:

A.      Defendant NG 1500 Market St. LLC ("**Borrower**") is a Delaware limited liability company doing business in Philadelphia County, Pennsylvania.

B. This Court has jurisdiction over the subject matter of this case and personal jurisdiction over the parties. Venue is proper in this Court.

C. Borrower and Lender have consented to the entry of this Order.

D. This Court is authorized to appoint a receiver for the Property under Fed. R. Civ. P. 66.

E. CBRE, Inc. (the "**Receiver**") is an experienced and qualified real estate property management company and, through its employee, John Svorcek, is willing to serve as receiver for the Property.

F. Just cause has been shown that the Motion should be granted and that the Receiver should be appointed for the Property.

G. Although this Order is effective immediately, the term of the receivership contemplated by this Order shall not commence until 12:01 a.m. on the Turnover Date. The term "**Turnover Date**" shall mean the fifth (5th) business days from the date of entry of this Order, but if such fifth (5th) business day is within 10 calendar days from the end of the month, then the "**Turnover Date**" shall mean the later of (i) 5 business days from the date of entry of this order or (ii) the first day of the calendar month which immediately succeeds the date of entry of this Order.

H. Pursuant to the terms of a Cash Management Agreement dated December 6, 2019 (the "**Cash Management Agreement**") executed in connection with the Loan, all rents, revenues and income from the Property are initially deposited into a "**Clearing Account**" (also referred to as the "**Lockbox Account**" in Section 2.6.1 of the Loan Agreement) and are then swept (less any minimum balance required to be maintained in the Clearing Account) into a "**Cash Management Account**." Funds are disbursed from the

Cash Management Account on a monthly basis to Borrower to pay Operating Expenses (as defined in the Loan Agreement) in accordance with an approved annual budget as well as certain other Extraordinary Expenses (as defined in the Loan Agreement) approved by Lender. The Cash Management Agreement also provides (i) for the creation of certain reserve and escrow subaccounts (including, without limitation, a certain Tax and Insurance Escrow Account) and for the payment or disbursement by Lender from these subaccounts for their intended purposes (the amounts in such subaccounts, the "**Reserve Funds**") and (ii) for the application by the "**Deposit Bank**" of funds on deposit in the "**Deposit Bank Account**" towards "**Deposit Bank Fees**."

I.     It is the intention of the Lender and Borrower that during the term of the receivership created by this Order, all rents, revenues and income from the Property shall continue to be initially deposited into the Clearing Account and then swept (less any minimum balance required to be maintained in the Clearing Account) into the Cash Management Account but that any funds otherwise payable to Borrower for Operating Expenses or Extraordinary Expenses under the terms of the Cash Management Agreement shall be delivered to the Receiver (instead of being delivered to Borrower), with Lender disbursing funds held in escrow for taxes and insurance as requested by the Receiver and in order to protect and preserve the Property, and with Lender generally being obligated to provide funds to the Receiver in order to enable the Receiver to pay Operating Expenses in accordance with a preapproved budget, all as set forth in more detail below in this Order.

J.     The portion of the Property which is comprised of the Real Property and the tangible personal property (excluding cash) owned by Borrower and located within or about the Real Property is hereinafter called "**1500 Market**."

4

IT IS THEREFORE ORDERED THAT:

1.     Effective on the Turnover Date, the Receiver shall have possession of the Property (subject to the rights of tenants and licensees and subject to the right of Borrower to retain copies of its files and records and documents, including contracts, pertaining to the Property and to otherwise engage in activities with respect to the same as may be specifically authorized by this Order), the right to receive copies of documents and information as provided for in Sections 6 and 7 below and full power and authority to operate and manage 1500 Market and to conserve the Property. Without limiting the foregoing, the Receiver shall have the power and authority to, upon the Turnover Date, and without further approval of the Court:

        (a)     secure tenants and execute, modify, and terminate leases for 1500 Market, the duration and terms of which are reasonable and customary for the type of use involved, and such leases shall have the same effect as if made by the Borrower (except that Borrower shall have no liability with respect to any action or omission by the Receiver related to the securing of tenants or the execution, modification or termination of leases from or after the Turnover Date, however, it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents);

        (b)     collect (by causing the same to be paid into the Clearing Account) the rents, issues, account receivables, insurance claim proceeds, real estate tax refunds, utility deposits, and profits from the Property for any time period (but, in each of the foregoing cases, excluding any amounts in the Clearing Account or the Cash Management Account, including, but not limited to, any Reserve Funds, and excluding any amounts (i) received by Borrower prior to the occurrence of a Cash Sweep Period, (ii) received by Borrower (with Lender's permission)

5

from the Cash Management Account during the duration of a Cash Sweep Period and used (or being used) to pay Property related expenditures approved by the Lender or (iii) received by Borrower from the City of Philadelphia on account of refunds of Philadelphia Use and Occupancy payments to tenants as a result of the successful tax appeal of a prior year's real estate tax assessment and used (or being used) to either make refunds to tenants of such Philadelphia Use and Occupancy tax payments or (to the extent of any amounts not needed for such purpose) to pay Property related expenditures approved by the Lender (the amounts received by Borrower referenced in preceding clauses (i), (ii) and (iii) collectively "**Permitted Borrower Cash Receipts**"), and to collect and disburse security deposits;

(c)     maintain appropriate insurance for the Property against loss by fire or other casualty, which shall include but is not limited to the following coverages, from any insurer or prospective insurer: property, liability (and excess liability), auto liability, workers compensation, employment practices liability, employer liability, employee dishonesty, business interruption, boiler and machinery, builders risk, construction bonding, environmental, terrorism, other bonding, professional liability, and errors and omissions, in such amounts and with such coverage as are required under the Loan Documents. The Receiver is authorized to continue any current insurance policies in place that are in accordance with the requirements of the Loan Documents, and the Receiver may be added as an additional insured on such policy during the term of the receivership. With Lender's prior written approval, the Receiver may purchase such insurance as the Receiver deems appropriate and that is in accordance with the requirements of the Loan Documents.  All such insurance policies (i) shall name Lender as an additional insured, as mortgagee, and as loss payee with respect to all casualty policies, and with respect to any insurance purchased by the Receiver, and shall also name Borrower and any other person or

6

entity named on Borrower's existing insurance policies as an insured or additional insured as appropriate. The existing insurance policies maintained by Borrower may be cancelled by Borrower upon delivery to Borrower of evidence of insurance obtained by the Receiver (including a certificate of insurance), replacing the existing insurance policies, and only to the extent that the Receiver obtains new insurance coverage that in the Receiver's reasonable discretion and with Lender's reasonable approval covers the same risks and potential loss as were covered by the insurance policies maintained by Borrower prior to the entry of this Order (and, if it does not, Borrower shall only have the right to cancel such coverages, if any, which in the Receiver's and in the Lender's reasonable discretion are duplicative);

(d)     employ construction managers, general contractors, subcontractors, architects, engineers, consultants, title companies, environmental consultants, asset managers, property managers, leasing agents, administrative support, attorneys, security companies, custodians, janitors, maintenance workers, repairman, contractors, assistants, agents, accountants, and other employees reasonably deemed necessary, appropriate, or desirable to assist the Receiver in diligently executing the duties imposed upon the Receiver by this Order, including the maintenance and operation of 1500 Market;

