**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-MKST, THE RR INTEREST OWNER AND THE FUTURE ADVANCE LENDER, | : CIVIL ACTION |
| Plaintiff, | : NO. 23-cv-00146-NIQA |
| v. | : The Honorable Nitza I. Quiñones Alejandro |
| NG 1500 MARKET ST. LLC, | : |
| Defendant. | : |

**DECLARATION OF SHAMIKH KAZMI**
**IN SUPPORT OF EMERGENCY MOTION**

I, Shamikh Kazmi, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Chief Executive Officer of Universal Group Company Inc. ("Universal"). I submit this Declaration in support of Universal's Emergency Motion to Intervene, for Temporary Restraining Order and Preliminary Injunction, for Unsealing of ECF 73 through 75, for Expedited Targeted Discovery, for Enforcement of the Receivership Order, and for Reservation of Rights (the "Motion").

2. I have personal knowledge of the facts set forth in this Declaration, based on my direct participation in Universal's engagement with CBRE, Inc. ("CBRE") regarding the sale of the property at 1500 Market Street, Philadelphia (the "Property").

3. I make this Declaration to set forth facts known to me concerning (a) Universal's formal qualification as a buyer for the Property; (b) Universal's $70,000,000 written acceptance of CBRE's proposed terms on January 22, 2026; (c) Universal's $75,000,000 all-cash, no-contingency

offer on February 17, 2026; (d) CBRE's one-sentence rejection of that offer on February 23, 2026; (e) Universal's acquisition pipeline impairment resulting from CBRE's conduct and the subsequent trade-press market-finality narrative; and (f) the May 11, 2026 production of the executed PMC PSA to Universal's counsel. UNIVERSAL'S FORMAL QUALIFICATION

4. Beginning in approximately late October 2025, Universal engaged with CBRE through CBRE personnel acting in CBRE's marketing-broker capacity as the Capital Markets / National Office Partners function (the "CBRE Capital Markets Function"). The Capital Markets Function personnel coordinated property tours, distributed offering materials, provided access to CBRE's structured Virtual Deal Room ("Dealflow"), and conducted multiple buyer-qualification activities with respect to Universal.

5. On November 21, 2025, I personally attended a formal "1500 Market St Buyer Interview" via Zoom hosted by CBRE Capital Markets Function personnel. The attendees of that meeting included: John Svorcek of CBRE Property Management (who I now understand to be the named knowledge agent for CBRE's Receivership-Officer Function under Section 4.1 of the executed PSA); Tom Floyd and Steve Britt of KeyBank (acting as special servicer for the Lender, Wells Fargo); multiple CBRE Capital Markets Function personnel; and me. At that meeting, Universal was vetted by both CBRE's Receivership-Officer Function and by the Lender's special servicer.

6. On December 12, 2025, I received an email from CBRE Capital Markets Function personnel stating, in part: "We have been given the green light from KeyBank to continue the sale process with a limited set of potential buyers. Attached is a draft PSA for 1500 Market Street." Universal was, by this email, formally confirmed as a Lender-approved qualified buyer in the limited set. This email is attached to the Motion as Exhibit 22.

7. Throughout December 2025 and January 2026, Universal received transaction-level diligence materials, participated in multiple property inspections (including inspections conducted on January 7, January 9, and January 12, 2026), received access to the structured Virtual Deal Room, and received the formal "Next Steps" communication on January 15, 2026 inviting Universal's pricing bid. UNIVERSAL'S OFFERS

8. On December 17, 2025, on Universal's behalf, I transmitted to CBRE Capital Markets Function personnel an initial offer to purchase the Property at $61,000,000 with 5% non-refundable deposit and no due diligence contingency.

9. On January 22, 2026, Andrew Teitelman, Esquire, on Universal's behalf, transmitted to Christopher Schueller of Buchanan Ingersoll & Rooney PC ("BIPC"), the Receiver's transactional counsel, a written acceptance of CBRE's proposed Purchase and Sale Agreement (v2) and Assumption

Agreement (v1) at $70,000,000. CBRE Capital Markets Function personnel were copied on this acceptance. A copy of the acceptance is attached to the Motion as Exhibit 1.