(e)     pay taxes which may have been or may be levied against the Property and, if the Receiver deems appropriate, contest or appeal any real estate tax assessment or bill relating to the Property;

(f)     establish segregated bank accounts and utilize the tax identification number of the Borrower in so doing so long as Borrower continues to own 1500 Market;

(g)     receive, on Borrower's behalf, all disbursements of funds which are otherwise payable to Borrower from the Cash Management Account as contemplated by Recital I above;

(h)     hire or retain any agents necessary or appropriate to do any of the duties listed above without further approval of this Court, including accountants, attorneys, environmental consultants and personnel, brokers, leasing agents, and property managers (including the leasing and property management divisions of CBRE, Inc.);

(i)     operate 1500 Market under any and all existing agreements currently in place between Borrower and any third party, as the Receiver may determine in the Receiver's discretion (except that the existing property management agreement with Nightingale Realty, LLC, as property manager, shall be terminated as of the time immediately preceding the Turnover Date [which termination, for the avoidance of doubt, has been consented to by Lender] and a replacement property manager shall be retained by the Receiver) and Borrower shall have no liability for any obligations accruing under such existing agreements that the Receiver has assumed from and after the Turnover Date (the liability for the same being limited to the assets of the receivership created by this Order, and it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents);

(j)     terminate or enter into vendor or other contracts pertaining to the Property as Receiver may determine in its reasonable judgment are necessary, with no further obligation or liability on the part of Borrower or the Receiver (including but not limited to not having to pay any termination fees or severance benefits to any laid off or terminated employee) under, or related to, any terminated contract, except that the contracts listed on Schedule A attached hereto

shall be assumed by the Receiver and shall not be terminated (it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents);

(k)     procure or maintain utility services for 1500 Market, to include but not be limited to, gas, steam, electric, water, sewer, trash, phone, cable, internet, and snow removal, without suffering, regardless of the internal policies of any utility provider, the termination of such service or refusal to authorize any new account based upon previous unpaid bills for services rendered prior to the appointment of the Receiver or during the term of the Receiver, with any and all accounts to be opened in the Receiver's name (and any existing accounts shall be closed or be retitled in the name of the Receiver and Borrower shall be removed from any further obligation thereunder on account of services rendered or utilities furnished from and after the Turnover Date, with recourse therefor for utility service rendered from and after the Turnover Date to be limited to the assets of the receivership created by this Order) but still utilizing the Borrower's tax identification number, if applicable.

(l)     in accordance with Section 18 of this Order, take possession of all cash and funds derived from the Property belonging to or for the benefit of Borrower in bank accounts (no matter from what time period), whether in the name of 1500 Market Street, Borrower or its agents or employees, but excluding in each of the foregoing cases any amounts in the Clearing Account or Cash Management Account, including, but not limited to, any Reserve Funds, and excluding Permitted Borrower Cash Receipts, and to open bank accounts in the Receiver's name (segregated with respect to the Property) but still utilizing the Borrower's federal employer identification number;

9

(m)     manage, operate, lease, and market for lease 1500 Market;

(n)     if directed by the Lender, engage a sales broker and sell the Property (in each case with the prior approval of the Court and on such terms as may be set out in a separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order); and

(o)     take such other actions as may be reasonably necessary or prudent to manage and operate 1500 Market and to conserve the Property or as otherwise authorized by the Court (but the Receiver shall in no event have authority to cause the imposition of obligations or liabilities on Borrower).

2.     From and after the Turnover Date, the Receiver is authorized, without further leave of the Court, to defend or institute and prosecute suits or summary proceedings related to the Property or the duties imposed upon the Receiver by this Order (exclusive of the institution of suits or summary proceedings against Borrower or its property manager, other than for violations of this Order—it being understood that the Borrower's retention and use of Permitted Borrower Cash Receipts shall not constitute a violation of this Order), including, without limitation, proceedings: (a) for the collection of rents, income, and other amounts (which includes but is not limited to tenants who have vacated their space); (b) for the removal of: (i) any tenant or tenants in default (whether for failure to pay rent or other amounts when due, or otherwise, including violation of the property rules), (ii) any tenant or tenants whose terms have expired and have not been renewed, or (iii) any other person(s) or entity(ies) unlawfully in possession of the Property; or (c) otherwise related to the Property or the duties imposed upon

10

the Receiver by this Order. This Order shall act as notice to all tenants of 1500 Market that 1500 Market is now under the control of the Receiver.

3.     From and after the Turnover Date, the Receiver may, without an order of the Court, delegate managerial functions to a person in the business of managing real estate of the kind involved who is financially responsible and prudently selected (including CBRE, Inc.). To the extent the Receiver receives sufficient receipts from the Property, and except to the extent ordered otherwise by the Court, the Receiver, from and after the Turnover Date:

(a)     shall maintain the existing casualty and liability insurance required in accordance with the Loan Documents at the time the Receiver took possession, or shall find more cost-effective replacement insurance of comparable coverage with replacement insurers in compliance with the provisions of Section 1(c) above;

(b)     shall use reasonable efforts to maintain 1500 Market in at least the same condition as existed at the time the Receiver took possession, excepting reasonable wear and tear and damage by any casualty, and shall cause compliance with the landlord's obligations under the leases of 1500 Market;

(c)     shall apply receipts in accordance with the provisions of this Order;

(d)     shall make other repairs and improvements necessary to comply with building, life-safety and other similar codes or with such other contractual obligations as affect 1500 Market, however, Receiver must obtain Lender's prior written approval (not to be unreasonably withheld, delayed or conditioned, except as to amounts described clause (iii) next following) for (i) any such single cost in excess of $5,000.00 not set forth in the Budget (as defined in Section 10 below), (ii) costs exceeding $15,000.00 in the aggregate not set forth in the Budget, and (iii) payment of unsecured indebtedness for borrowed money);

(e)      may hold receipts (to the extent remitted from the Cash Management Account to the Receiver) as reserves reasonably required for the foregoing purposes;

(f)      may take such other actions as may be reasonably necessary or prudent to manage and operate 1500 Market and to conserve the Property, or as otherwise authorized by the Court, provided sufficient funds are available and further provided that (i) in no event may the Receiver incur any obligations on behalf of the Borrower pursuant to the terms of this Order, recourse for all such obligations being limited to the assets of the receivership estate created by this Order, and (ii) no acts or omissions of the Receiver with respect to the receivership or this Order, or any obligations incurred or created by the Receiver, shall expose the Borrower to any personal liability notwithstanding anything to the contrary in the Loan Documents or this Order (and the Lender shall have no right to pursue Borrower on account of the same, however, it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the terms of the Loan Documents); and

(g)      may in its discretion pay any or all other outstanding obligations to suppliers or vendors as of the Turnover Date incurred in arm's length transactions who, prior to the Turnover Date, supplied materials, business supplies or labor to or for the benefit of the Property, but only to the extent the Receiver shall determine, in its sole judgment, that it is prudent to do so in order to maintain the business relationships with such suppliers or vendors for the benefit of the Property, provided sufficient funds are available from the Property, and without, by so doing, making the Receiver liable for any other antecedent debts relating to the Property.