10. Approximately one week after the January 22 written acceptance, in late January 2026, I received a telephone communication from CBRE Capital Markets Function personnel informing me that a "higher offer was signed yesterday." I asked whether Court approval had been sought for any such higher offer. The CBRE Capital Markets Function personnel acknowledged that no Court approval had been sought.

11. On February 17, 2026 at approximately 8:25 PM EST, I transmitted to CBRE Capital Markets Function personnel an email captioned "1500 Market, URGENT!!!" offering $75,000,000 all-cash, no financing contingency, no due diligence contingency, closing within ten business days following Court approval, as the offer itself stated. A copy of that email is attached to the Motion as Exhibit 2. On February 19, 2026, I transmitted a follow-up email. Exhibit 3.

THE FEBRUARY 23 REJECTION

12. On February 23, 2026 at approximately 12:44 PM EST, I received a one-sentence rejection email from CBRE Capital Markets Function personnel. The complete text of the rejection reads: "Your updated offer has been presented to the Receiver for 1500 Market. Unfortunately, he has asked me to let you know that 1500 Market is currently under agreement, and as such, the Receiver cannot entertain any offers at this time. If anything changes I will certainly let you know right away." The rejection email's own text, particularly the phrases "has been presented to the Receiver" and "he has asked me to let you know," indicates that the rejection decision was made by another person within CBRE — within CBRE's Receivership-Officer Function or by CBRE corporate decision-makers above that Function — and was being relayed by the CBRE Capital Markets Function personnel who transmitted the email. A copy of the rejection email is attached to the Motion as Exhibit 4.

13. I do not know, from the public record, whether Universal's $75 million offer was actually transmitted to John Svorcek, as the named Receivership-Officer Function knowledge agent. I do not know whether Universal's offer was presented to Wells Fargo as Lender or to KeyBank as special servicer. I do not know which CBRE personnel within CBRE in its corporate capacity made or authorized the decision to reject Universal's offer. UNIVERSAL'S ACQUISITION PIPELINE AND PIPELINE IMPAIRMENT

14. Universal's $75 million February 17, 2026 offer was not a standalone cash bid abstracted from operational substance. Universal's acquisition economics depended on a developed acquisition pipeline assembled during the months preceding the offer, including (i) an active and documented relationship with Hard Rock Hotels International ("Hard Rock") concerning the inclusion of a Hard Rock hotel component at the Property, documented in the contemporaneous written record now attached as Exhibit 24 and including: (a) the October 31, 2025 Universal Group / Hard Rock introductory meeting, which was convened by CBRE Capital Markets Function personnel and held on CBRE's corporate Zoom system under the subject line "1500 Market Discussion with Universal Group and Hard Rock Hotels" (Exhibit 24-A); (b) Hard Rock International's November 4, 2025 transmission to Universal of an underwritten 400-room Hard Rock hotel program identified by Hard Rock as the program "previously underwritten for the Center City market" — i.e., for Philadelphia Center City, where the Property sits (Exhibit 24-B); (c) Universal's November 7, 2025 site tour of Hard Rock Hotel New York, documented by Hard Rock Hotel New York's guest folio and by Hard Rock International's coordination of the tour (Exhibit 24-C); (d) Universal's November 8, 2025 post-tour written communication to Hard Rock International and the introducing broker — with CBRE Capital Markets Function personnel CC'd — stating that Universal "would be thrilled to bring Hard Rock to Philadelphia, especially at 1500 Market" and was "very interested in securing the rights to bring Hard Rock to 1500 Market through a deposit or similar arrangement" (Exhibit 24-C); (e) the November 10, 2025 escalation of the Hard Rock engagement to include Hard Rock International's Senior Vice President of Global Hotel Business Development, with the scheduled follow-up call coordinated through CBRE Capital Markets Function personnel (Exhibit 24-D); and (f) continued CBRE-coordinated Hard Rock engagement through November 22, 2025, with CBRE Capital Markets Function personnel on every subsequent email (Exhibit 24-E); (ii) prospective anchor-tenant and corporate-occupier discussions; (iii) prospective capital- partner alignment; and (iv) prospective redevelopment-program work.