4.      Irrespective of whether the Receiver decides to continue the services of any current employees, agents or other personnel with respect to the Property, neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be liable for any claims of any nature whatsoever of such employees, agents, or other personnel that arose prior to the Turnover Date or relate to agreements (which have not been assumed by the Receiver) entered into by the Borrower with its employees, agents or other personnel dated prior to the Turnover Date, which claims include severance payments, unpaid but accrued wages, unpaid but accrued sick time, unpaid but accrued vacation time, unpaid but accrued overtime, and any other liabilities related to unemployment or worker's compensation claims.  Notwithstanding the above, and for the avoidance of doubt, any leasing commission payment obligations of the Borrower which were earned before the Turnover Date, but which are payable after the Turnover Date, shall be paid by the Receiver.

5.      Except as provided in Section 24 below, the liability of the Receiver is and shall be limited to the assets of the receivership, and neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be personally liable for any duly authorized actions properly and lawfully taken pursuant to this Order.

6.      Within 10 business days of the entry of this Order unless otherwise indicated, Borrower and its agents shall provide or make available to the Receiver the following, to the extent such items and things exist and are in Borrower's possession or control:

(a)      Borrower's federal, state, and municipal employer and tax identification numbers;

(b)      Copies of any and all service contracts pertaining to the Property which are currently in effect;

13

(c)     Copies of any and all existing leases pertaining to 1500 Market and lease abstracts with respect to such existing leases;

(d)     A list of any and all bank accounts in the name of the Property, Borrower or 1500 Market Street (excluding the Cash Management Account and the Clearing Account), including the name or names of the institutions in which the accounts are located, any and all account numbers for each account, and monthly statements for each such account;

(e)     Prior to the Turnover Date, a complete set of keys and all security and access codes and cards to 1500 Market, and a schedule (including full contact information) identifying, to Borrower's knowledge, each person or entity (including security companies, municipal and governmental agencies and utility companies), who currently has one or more keys or access cards to 1500 Market or who has knowledge of any access codes thereto;

(f)     The lap top computers currently used in the management office at the Real Property by employees below the level of general manager and all copiers currently used in the management office at the Real Property;

(g)     (i) balance sheets, income statements and general ledgers relating to the Property for the last 3 years; (ii) access to the preventative maintenance and work order data maintained in the Angus system (subject to any required consent being obtained from the licensor of such Angus system); and (iii) all electronic data for all common area maintenance, operating expense and/or real estate tax reconciliations for each tenant for the past three years including, without limitation, all workbooks, calculations, spreadsheets and other supporting documentation; and

(h)     As soon as practicable and within such period of time as agreed to by the Receiver and Borrower, any and all other documents relating to the Property as specifically and

14

reasonably requested by the Receiver which may be necessary or pertinent to the Receiver's management, maintenance, operation or leasing of the Property (to the extent not subject to the attorney/client privilege or other privilege and to the extent not containing Confidential Information).

Borrower's obligation to make available information under Section 6(f) above shall be continuing until the earlier of (i) six (6) months from the Turnover Date or (ii) the date of a receiver's sale, foreclosure sale, other execution sale or the acceptance of a deed in lieu of foreclosure with respect to 1500 Market.

7.    Within 15 business days of the entry of this Order unless otherwise indicated, Borrower and its agents shall provide or make available to the Receiver the following, to the extent such items and things exist and are in Borrower's possession or control:

(a)    All open invoices for services or goods relating to 1500 Market;

(b)    In addition to the materials identified above, to the extent not subject to the attorney/client privilege or other privilege and to the extent not constituting information Confidential Information as hereinafter defined, (i) copies of any material agreements to which the Property is or may be subject (excluding documents relating to the Loan), (ii) a summary of amounts received from the tenants of 1500 Market, from the time Borrower took ownership of 1500 Market to the date of entry of this Order, (iii) copies of documents evidencing all liens or other monetary encumbrances on the Property (exclusive of the liens or encumbrances related to the Loan), (iv) current property tax bills, current assessment notices, and pleadings relating to any pending tax appeals (and appraisals submitted to the relevant taxing authorities or the applicable municipal body or court in connection with current pending tax appeals), (v) certificates and/or policies with respect to current insurance of all types for Borrower and tenants

15

(including but not limited to liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance and workmen's compensation) related to 1500 Market, (vi) copies of all current maintenance and service contracts to which Borrower or Nightingale Realty, LLC is a party relating to 1500 Market, (vii) copies of all outstanding invoices for services at 1500 Market, (viii) copies or originals of all tenant files with respect to existing leases, including but not limited to correspondence, leases, lease abstracts, CAM billing statements with respect to those leases from the time Borrower took ownership of 1500 Market to the date of entry of this Order, in each of the foregoing cases to the extent not subject to the attorney/client privilege or other privilege and to the extent not constituting Confidential Information, (ix) a current and accurate copy of all electronic information for items related to tenant escalations/reconciliations from the time Borrower took ownership of 1500 Market to the date of entry of this Order, (x) the current rent roll utilized by the Borrower in the operation of its business, and (xi) all marketing information (in hard copy and electronic format) currently used by Borrower in the operation of its business, including but not limited to brochures, photographs (including aerial), maps, and signage; notwithstanding the above, to the extent Borrower is subject to certain confidentiality agreements with respect to certain financial information concerning certain tenants and tenant guarantors at 1500 Market (the "**Confidential Information**"), Borrower will deliver such Confidential Information to Lender and Lender shall keep such Confidential Information confidential and use such Confidential Information only for the benefit of the Property.

(c)     Any and all insurance loss histories since Borrower acquired ownership of 1500 Market and documentation relating to any currently unresolved insurance claims with

16

respect to the Property (to the extent not subject to the attorney/client privilege or other privilege and to the extent not constituting Confidential Information).

8.      Borrower shall, at all times after the entry of this Order until the earliest of (i) termination of this Order, (ii) mutual agreement of Lender and Borrower or (iii) six (6) months from the Turnover Date: (a) reasonably cooperate with the Receiver in the transition of the management of 1500 Market to the Receiver on the Turnover Date (including, without limitation, by cooperating with the Receiver's efforts to obtain 3rd party access to the Borrower's Philadelphia Use and Occupancy Tax account through the Philadelphia Tax Center) and (b) timely respond to all reasonable requests for information in its possession or under its control relating to the management, leasing or operation of the Property made by the Receiver, except to the extent that any request represents information subject to the attorney/client privilege, other privilege or such information is Confidential Information. Furthermore, Borrower shall remain responsible to complete all 2022 common area maintenance, operating expense and real estate tax reconciliations under existing tenant leases at the Property (which shall be completed no later than April 30, 2023). The Receiver shall be responsible for such reconciliations for calendar year 2023 and thereafter during the term of the receivership.