15. Universal's pipeline counterparties were aware that Universal was actively pursuing the Property as a qualified, Lender-approved buyer and were positioned to participate in Universal's contemplated acquisition and ownership of the Property.

16. After CBRE Capital Markets Function personnel's February 23, 2026 rejection of Universal's $75 million offer, and after the trade-press market-finality narrative described in the Motion attributed

actual or imminent ownership of the Property to PMC-Adler, Universal's pipeline counterparties paused, withdrew from, or ceased to advance their engagement with Universal regarding the Property, on the stated or implied basis that Universal no longer had a viable path to acquire the Property.

17. Universal has submitted with this Motion, as Exhibit 24 hereto, the Hard Rock International pipeline correspondence dated October 31, 2025 through November 22, 2025, in five sub-exhibits (24-A through 24-E). Universal is further prepared to submit, under seal or subject to a protective order entered by this Court, additional documentation of the tenant, operator, and capital-partner pipeline communications described in paragraphs 14 through 16 above, including any further Hard Rock written communications, calendar entries, the underwritten 400-room hotel program identified in Exhibit 24-B (Hard Rock's "400 Key Program" PDF), and further meeting records demonstrating the development and subsequent impairment of Universal's acquisition pipeline. THE MAY 11, 2026 PSA PRODUCTION

18. On May 11, 2026, my counsel received from Christopher Schueller of BIPC (Receiver's transactional counsel) an email transmitting the executed PMC PSA and a redline of a proposed Purchase and Sale Agreement with CSC Coliving LLC. The Schueller email is attached to the Motion as Exhibit 20.

19. The PMC PSA produced on May 11, 2026 confirmed information that Universal previously could not have known with certainty, including: (i) the cash purchase price of $70 million; (ii) the identity of the five buyer entities as Pennsylvania limited liability companies taking

as tenants-in-common (Centre Square East Upper, LLC; Centre Square East Lower, LLC; Centre Square West Upper, LLC; Centre Square West Lower, LLC; and Centre Square Base, LLC); (iii) the existence of Court Approval and Lender Approval as conditions precedent to the consummation of the PSA; (iv) the auto-termination of the PSA if such approvals are not obtained; (v) the identification of John Svorcek as the named knowledge agent for CBRE's Receivership- Officer Function; and (vi) the existence of a separate written broker-compensation agreement between CBRE-as-Seller and CBRE-as-Broker, referenced in Article VIII (Section 8.1) of the PSA, the terms and amount of which have not been disclosed.

20. On the same day, May 11, 2026, I learned that CSC Coliving LLC, through its managing directors Salomon Smeke and Alberto Smeke, had filed on the public docket at ECF 79 a Letter of Intent offering $80 million for the Property, representing on the face of the LOI that CSC was the "second

highest bidder for this property, got qualified in the process, had multiple interviews with the servicer and got approved as a buyer." CHARACTERIZATION OF CBRE PERSONNEL

21. My communications regarding the Property with CBRE Capital Markets Function personnel were professional. The Capital Markets Function personnel I dealt with were responsive, organized, and engaged. Universal's complaint, as set forth in the Motion and the contemporaneously commenced state-court action, is not directed at any individual employee or agent of CBRE in any personal capacity. My understanding is that the institutional conduct that is the subject of this Motion — including the decision to reject Universal's $75 million offer on February 23, 2026 — was made within CBRE's Receivership-Officer Function or by CBRE corporate decision-makers above that Function, and was transmitted to Universal by the CBRE Capital Markets Function personnel acting as messenger. CONTINUED PROFESSIONAL RELATIONSHIPS

22. I have maintained professional engagement with the CBRE Capital Markets Function personnel for purposes of other real-estate transactions and industry contacts unrelated to the conduct that is the subject of this Motion. Such continued professional engagement is consistent with normal industry practice for maintaining broker relationships, and is in no way a waiver of any rights or claims arising from the institutional conduct of CBRE in its corporate capacity described in the Motion.

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of May, 2026. ______________________________ Shamikh Kazmi Chief Executive Officer Universal Group Company Inc.