9.      If the Lender or the Receiver desire Borrower's cooperation in the carrying out of the duties of the Receiver under this Order, and such cooperation is not already provided for in Sections 6 through 8 above, the Receiver or Lender may request that the Court order such cooperation, through a separate and subsequent order of the Court on such terms as may be set out in such separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order.

10. Lender shall arrange for the disbursement of funds from the Cash Management Account to the Receiver in accordance with the budget for the calendar year 2023 which has been previously approved by Lender, pursuant to Section 5.1.11(d) of the Loan Agreement, and the Receiver, a copy of which is attached hereto as **Exhibit 1**, as increased to reflect the Receiver's compensation provided for in this Order (the "**Budget**"). So long as any part of the Property remains in the Receiver's possession, the Receiver is directed to prepare and file with the Court, within 75 business days after the last day of the first month of the entry of this Order (and on or prior to each anniversary of such 75th day) a proposed 12-month budget for the operation of 1500 Market, which budget shall supersede and replace the budget on Exhibit 1 hereto. The budgets proposed by the Receiver shall be subject to the prior written approval of Lender, not to be unreasonably withheld. Lender shall arrange for the disbursement of funds from the Cash Management Account to the Receiver in accordance with the Budget; however, Lender shall not have any obligation to advance additional funds beyond those provided for in the Budget or to make protective advances to the receivership (it being understood and agreed that any such protective advances are discretionary by Lender and are authorized under Section 12 of this Order and that disbursements from the Cash Management Account are not considered protective advances). Any party having an objection to the Receiver's Budget shall file a written objection with the Court no later than the later of (i) 15 business days after the date of the Receiver's filing of the Budget, or (ii) 15 business days after the date the Budget is served upon such party if such party is required to be served with the Budget. The Receiver is further directed to serve copies of the Budget on (i) the attorneys of record for Lender, (ii) the attorney of record for Borrower and (iii) the Borrower at the address provided to the Receiver by the Borrower, and any other party to this lawsuit who submits a written request to the Court and the

18

Receiver, with such copies to be served within 15 calendar days following the filing of the Budget with the Court. Any objection not filed within the time prescribed by this Order shall be deemed waived. Notwithstanding the above, Lender and the Receiver may agree to amend the Budget in their sole discretion and as reflected in a supplemental report filed with the Court. To the extent Borrower objects to the amended Budget, Borrower shall file a written objection with the Court no later than the later of (i) 15 business days after the date of the Receiver's filing of the amended Budget, or (ii) 15 business days after the date the amended Budget is served upon Borrower. Any objection not filed within the time prescribed by this Order shall be deemed waived. Nothing in this Order is intended to limit the right of Lender to approve the funding of Extraordinary Expenses from the Cash Management Account or to restrict the Receiver from requesting Lender's approval of such Extraordinary Expenses pursuant to the terms of the Loan Agreement. To the extent such approval is obtained then the Budget shall be deemed modified to reflect such approval. To the extent Lender requires compliance with Section 3.6 of the Cash Management Agreement with respect to any period from and after the Turnover Date, the Receiver shall be responsible for such compliance.

11.     So long as any part of the Property remains in the Receiver's possession, the Receiver is directed to prepare and file with the Court, within 75 business days after the last day of the first month of the entry of this Order and no less frequently than every month thereafter, and within 90 days after termination of the receivership, a full and complete report, under oath, setting forth: (i) all receipts, disbursements, cash flow, and all changes in the assets in the Receiver's charge, or interests in or claims against the assets, that have occurred during the preceding month; (ii) (a) detailed rent roll showing the name of each tenant, and for each tenant, the space occupied, the lease commencement/expiration date, the rent payable, aged accounts

19

receivables, the rent paid to date, and the security deposit (if any) being held for said tenant, a comparative sales report for each tenant (with per square foot sales), if applicable under the leases, and a leasing activity report, each in reasonable detail, (b) an aged payables report and an aged receivables report, (c) a capital expenditures report including the type and amount of each capital expenditure made or proposed during the reporting period, and (d) bank statements with monthly reconciliations for the reporting month; (iii) the condition of 1500 Market; (iv) any recommendations as to actions needed to preserve and protect the Property or to otherwise carry out the Receiver's duties; (v) marketing and leasing efforts; (vi) the current status of all licenses, permits, and other governmental entitlements or approvals; (vii) a balance sheet, statement of income and expenses, statement of cash flows, and budget vs. actual comparison report; and (viii) any other information the Receiver determines is relevant to the receivership or the Property. The Receiver is further directed to serve copies of each report on (i) the attorneys of record for Lender, (ii) the attorney of record for Borrower and (iii) the Borrower at the address provided to the Receiver by the Borrower, and any other party to this lawsuit who submits a written request to the Court and the Receiver, with such copies to be served within 30 calendar days following the end of each calendar month. Any party having an objection to the Receiver's report shall file a written objection with the Court no later than the later of (i) 15 business days after the date of the Receiver's filing of the report or (ii) 15 business days after the date such report is served upon such party if such party is required to be served with such report. Any objection not filed within the time prescribed by this Order shall be deemed waived.

12. In the event Lender advances funds (other than disbursements from the Cash Management Account) pursuant to the terms of the Loan Documents (the "**Advances**") to the Receiver during the pendency of the receivership to enable the Receiver to perform its duties

hereunder, such Advances shall be considered part of the indebtedness secured by the lien of the Mortgage.

13.     The Receiver may at any time file a motion requesting that it be exonerated, discharged, and released from all its appointments as Receiver.

14.     The Receiver shall not have any responsibility for the preparation or filing of any tax return of any kind for Borrower or its direct or indirect members other than with respect to the Philadelphia Use and Occupancy Taxes applicable to 1500 Market (which the Receiver shall promptly prepare and timely file and accurately and timely report thereon any tenant delinquencies so as to avoid subjecting the landlord to liability for the applicable taxes) commencing with the report due on the 25th day of the calendar month in which the Turnover Date occurs, but shall, if so asked by Borrower, provide to Borrower within a reasonable time, at Borrower's expense, with information within Receiver's possession or control so that Borrower or its direct or indirect members may prepare and file any such returns.  The Receiver shall earmark all amounts collected with respect to the Philadelphia Use and Occupancy Taxes applicable to 1500 Market and the Receiver shall remit such amounts to the appropriate authorities in accordance with applicable law.

15.     From and after the Turnover Date, neither Borrower nor anyone associated therewith or acting under Borrower's authority or control shall:

(a)     possess or manage 1500 Market in any way or interfere with the activities of the Receiver authorized by this Order;

(b)     collect, withdraw, or transfer, in any way, funds or revenue derived from operation of the Property from and after the Turnover Date;

(c)     remove or destroy any tangible personal property from 1500 Market;

21

(d)  terminate or cause to be terminated any (i) license, (ii) permit, (iii) lease, (iv) contract relating to the maintenance, operation, leasing or management of 1500 Market, (v) insurance policy, or (v) agreement relating to the maintenance, operation, leasing or management of 1500 Market except as otherwise expressly provided in this Order and except that Borrower shall have the right to terminate, and be permitted to terminate, any license, permit, contract or insurance policy or agreement as to which (i) the Receiver (and Lender, to the extent its consent is required under the Loan Documents as to the termination of the same) have agreed, in writing, shall not be assumed by the Receiver (Receiver agreeing to confirm to Borrower in writing within the later of (A) 30 days of the entry of this Order or (B) 10 business days following the request of Borrower whether the license, permit, contract or insurance policy or agreement at issue is being assumed by the Receiver) or (ii) the Receiver does not pay any amounts payable with respect thereto accruing from and after the Turnover Date as and when due; or

(e)  otherwise interfere with Receiver's possession or operation of 1500 Market or the other activities of the Receiver authorized by this Order.

16.  Receipts received from the operation of the Property by the Receiver shall be applied in the following order of priority (unless expressly provided to the contrary elsewhere in this Order):

(a)  to payment of the Receiver's fees as to which the Receiver is entitled to payment pursuant to the terms of this Order;

(b)  to payment of authorized insurance premiums and to the payment of taxes and Center City District assessments on 1500 Market (to the extent the same are not paid directly by the Lender)[1];

---

[1] Lender, at its option, may fund the monthly payments contemplated by the Budget for these items (a) into a reserve maintained by the Receiver which shall be used to pay these items when due or (b) into the Tax and Insurance

(c)    to payment of reasonable and necessary expenditures associated with the Property that have accrued after the Turnover Date (including, without limitation, any parking taxes on parking revenue generated by the University of Pennsylvania Health System or its affiliates which are not the responsibility of the tenant under the Parkway lease for the parking garage) and any other amounts which the Receiver is entitled to incur, or be reimbursed for, under the terms of this Order which are not described in subsections (a) through (b) above;

(d)    to payment of the obligations owed to Lender under the Loan Documents for the Property, to the extent funds remain after payment of the foregoing; and

(e)    To the extent all amounts due and owing to Lender under the Loan Documents have been paid in full, any excess funds shall be held by the Receiver for payment to the Borrower upon termination of the receivership;

17.    Borrower, its agents and employees, shall turn over to the Lender, within 10 business days from the Turnover Date, all cash security deposits made under any lease of 1500 Market or any portion thereof and all letters of credit which secure obligations of any tenant under a lease for 1500 Market or any portion thereof.  Upon turning over such cash security deposits  and letters of credit to the Lender, Borrower shall not have any liability to the respective tenants for the remittance of the security deposits if and when the respective tenants are entitled to the return of the same pursuant to their leases and Borrower shall not have liability for any draw by the Lender or the Receiver on any such letter of credit, but only to the extent such cash security deposits or letters of credit have been turned over to the Lender (it being understood and agreed that nothing in this Order shall constitute a release of Borrower by Lender or a waiver of any of Lender's rights at law or in equity or a waiver or modification of any of the

24

Escrow Account (as defined in the Cash Management Agreement), which shall be used by the Lender to pay these items when due.

terms of the Loan Documents).  Upon receiving the cash security deposits and letters of credit referenced in this Section, Lender shall turn them over to the Receiver.

18.     Without duplication of Section 17 above, Borrower, its agents and employees, shall turn over to the Receiver, within 10 business days from the date this Order is entered, all sums (which are not Permitted Borrower Cash Receipts) in existence on or before the Turnover Date and held by Borrower or for the benefit of Borrower as of the Turnover Date and were derived from the Property, including, without limitation: (a) all cash in hand; (b) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments, which shall be endorsed to the Receiver without recourse); and (c) all sums held in accounts in any financial institutions, including (i) deposits held in escrow for any purpose (exclusive of tenant security deposits, which are addressed in Section 17 above), such as for payment of real estate taxes and insurance premiums, (ii) proceeds of insurance maintained for, or pertaining to, the Property, (iii) rent or prepaid rent, (iv) funds designated or intended for capital improvements, repairs, or renovations to, or in connection with, the Property, and (v) all other sums of any kind relating to the use, enjoyment, possession, improvement, or occupancy of all or any portion of the Property, but excluding in each of the foregoing cases Permitted Borrower Cash Receipts. Borrower hereby represents and warrants that as of April 10, 2023 it is holding $0 in cash or other sums or proceeds derived from the Property (excluding Permitted Borrower Cash Receipts) and expressly agrees to turn over such amounts to the Receiver within 10 business days from the date this Order is entered.  For the avoidance of doubt, the provisions of this Section 18 shall not apply to amounts held in the Clearing Account or in the Cash Management Account, including, but not limited to, any Reserve Funds, and shall also not apply to Permitted Borrower Cash Receipts.

19.     The Receiver shall post a bond of $ _____(zero if left blank), the cost of
which shall be an expense of the receivership.

20.     The Receiver shall be paid a one-time fee of $25,000.00 for transition of the
Property to the Receiver and a monthly fee for receivership services of $2,000.00. Any property
manager acting under Receiver's control shall be paid a monthly fee for property management
services calculated at the greater of 1.35% of gross revenue from the operations of 1500 Market
or $42,500.00 per month, plus payroll reimbursement for all personnel acting under the
Receiver's control at 1500 Market. Any leasing agent acting under Receiver's control shall be paid
as reflected on Schedule B attached hereto except that if Newmark is retained as leasing agent by
the Receiver pursuant to the existing Exclusive Right Agreement with Newmark, the fee schedule
in that agreement with Newmark shall govern and control during the term of that agreement. The
Receiver shall also be responsible for paying any amounts due to tenant broker's or tenant
representatives pursuant to existing agreements as of the Turnover Date with respect to
transactions effectuated from and after the Turnover Date. The Receiver may also be reimbursed
from the receivership estate for the cost of the receiver's bond required hereunder and for any
out-of-pocket costs and expenses which are set forth in the Budget and incurred outside the
ordinary course and scope of operating, leasing and managing the Property. The compensation set
forth in this paragraph shall be the sole compensation payable to the Receiver and any property
manager acting under its control without further order of the Court, notwithstanding any amount
of monies that may be distributed by the Receiver to Lender or any other person or entity in the
course of the receivership.

21.     Payment of the amounts set forth in the immediately preceding paragraph may be
made utilizing funds derived from operations of the Property or from any funds that may be

advanced by Lender (in its sole discretion) as reasonable and necessary costs for maintaining and preserving the Property pursuant to the Mortgage.

22.     No person or entity may file suit against the Receiver, in its capacity as Receiver, or the Receiver's agents, acting in such capacity, unless otherwise authorized in advance by this Court; provided, however, that no prior Court order is required to file a motion in this action to enforce the provisions of this Order or any other order of this Court.

23.     The Receiver, and those agents and any property manager and leasing agent acting under its control, shall have no liability in connection with any obligations owed by Borrower to its creditors on account of obligations accruing prior to the Turnover Date, and no creditor of Borrower, other than Lender, shall seize or attempt to seize any property, including the Property, delivered to the Receiver hereunder and no creditor, including any utility company, shall act to terminate any existing service either (a) as a means of attempting to collect an obligation of Borrower which accrued prior to the Turnover Date or (b) on account of an obligation of Borrower accruing prior to the Turnover Date.

24.     The Receiver, and those agents, and any property manager and leasing agent acting under its control, shall have no personal liability in connection with their conduct in the course of this receivership, except for claims due to their gross negligence, gross or willful misconduct or malicious acts.

25.     The Receiver may be removed upon 15 calendar days written notice by Lender that Lender desires such removal, with a copy of such notice lodged with the Court and Borrower, or upon an order of the Court, in which event the Court shall appoint a substitute receiver to be recommended by Lender and approved by Borrower (such approval not to be unreasonably withheld).

28

26.     Nothing contained in this Order shall be construed as obligating the Receiver to advance its own funds in order to pay the costs and expenses of the receivership that have been approved by Lender and the Court.

27.     The Receiver may apply at any time to the Court, with notice to all other parties in this case, for further instruction and for further power necessary to enable the Receiver to properly fulfill its duties.

28.     If there are any bonds, they shall be canceled, and the Receiver shall be discharged, upon the termination of this receivership and the Court's approval of the Receiver's final accounting.

29.     Except to the extent, if any, provided by the express terms of this Order, the entry of this Order shall not in any manner prejudice any of the other rights and remedies of Lender, Borrower (or any guarantor of the Loan) under the Loan Documents or under applicable law. For the avoidance of doubt, all holders of the notes secured by the Mortgage shall be bound by, and subject to the terms of, this Order applicable to the Lender.

30.     The entry of this Order shall not in any manner preclude any consensual resolution that may be reached between Lender and Borrower, and the Receiver shall abide by the terms of any such consensual resolution.

31.     Any action of the Receiver authorized in this Order shall require the consent of Lender if and when such action, if undertaken by Borrower, would require Lender's consent or authorization under any of the Loan Documents.

32.     Lender shall not become a mortgagee-in-possession as a result of this Order, and neither Lender nor the Receiver shall become responsible for any debts or obligations relating to the Property incurred prior to the Turnover Date, including assessments, real estate taxes,

environmental obligations, or any other obligations (unless, in each of the foregoing cases, otherwise expressly provided by this Order). Lender is not required to advance monies to cover operating deficits (it being understood that the release or disbursement of funds from the Cash Management Account shall not constitute an "advance" for this purpose), and the Receiver does not assume any personal liability for any obligations of the Property or Borrower or any of its respective agents except as provided in Section 24.

33.     Any utility company providing services to 1500 Market, including gas, electricity, water, sewer, trash collection, telephone, communications, or similar services, is prohibited from discontinuing service to 1500 Market based upon unpaid bills incurred by Borrower for service rendered prior to the Turnover Date. Further, such utilities are prohibited from demanding that the Receiver deposit funds in advance to secure such services.

34.     Except to the extent, if any, provided by the express terms of this Order, nothing set forth herein is intended and shall not be deemed to modify, limit, release, reduce, or waive any of Lender's or Borrower's (or any other party's) rights, remedies, or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved, including any rights or remedies Lender may have to foreclosure of the Property.

35.     The receivership created by this Order shall terminate upon entry of an order of the Court terminating the receivership, and, without limiting other grounds on which this receivership estate may be wound up and terminated, if Borrower pays in full all amounts due and owing to Lender under the Loan Documents, then the receivership estate shall be wound up and terminated within a reasonable time after such payment in full.

Consent is given to the form and
entry of the within Consent Order:

MAX L. LIEBERMAN & ASSOCIATES, P.C.     COZEN O'CONNOR

By: */s/ Max L. Lieberman*                By: */s/ Robert V. Dell'Osa*
    Max L. Lieberman, Esquire                Robert V. Dell'Osa (44281)
    Attorney I.D. No. 15344                   Erica Pulford (330878)
    591 Skippack Pike, Suite 400              1650 Market Street, Suite 2800
    Blue Bell, PA 19422-2160                  Philadelphia, PA 19103
    (610) 397-1820                            rdellosa@cozen.com
                                              epulford@cozen.com
                                              (215) 665-2745

*Attorneys for Plaintiff*                  *Attorneys for Defendant*

**APPROVED BY THE COURT:**

/s/ *Nitza I. Quiñones Alejandro*
**NITZA I. QUIÑONES ALEJANDRO**
*Judge, United States District Court*

31

**Exhibit 1**

(Budget for Calendar Year 2023)

Case 2:23-cv-00146-NIQA   Document 20   Filed 04/14/23   Page 33 of 37

Database: NIGHTINGALE
ENTITY: 150MKT

**Budget Report**
Nightingale Properties
NG 1500 Market Street LLC

Budget amounts from 01/23 to 12/23

Accrual Tax Basis

Page: 1
Date: 1/19/2023
Time: 9:36 AM

| Account | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | |
| Base Rent Income | 3,234,385 | 3,234,385 | 3,208,423 | 3,217,240 | 3,234,844 | 3,283,794 | 3,276,699 | 3,277,291 | 3,303,780 | 3,315,734 | 3,338,323 | 3,117,707 | 39,042,606 |
| CAM-Operating Exp | 32,504 | 32,504 | 31,731 | 31,731 | 31,693 | 31,693 | 31,814 | 31,814 | 31,814 | 31,814 | 31,814 | 30,553 | 381,476 |
| CAM - Real Estate Taxes | 77,230 | 77,230 | 76,747 | 76,747 | 76,658 | 76,658 | 76,612 | 76,612 | 76,612 | 76,612 | 76,612 | 73,886 | 918,211 |
| CAM - Overhead | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 1,014 | 12,166 |
| CAM - Utilities | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 475 | 5,701 |
| Prior Year CAM | 0 | 0 | 0 | -244,191 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -244,191 |
| Prior Year RET | 0 | 0 | 0 | -4,815 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -4,815 |
| Storage Income | 20,835 | 20,835 | 19,622 | 19,798 | 19,798 | 19,798 | 19,798 | 19,798 | 19,798 | 19,798 | 19,942 | 16,188 | 236,007 |
| Roof/Antenna Income | 38,097 | 17,932 | 17,968 | 17,968 | 18,148 | 18,148 | 18,148 | 18,148 | 18,148 | 18,148 | 18,148 | 16,348 | 237,246 |
| Utility Reimbursements (E | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 11,050 | 132,600 |
| Water & Sewer Reimb | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 3,840 |
| Electrical Svcs Income | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Janitorial Svcs Income | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 39,600 |
| Trash Removal Income | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,075 | 1,075 | 1,075 | 1,075 | 13,500 |
| Lighting Income | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 13,500 |
| Access Cards Income | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Keys/Locksmith Svcs Inc | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Security Services Income | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Plumbing Svcs Income | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 3,660 |
| Maintenance Svcs Income | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 1,025 |
| U&O Income | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 149,725 | 1,796,700 |
| Other Income | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 17,233 | 206,799 |
| Interest Earned on Accounts | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **EFFECTIVE GROSS INCOME** | 3,590,884 | 3,571,019 | 3,542,323 | 3,302,311 | 3,569,273 | 3,617,923 | 3,610,903 | 3,611,795 | 3,637,909 | 3,649,863 | 3,672,885 | 3,444,440 | 42,821,539 |
| **EXPENSES** | | | | | | | | | | | | | |
| Utilities-Electricity | 165,741 | 150,563 | 139,089 | 141,251 | 157,282 | 185,351 | 202,998 | 192,503 | 167,528 | 150,311 | 148,436 | 158,385 | 1,959,456 |
| Utilities-Steam | 476,514 | 357,498 | 177,962 | 123,546 | 86,211 | 15,403 | 17,410 | 17,514 | 15,610 | 78,988 | 143,435 | 225,260 | 1,735,352 |
| Utilities-Water & Sewer | 9,691 | 9,193 | 7,991 | 9,628 | 15,906 | 19,488 | 24,274 | 20,547 | 15,285 | 11,998 | 14,130 | 9,113 | 167,244 |
| Utilities-Telephone | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 3,760 | 45,123 |
| Utilities-Tel (Mobile) | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 1,445 | 17,337 |
| Electrical-R&M | 3,500 | | 800 | 3,500 | | 800 | | 2,500 | 800 | 3,500 | | 800 | 6,700 |
| Electrical (Exterior)-R&M | | | | | | | 9,800 | | 40,000 | | | 9,800 | 64,300 |
| Electrical-Supplies | 1,500 | 2,500 | | | 1,500 | | | 1,500 | | 1,500 | 1,500 | | 15,000 |
| Meter Reading Service | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Elevator Contract | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 1,201 | 14,412 |
| Elevator-R&M | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 54,168 | 56,335 | 56,335 | 654,354 |
| Elevator-Inspections | | 750 | | 6,600 | 750 | | 11,500 | 12,250 | 5,950 | | 4,475 | | 40,050 |
| HVAC Contract | | | | 4,950 | | | | | | 4,950 | | 3,500 | 10,100 |
| HVAC Contract | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 22,181 | 266,170 |

Database: NIGHTINGALE
ENTITY: 1500MKT
Accrual Tax Basis

**Budget Report**
Nightingale Properties
NG 1500 Market Street LLC
Budget amounts from 01/23 to 12/23

Page: 2
Date:
Time: 1/19/2023 9:36 AM

| | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HVAC-R&M | 79,500 | 9,050 | 67,000 | 13,000 | 4,500 | 0 | 70,000 | 64,500 | 9,800 | 0 | 4,500 | 0 | 321,850 |
| HVAC-Supplies | 29,000 | 0 | 0 | 1,500 | 0 | 29,000 | 0 | 0 | 0 | 1,500 | 0 | 0 | 61,000 |
| System Chemical Treatment | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 3,409 | 40,907 |
| Plumbing-R&M | 30,000 | 13,000 | 12,000 | 6,650 | 3,000 | 0 | 9,500 | 7,400 | 12,000 | 11,500 | 3,000 | 0 | 108,050 |
| Janitorial Contract-Offic | 195,762 | 195,762 | 230,093 | 196,203 | 230,534 | 196,203 | 196,203 | 196,135 | 230,467 | 196,135 | 202,385 | 245,859 | 2,511,810 |
| Janitorial-Supplies | 7,000 | 7,000 | 11,845 | 7,000 | 7,000 | 9,000 | 7,000 | 9,700 | 7,000 | 7,545 | 7,000 | 7,000 | 94,090 |
| Window Cleaning | 4,307 | | 17,636 | | | | 37,133 | 8,707 | 7,020 | | | | 74,803 |
| Trash Removal Contract | 2,212 | 3,212 | 3,162 | 2,212 | 2,212 | 2,412 | 2,212 | 2,212 | 4,162 | 2,212 | 2,212 | 2,412 | 30,844 |
| Landscape Maint. Contract | 1,849 | 1,849 | 2,449 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 2,449 | 1,849 | 1,849 | 2,449 | 24,581 |
| Interior Plant Contract | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 132 | 1,584 |
| Exterminator Contract-Off | 508 | 508 | 508 | 852 | 852 | 852 | 852 | 852 | 852 | 508 | 508 | 508 | 8,518 |
| Property Insurance | 76,292 | 76,292 | 92,283 | 76,292 | 92,283 | 76,292 | 92,283 | 76,292 | 92,283 | 76,292 | 76,292 | 80,492 | 983,663 |
| Security Systems-R&M | 5,775 | 5,975 | 53,215 | 50,542 | 5,975 | 274,088 | 5,975 | 5,975 | 8,275 | 27,891 | 5,975 | 7,075 | 461,210 |
| Security-Other | 767 | 167 | 767 | 167 | 767 | 167 | 767 | 167 | 167 | 767 | 767 | 167 | 5,600 |
| Fire & Life Safety Contra | 13,820 | 13,820 | 13,820 | 19,820 | 13,820 | 15,820 | 15,820 | 28,820 | 60,820 | 13,820 | 13,820 | 13,820 | 235,844 |
| Bldg Interior Maint-R&M | 3,756 | 2,256 | 4,456 | 15,756 | 5,256 | 5,106 | | 3,756 | 71,766 | 5,256 | 5,256 | 4,456 | 125,529 |
| Bldg Exterior Maint-R&M | 2,400 | 1,200 | 6,923 | 38,450 | 5,200 | 23,863 | | 3,756 | 101,623 | 5,200 | 5,200 | 8,923 | 193,782 |
| Glass/Windows-R&M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000 |
| Signage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 |
| Seasonal Decorations | 0 | 2,500 | 0 | 0 | 0 | 0 | 2,500 | 5,000 | 2,000 | 0 | 0 | 33,421 | 33,421 |
| Roof-R&M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 950 | 1,000 | 0 | 6,950 |
| Snow Removal Svcs & Suppl | 6,601 | 2,579 | 2,000 | 2,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 | 11,679 |
| General Maintenance-R&M | 150 | 3,100 | 1,250 | 150 | 3,500 | 1,250 | 3,250 | 1,350 | 1,250 | 150 | 1,500 | 1,250 | 15,300 |
| Uniforms-Contract | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 1,359 | 16,314 |
| Real Estate Taxes | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 48,720 | 584,640 |
| | 473,756 | 473,756 | -989,290 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 473,756 | 4,222,028 |
| Utility Insurance | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 634 | 7,611 |
| U&O Passthru | 0 | 0 | 0 | 48,336 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48,336 |
| Business & Occupation Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Salaries | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 55,773 | 110,773 | 724,282 |
| Salaries - Maintenance | 126,740 | 129,033 | 153,167 | 129,033 | 129,033 | 153,167 | 129,033 | 129,033 | 153,167 | 129,761 | 129,761 | 208,895 | 1,699,094 |
| Management Fees | 63,421 | 63,421 | 62,877 | 63,053 | 63,403 | 64,382 | 64,241 | 64,253 | 64,396 | 64,635 | 65,087 | 60,395 | 763,565 |
| Office Rent | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 13,631 | 163,575 |
| IT Repairs & Maint | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Office Supplies | | | | | | | | | | | | | 4,600 |
| Postage & Delivery | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Computer Equipment Exp. | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 134 | 1,613 |
| Computer Softare Purch & | 633 | 633 | 1,443 | 633 | 633 | 633 | 633 | 633 | 1,443 | 633 | 633 | 1,443 | 10,839 |
| Office Equipment-Contract | 2,124 | 2,112 | 2,112 | 2,112 | 2,112 | 2,112 | 2,112 | 2,112 | 2,287 | 2,112 | 2,112 | 2,487 | 27,034 |
| Right Software Fees | 2,642 | 2,642 | 2,642 | 3,417 | 2,642 | 10,725 | 2,642 | 2,642 | 2,487 | 2,642 | 2,642 | 2,487 | 40,564 |
| Website Expense | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 8,100 |
| Marketing/Advertising Exp | 0 | 0 | 0 | 0 | 5,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,500 |

Case 2:23-cv-00146-NIQA   Document 20   Filed 04/14/23   Page 35 of 37

Database: NIGHTINGALE
ENTITY: 150MKT
Accrual Tax Basis

**Budget Report**
**Nightingale Properties**
**NG 1500 Market Street LLC**

Budget amounts from 01/23 to 12/23

Page: 3
Date: 1/19/2023
Time: 9:36 AM

| | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Total Budgeted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tenant Relations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 1,500 |
| Meals & Entertainment | 0 | 0 | 1,325 | 0 | 0 | 1,325 | 0 | 0 | 1,325 | 0 | 0 | 1,325 | 5,300 |
| Travel | 0 | 0 | 875 | 0 | 0 | 875 | 0 | 0 | 875 | 0 | 0 | 875 | 3,500 |
| Dues & Subscriptions | 4,310 | 1,200 | 1,450 | 1,195 | 200 | 200 | 200 | 1,450 | 200 | 200 | 4,900 | 1,700 | 17,205 |
| Bank Fees | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 |
| RE/E Tax Consultant Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500 | 0 | 0 | 500 |
| Accounting | 289,769 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 289,769 |
| Legal Recoverable | 0 | 0 | 0 | 57,850 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 57,850 | 0 |
| Administrative-Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Bldg Exterior Maint-R&M-N | 0 | 0 | 6,500 | 0 | 30,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36,500 |
| U&O Passthru-NPT | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 13,613 | 163,350 |
| U&O tax-NPT | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 137,158 | 1,646,897 |
| Mgmt Software Fees - NPT | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 1,332 | 15,986 |
| Marketing/Advertising-NPT | 1,000 | 4,500 | 1,000 | 1,000 | 1,000 | 1,000 | 4,500 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 19,000 |
| Tenant Relations-NPT | 0 | 0 | 200 | 0 | 0 | 200 | 200 | 0 | 200 | 0 | 0 | 200 | 1,000 |
| Space Planning Fees-NPT | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 3,500 | 5,000 | 5,000 | 5,000 | 5,000 | 15,200 | 22,700 |
| Legal Fees-NPT | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| LLC Fees-NPT | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 11,667 | 140,000 |
| Tenant Work Order Expense | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 4,583 | 55,000 |
| **TOTAL EXPENSES** | 2,467,443 | 1,925,873 | 473,891 | 1,907,541 | 1,882,757 | 2,003,179 | 1,769,929 | 1,725,488 | 1,932,795 | 1,657,349 | 1,726,192 | 2,016,176 | 21,532,926 |
| **NET OPERATING INCOME** | 1,123,441 | 1,645,146 | 3,068,433 | 1,394,770 | 1,886,517 | 1,614,744 | 1,840,974 | 1,886,307 | 1,705,113 | 1,992,514 | 1,946,704 | 1,428,264 | 21,288,613 |

**Schedule A**

(Service Contracts to be Assumed)

| NAME OF CONTRACT | PARTIES | DATE OF CONTRACT | TYPE OF CONTRACT |
|---|---|---|---|
| Veolia Energy Philadelphia, Inc. Steam Service Agreement | Veolia Energy Philadelphia, Inc. ("Company")<br><br>Nightingale Realty, LLC ("Customer") | 3/1/20 | Steam Purchase Agreement |
| Aggressive Energy Electricity Sales Agreement | Aggressive Energy, LLC ("Seller")<br>NG 1500 Market St., LLC ("Buyer") | 3/26/20 | Electric Supply Purchase Agreement |
| Nightingale Realty Service Agreement | Schindler Elevator Corporation ("Contractor")<br><br>Nightingale Realty, LLC ("Manager") on behalf of NG 1500 Market Street, LLC ("Owner") | 10/1/18 | Elevator Maintenance Contract |
| Comcast Business Service Order Agreement | Comcast Business<br><br>Nightingale Realty LLC AAF NG 1500 Market St LLC ("Customer") | 9/22/22 | Building Phone IP Address Contract |
| Lumen | Centurylink Communications, LLC D/B/A Lumen Technologies Group ("Lumen")<br><br>1500 Market Street, Philadelphia, PA | 10/21/22 | Building Phone System Circuits Contract |
| Ooma Quote Summary | Ooma Enterprise<br><br>Nightingale Realty LLC As Agent for NG 1500 Market St. LLC ("Customer") | 9/22/22 | Building Phone System Contract |
| Nightingale Realty Service Agreement | The Arthur Jackson Company ("Contractor")<br><br>Nightingale Realty, LLC ("Manager" on behalf of Borrower) | 6/6/19 | Janitorial Services Contract |
| Nightingale Realty Service Agreement | Universal Protection Services, LP n/k/a Allied Universal ("Contractor")<br><br>Nightingale Realty, LLC ("Manager" on behalf of Borrower) | 6/10/19 | Building Security Contract |
| Nightingale Realty Service Agreement | ABM Industry Groups, LLC ("Contractor")<br><br>Nightingale Realty, LLC ("Manager" on behalf of Borrower) | 2/1/18 | HVAC Maintenance, Repair, and Service Contract |

**Schedule B**

(Leasing Agent Commission)

| **OFFICE:** | | **% of Base Rent** |
|---|---|---|

**New Lease and Expansions:**

| With a Cooperating Broker: | Years 1-10 | 4% to the Cooperating Broker 2% over-ride to Listing Broker |
|---|---|---|
| | Years 11-15 | 2% to the Cooperating Broker 1% over-ride to Listing Broker |

**New Lease and Expansions:**

| Direct Deal Without Cooperating Broker | Years 1-10 | 4% to Listing Broker |
|---|---|---|
| | Years 11-15 | 2% to Listing Broker |

**For Renewals:**

| With a Cooperating Broker: | Years 1-10 | 4% to the Cooperating Broker 2% over-ride to Listing Broker |
|---|---|---|
| | Years 11-15 | 2% to the Cooperating Broker 1% over-ride to Listing Broker |
| Direct Deal Without Cooperating Broker | Years 1-10 | 2% to Listing Broker |
| | Years 11-15 | 1% to Listing Broker |

| **RETAIL:** | | **% of Gross Rent** |
|---|---|---|

**New Lease and Expansions:**

| Direct Deal Without Cooperating Broker | Years 1-15 | 4% to Listing Broker |
|---|---|---|
| With a Cooperating Broker: | Years 1-15 | 6% to Listing Broker (shared per separate agreement with tenant's broker) |