## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("**Agreement**") is made to be effective as of the Effective Date (as hereinafter defined), by and between **CBRE, INC.,** solely in its capacity as receiver and not in its personal capacity (hereinafter referred to as "**Seller**") under the Order entered on April 14, 2023 ("**Receivership Order**" and the receivership appointment thereunder the "**Receivership**") in a case in the United States District Court for the Eastern District of Pennsylvania ("**Court**"), entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146, ("**Receivership Action**") and CSC Coliving LLC, a Delaware limited liability company or its designee (, the "**Buyer**").

**WHEREAS**, the Court empowered Seller, with the consent of Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender (together with its successors and assigns, "**Lender**"), to market the Property (defined below) for sale and to execute proposed contracts, provided that no sale of the Property shall be effective or consummated except with the approval of the Lender in its sole discretion and upon approval of the Court, all as set forth below; and

**WHEREAS**, the Seller has been informed by Lender that NG 1500 Market St. LLC executed and delivered that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 6, 2019 but made effective as of December 6, 2019, recorded on December 12, 2019 in the real estate records of Philadelphia County, Pennsylvania (the "**Records**") as Instrument Number 53604614, as amended by that certain First Amendment to Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 27, 2019 but made effective as of December 31, 2019, recorded on January 7, 2020 in the Records as Instrument No. 53615245, certain promissory notes, and other documents evidencing and securing the loan, and Elchonon Schwartz ("**Loan Guarantor**"), executed and delivered a certain Guaranty Agreement (together with all such other loan documents executed by any NG 1500 Market St. LLC, Loan Guarantor, and any other persons, in connection with the Loan, collectively, the "**Loan Documents**"); and

**WHEREAS**, subject to Court Approval and Lender Approval, Seller desires to sell and convey the Property upon the terms and conditions set forth herein.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual covenants hereinafter set forth in this Agreement, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I
### The Property

1.1     For the price and upon and subject to the terms, conditions and provisions herein set forth, Seller agrees to sell and convey to Buyer "**as-is, where-is and with all faults**," and Buyer

agrees to purchase from Seller "**as-is, where-is and with all faults**," all of Seller's right, title and interest, if any, in, to and under the following (collectively, and subject to the Permitted Exceptions (as hereinafter defined) in all respects, the "**Property**"):

(i)      that certain improved real property generally located at 1500 Market Street, Philadelphia, Pennsylvania, all as legally described in **Exhibit A** attached hereto and made a part hereof by this reference, together with all rights, privileges, easements, strips or gores, rights-of-way and hereditaments and appurtenances thereto; all fixtures, buildings and improvements located thereon; and any and all oil, gas, mineral, and water rights held by Seller therein, thereunder or thereto, if any (collectively, the "**Real Property**") at the time of Closing (as such term is hereinafter defined);

(ii)     All of the personal property (including, without limitation, surveys, plans, drawings and operating manuals), fixtures and equipment, if any, access cards, computers, hardware and software, presently affixed or attached to, placed or situated upon the Real Property and used in connection with the ownership, operation and occupancy of the Real Property, and specifically including all artwork in the building (including the lobby and mezzanine area), and the clothespin statue and Benjamin Franklin statute located outside of/adjacent to the buildings on the Real Property, but specifically excluding any items of personal property owned by lawful tenants at or on the Real Property pursuant to the Leases (individually a "**Tenant**" and collectively, the "**Tenants**") and further excluding all items of personal property owned by third parties or that are leased (which personal property, fixtures and equipment not so excluded is hereinafter collectively referred to as the "**Personal Property**");

(iii)    All leases now or hereafter affecting the Real Property and that are in effect as of the date of the Closing Date (as such term is defined in **Section 5.1**) and any guaranties associated therewith, if any (individually a "**Lease**" and collectively, the "**Leases**"), together with, as of the time of Closing, all refundable tenant security deposits from Tenants under Leases, but with respect to such tenant security deposits, only to the extent such refundable tenant security deposits were received by Seller or its property manager in connection with Seller's appointment as receiver of the Real Property or were previously remitted by Tenants under Leases to Seller or its property manager and have not been applied by Seller or its property manager against any obligations owing by such Tenants under the Leases (as so limited, the "**Security Deposits**") but excluding all Leases which are the subject of any pending litigation and as to such leases all rights under those lease and rights to any recoveries in those litigation matters are expressly retained by the Seller for the benefit of the Lender. To Seller's knowledge, attached hereto as Schedule 1.1(iii)(A) is a current rent roll containing a schedule of Leases, a schedule of Security Deposits in Seller's possession to assigned to Buyer and additional security deposits that may be owed to tenants, a schedule of lease guarantees and lease expiration dates. To Seller's knowledge, attached hereto as Schedule 1.1(iii)(B) is a schedule of current or pending litigation affecting Seller and/or the Real Property – any pending litigation is covered by insurance to the

extent that Seller is the defendant and no litigation is intended to be assigned to or assumed by Buyer;

(iv)    All assignable contracts, if any, relating to the operation, maintenance and/or management of the Real Property that Buyer notifies Seller in writing during the Approval Period (as such term is hereinafter defined) that it desires to assume (with all other such contracts, including the existing property management agreement and any rental listing agreement, if any, relating to the operation of the Property to be terminated by Seller, at Seller's cost and expense, on or before Closing) (collectively, the "**Assumed Contracts**"). To Seller's knowledge, a schedule of some (but not all) assignable contracts is attached hereto as Schedule 1.1(iv); and

(v)    (i) all assignable guarantees, warranties, licenses, permits, licenses, certificates of occupancy, development rights, entitlements, so called "tap-ins" and "EDUs" and any deposits associated therewith, consents, approvals and authorizations, if any, related to the Real Property; (ii) any tenant data and information if available and the cost and burden of providing such information is commercially reasonable; (iii) all telephone numbers, websites and URL's associated with the Property (other than telephone numbers of tenants); (iv) all right, title and interest of Seller, if any, in and to all site plans, surveys, architectural drawings, plans and specifications, engineering plans and studies, floor plans, landscape plans, operating or maintenance manuals and other plans owned by Seller, if any, with respect to the Property, and any other intangible property now or hereafter owned by Seller and used in the ownership or operation of the Property; (iv) all right, title and interest of Seller, if any, in and to all promotional material, leasing materials and forms, and all signs, logos, photographs, brochures, artwork, graphics or styles (collectively, the "**Intangible Rights**")

Notwithstanding any provision of this Agreement to the contrary, the parties acknowledge that the Property does not include any monies, if any, of Seller or any of its agents that are held by any utility company or other service company as a deposit, that all of such monies, if any, shall be and remain the sole property of Seller, and Buyer shall not have any right, title, interest or claim in, to or under any of such monies. Buyer hereby acknowledges that it has been informed by Seller that Seller acquired the Property in connection with a foreclosure (or similar transaction) and that Seller did not receive, nor has Seller subsequently received, all of the refundable security deposits from Tenants. The parties acknowledge that the sole security deposits from Tenants to be assigned or remitted to Buyer at Closing shall be the Security Deposits.  After the Closing, Buyer shall be solely liable to any Tenant for the return of all security deposits and other security deposits as set forth in the Leases.

## ARTICLE II
### Purchase Price; Earnest Money

2.1    Purchase Price.  The total purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be Eighty Million Dollars ($80,000,000.00).

3

2.2     Earnest Money. Within two (2) Business Days (as such term is hereinafter defined) following the full execution of this Agreement, Buyer shall deliver to Commonwealth Land Title Company ("**Escrow Agent**" or "**Title Company**," as applicable), by wire transfer of immediately available funds, the sum of Five Million Dollars ($5,000,000.00) (the "**Earnest Money**"). Notwithstanding any provisions of this Agreement to the contrary, if Buyer fails to timely make the Earnest Money Payment as contemplated by this Section 2.2, Buyer shall automatically be deemed to have terminated this Agreement and the parties shall thereafter have no further rights or obligations hereunder except for any obligations that expressly survive the termination of this Agreement. The Earnest Money shall be held in escrow by the Escrow Agent in an interest bearing account in accordance with the terms of this Agreement. The Earnest Money shall be applied against the Purchase Price at the Closing unless (i) this transaction does not close in accordance with the terms of this Agreement due to a default by Buyer, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein, or (ii) this transaction does not close in accordance with the terms of this Agreement due to a default by Seller, in which event the Earnest Money shall be payable in accordance with **Section 7.3** herein. Buyer hereby acknowledges and agrees that except (A) in the event of a default by Seller or a Material Casualty (as defined in **Section 6.1** below); or (B) as set forth in **Section 4.6** or **Article XII**, the Earnest Money shall be non-refundable from and after the Effective Date .

2.3     Balance of Purchase Price. The balance of the Purchase Price, together with the Earnest Money that previously has been delivered as hereinabove provided in this Agreement, subject to any prorations and adjustments at Closing (all as provided below), shall be paid by Buyer to Seller by wire transfer of immediately available funds at the Closing.

2.4     [RESERVED].

ARTICLE III
Buyer's Inspection of the Property

3.1     Seller has provided Buyer with a title commitment describing the Real Property from the Title Company, a copy of which is attached as **Exhibit 3.1(a)** (the "**Title Commitment**"). Buyer has approved the Title Commitment. The title encumbrances or exceptions set forth in the Title Commitment and set forth on **Exhibit 3.1(b)** attached hereto are deemed to be permitted exceptions to the status of Seller's title (collectively, the "**Permitted Exceptions**"). "Permitted Exceptions" shall not include liens which have attached to the Real Property during the pendency of the Receivership Action.

3.2     Buyer acknowledges that, except as otherwise expressly set forth in this Agreement or any documents delivered by Seller at Closing to the contrary, (i) neither Seller, Lender Group (as hereinafter defined), nor anyone acting for or on behalf of Seller or Lender Group, has made any representation, warranty, promise or statement, express or implied, to Buyer, or to anyone acting for or on behalf of Buyer, concerning any of the Property, (ii) in entering into and closing the purchase of the Property contemplated under this Agreement, Buyer has not relied on any representation, warranty, promise or statement, express or implied, of Seller, Lender Group, or anyone acting for or on behalf of Seller or Lender Group and (iii) **AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED**

4

**IN THIS AGREEMENT AND ANY DOCUMENTS DELIVERED BY SELLER AT CLOSING, BUYER IS PURCHASING THE PROPERTY IN AN "AS-IS, WHERE- IS" CONDITION AND IN AN "AS-IS, WHERE-IS" STATE OF REPAIR, AND WITH ALL FAULTS**. Without limiting the generality of the foregoing, there is no express or implied warranty of merchantability, habitability or of fitness for a particular purpose made by Seller or Lender Group regarding the Property. Buyer represents to Seller and Lender Group that Buyer has either already conducted or, prior to the end of the Approval Period, will have conducted or will have had an adequate opportunity to conduct such investigations of the Property, including, but not limited to, the physical and environmental conditions thereof, as Buyer deems necessary to satisfy itself as to the condition of the Property and the existence or nonexistence of, or curative action to be taken with respect to, any hazardous or toxic substances on or discharged from the Property and will rely solely upon same and not upon any information provided by or on behalf of Seller, Lender Group or any of their respective agents or employees with respect thereto. Upon Closing, Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions and matters that may have been revealed by a survey of the Property, may not be revealed by Buyer's investigations, and Buyer, upon Closing, shall be deemed to have waived, relinquished and released Seller, Lender Group and all of their respective agents and employees from and against all claims, demands, causes of action (including, without limitation, causes of action in tort), losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller, Lender Group or any of their respective agents or employees at any time by reason of or arising out of any defects, physical conditions, violations of any applicable laws, rules, regulations or ordinances (including, without limitation, any environmental, housing or rent control laws, rules, regulations or ordinances) and any and all other acts, omissions, events, circumstances or matters regarding the Property or its occupancy or operation. Buyer agrees that if any clean-up, remediation or removal of hazardous substances or other environmental conditions on the Property is required after the date of Closing, such clean-up, removal or remediation shall be the sole responsibility of and shall be performed at the sole cost and expense of Buyer. The foregoing release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of Seller and/or Lender Group. As used in this Agreement, the term "**Lender Group**" shall mean Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST and KeyBank National Association and their respective past, present, and future officers, directors, shareholders, general partners, limited partners, agents, representatives, heirs, successors, assigns and attorneys and their respective heirs, successors, and assigns.

Buyer hereby specifically acknowledges that Buyer has carefully reviewed this **Section 3.2**, and discussed its import with legal counsel, is fully aware of its consequences, and that the provisions of this **Section 3.2** are a material part of this Agreement.

Notwithstanding anything to the contrary set forth in this **Section 3.2**, this **Section 3.2** shall not limit the rights and remedies of Buyer upon a breach of any of Seller's representations or warranties that are expressly set forth in this Agreement or any documents delivered by Seller at Closing.

3.3     [RESERVED].

3.4     [RESERVED]

The indemnity obligations of Buyer set forth in this **Article 3** and the release by Buyer as hereinabove set forth shall survive the Closing and any termination of this Agreement.

ARTICLE IV
Representations, Warranties and Covenants; Court and Lender Approval

4.1     Representations and Warranties of Seller.  Seller hereby represents and warrants to Buyer and agrees as follows (which representations and warranties shall also be true and correct as of the Closing):

(a)     To Seller's knowledge, subject to receipt of Lender Approval and Court Approval (as those terms are hereinafter defined) as provided for in this Agreement, Seller has the legal power, right and authority to execute this Agreement and to consummate all of the transactions contemplated herein and the individual who executes and delivers this Agreement and all documents to be delivered to Buyer hereunder is a person duly authorized by Seller to do so. Seller is duly organized, validly existing and in good standing under the laws of the state of its origin, and is qualified to do business in the Commonwealth of Pennsylvania;

(b)     Seller is not a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or under any statute, executive order, or other governmental action. Seller and its subsidiaries have conducted and will conduct their businesses in compliance with the Anti-Corruption Laws, the Anti-Money Laundering Laws and Sanctions, and no investigation, inquiry, action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Seller or any of its subsidiaries with respect to the Anti-Corruption Laws, the Anti-Money Laundering Laws or Sanctions is pending or, to the knowledge of the Seller, threatened.

(c)     To Seller's knowledge, Seller has not received written notice indicating that the Property or use thereof is in violation or breach of any applicable legal requirements, including, without limitation, Environmental Laws and Regulations. "**Environmental Laws and Regulations**" shall mean any federal, state or local laws now or hereafter in effect relating to pollution or protection of the environment or emissions, discharges, spills, releases or threatened releases of any Hazardous Materials into the environment (including without limitation indoor air, ambient air, surface water, ground water or land), including without limitation, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as amended, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq., as amended, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, the Clean Air Act, 42 U.S.C. §§ 7401 et seq., as amended, the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., as amended, and any rules and regulations now or hereafter promulgated under any of such acts.  The term "**Hazardous Materials**" shall mean and refer to any "hazardous waste" or "hazardous substance," as such terms are set forth in, under or pursuant to the Environmental Laws and Regulations, oil or petroleum

6

products or their derivatives, polychlorinated biphenyls, asbestos, radioactive materials or waste, and any other toxic, ignitable, reactive, corrosive, explosive, contaminating or polluting materials which are now or in the future subject to governmental regulation.

(d)    **FIRPTA.**    Seller is not a "foreign person", "foreign trust" or "foreign corporation" (as those terms are defined in the Internal Revenue Code of 1986, as amended, and related Income Tax Regulations).

(e)    **Early Termination Lease Fees**. The parties acknowledge and agree that Seller shall not be entitled to receive any early termination fees provided for in any Lease which have not been paid as of the Effective Date (even if an early termination notice is given prior to Closing).

As used in this Agreement, "to Seller's knowledge" or derivations thereof shall mean the current actual knowledge of John Svorcek, in his capacity as associate director of CBRE, Inc. Property Management, without any obligation to make investigation or inquiry.

4.2    Representations and Warranties of Buyer.    Buyer hereby represents and warrants to Seller (which representations and warranties shall also be true and correct as of the Closing):

(a)    Buyer, if an entity, is duly organized, validly existing and in good standing under the laws of the state of its origin, and as of Closing will be qualified to do business in the Commonwealth of Pennsylvania;

(b)    Buyer has full right, authority and capacity to execute and perform this Agreement and to consummate all of the transactions contemplated herein;

(c)    if Buyer is an entity or a trustee of a trust, the individual of the Buyer who executes and delivers this Agreement and all documents to be delivered to Seller hereunder is and shall be duly authorized to do so;

(d)    Buyer is not owned, in whole or in part, nor does Buyer own or hold any part of the beneficial ownership in Seller;

(e)    Buyer is not in a significantly disparate bargaining position in relation to Seller;

(f)    Buyer is represented by legal counsel of its own choice and designation in connection with the transaction contemplated by this Agreement;

(g)    Buyer's legal counsel was not directly or indirectly identified, suggested or selected by Seller or any agent of Seller; and

(h)    Buyer is purchasing the Property for business or commercial investment or similar purpose and not for use as Buyer's residence.

4.3    Survival.    All representations and warranties in this Agreement shall survive the Closing for a period equal to the lesser of (a) three (3) months  and (b) complete termination of the

Receivership Action resulting in the discharge of the Receivership (the "**Survival Period**"). In order to preserve any claim for any alleged breach of a representation or warranty under this Agreement, the party alleging the breach shall give written notice to the other within the Survival Period.

4.4 [RESERVED].

4.5 <u>Covenants of Seller</u>.

(a) Promptly after the Effective Date and until Closing or earlier termination of this Agreement, Seller shall use good faith, continuous and commercially reasonable efforts to diligently pursue and obtain Court Approval and Lender Approval. Seller shall be required to obtain Lender Approval within fifteen (15) Business Days after the Effective Date and Buyer shall have the right, in its sole and absolute discretion, to terminate this Agreement and receive a refund of the Deposit if Lender Approval is not received within such fifteen (15) Business Day period.

(b) From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall operate and insure the Property in a manner generally consistent with the manner in which Seller has operated and insured the Property prior to the Effective Date. Risk of loss shall remain on Seller until Closing. Provided, however, that Seller shall not enter into any new leases for any rentable portion of the Property without the prior written consent of Buyer, not to be unreasonably withheld. If Buyer approves such Lease, Buyer agrees to be bound by the terms thereof including any obligations for rent concessions, tenant improvement allowances and brokerage commissions.

(c) From the Effective Date until the Closing or earlier termination of this Agreement, excluding compliance with tenant expiration rights, tenant extension rights and tenant termination rights, Seller shall not enter into any agreement, letter of intent, term sheet, or understanding (whether binding or non-binding) with, any person or entity (other than Buyer and its representatives) regarding any proposal or offer relating to any new lease or new lease amendment covering all or any portion of the Property, provided however that the Seller is permitted to approve subleases when Seller's legal counsel determines in its sole discretion that the Seller is legally required to approve a sublease.

4.6 <u>Court Approval and Lender Approval</u>. Buyer acknowledges and agrees that this Agreement and the sale contemplated hereby is subject to approval by Lender, and in its capacity as lead lender on behalf of any serviced *pari passu* companion loan holder(s), as lender holding the loan secured by the Property. Neither the submission of any proposal or this Agreement for examination to Buyer, nor any correspondence or course of dealing between Buyer or Seller shall constitute a reservation of or option for the Property or in any manner bind Seller until this Agreement is fully executed by both Buyer and Seller. Buyer further acknowledges that it is a condition precedent to Seller's and Buyer's obligations under this Agreement that the following conditions are satisfied (i) the Court shall have entered a final, non-appealable order ("**Sale Order**"), in form and substance reasonably acceptable to Buyer and Seller and Title Company, approving this Agreement, the sale of the Property pursuant to the terms of this Agreement and the Closing by Seller on the terms of this Agreement ("**Court Approval**"). Seller shall provide Buyer a draft Sale Order for review and comment at least ten (10) days prior to the filing of a

8

motion to approve the Sale Order (and absent any objection within this ten (10) day period the Buyer shall be deemed to have approved the Sale Order), and (ii) Lender shall have received all internal and third-party approvals (including from any and all rating agencies as required under Lender's governing Pooling and Servicing Agreement) ("**Lender Approval**") to consent to the sale of the Property to Buyer pursuant to the terms of this Agreement. Buyer acknowledges and agrees that this Section 4.6 may not be amended or modified by Seller so as to reduce the amount payable to Lender or the timing of the Closing (other than as may be adjusted as expressly provided herein) except with the prior written consent of Lender. If Seller does not obtain the Lender Approval or Court Approval on or prior to the Closing Date, then this Agreement will automatically terminate, whereupon the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement.

The parties agree that the following concepts shall be included in any final Sale Order issued as part of the Court Approval: (i) the sale is free of all liens that affect the Property and/or any purchaser thereof including those identified on Schedule 3.1(a) but excluding those items set forth on Schedule 3.1(b), (ii) the sale is free of all claims that affect the Property and/or any purchaser thereof including those identified on Schedule 3.1(a) but excluding those items set forth on Schedule 3.1(b), (iii) Buyer is paying reasonably equivalent value for the Property, (iv) neither the Property nor Buyer with respect to this transaction shall be subject to taxes or assessments due as a result of the Pennsylvania Bulk Sale Laws (43 P.S. §788.3; 69 P.S. §529, 72 P.S. §7240; 72 P.S. §7321.1), and (v) under Pennsylvania law the Buyer is not a successor in interest to Owner (and in connection therewith Buyer shall provide, if requested, an affidavit to the Court to confirm the non-existence of any such relationship between Owner and Buyer).

4.7    Limitation on Liability.  Buyer expressly acknowledges and agrees that (a) this Agreement is subject to the terms and conditions of the Receivership Order and the Sale Order; and (b) Seller's obligations and liability under this Agreement are limited by the terms of the Receivership Order, and (c) the obligations and liability of Seller under this Agreement and any document referenced herein shall not constitute personal obligations of the officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals of Seller.  Notwithstanding anything to the contrary, Seller's liability, if any, arising in connection with this Agreement or with the Property shall be limited to the assets of the receivership, and Seller shall not be personally liable for any duly authorized actions properly and lawfully taken pursuant to the Receivership Order or the Sale Order and Seller shall not be personally liable for any such judgment or deficiency after execution on the assets of the Receivership. The limitations of liability contained in this paragraph shall apply equally and inure to the benefit of Seller's present and future officers, directors, shareholders, employees, agents, representatives, trustees, partners, members, certificate holders or other principals, and their respective heirs, successors and assigns. The provisions of this Section shall survive termination and Closing.

## ARTICLE V
## Closing

5.1    Time and Place of Closing.  The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place the latter of (y) within ten (10) Business Days

following the date that the Sale Order becomes final and non-appealable, or (z) on such other date as may be mutually agreed upon in writing by Buyer and Seller, (as so determined or mutually agreed upon, the "**Closing Date**"), but in no event shall the Closing Date be later than October 16, 2026, either at the offices of the Escrow Agent or through a closing in escrow with Escrow Agent. Time is of the essence with respect to the Closing Date.

     5.2    <u>Events of Closing</u>.  At the Closing:

     (a)    Seller shall deliver in escrow to Escrow Agent the following:

     (1)    A Quitclaim Deed in form and substance satisfactory to Seller and Buyer in their reasonable discretion and satisfactory to the Title Company to insure title as contemplated herein (the "**Deed**"), duly executed and acknowledged by Seller, conveying title to the Property to Buyer, all in an "**as-is, where-is condition, and with all faults**," and without any representation or warranty except as may survive Closing pursuant to this Agreement, subject to all of the following: the Leases and the rights of Tenants under the Leases; all taxes and general and special assessments for the year of Closing not yet due and payable; all other Permitted Exceptions; all matters shown on an accurate survey of the Property; underground and overhead cables, lines and utility services; and all existing and applicable zoning ordinances, laws, codes, statutes and subdivision regulations and other governmental laws, rules, codes, statutes and regulations;

     (2)    Such documents, certificates, affidavits and other instruments as may be reasonably required by and solely in favor of the Title Company and Escrow Agent in order to close the transaction contemplated under this Agreement, including the Title Company's standard owner's closing and gap affidavit (the "**Owner's Affidavit**"); provided, however, that with respect to any such owner's closing affidavit or any other affidavit, Seller may in its sole discretion modify such affidavit in a manner that is reasonably acceptable to Title Company and Escrow Agent and, in any event, Seller shall only be obligated to opine with respect to facts thereunder to its then current actual knowledge and without having made, or being required to make, any independent investigation of the facts, and only with respect to those matters first occurring during the pendency of the Receivership Action; provided, further, that Seller shall not be required to take any action or make any payment to remove or satisfy any mechanic's lien, and any such liens shall instead be discharged, released, or otherwise rendered unenforceable against the Property pursuant to the Sale Order, the Title Company insuring the Property free and clear of the same;

     (3)    A certificate executed by Seller with respect to the Foreign Investment in Real Property Tax Act, certifying that Seller is not a foreign person with the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the Treasury Regulations promulgated thereunder;

     (4)    A written assignment bill of sale duly executed by Seller, assigning to Buyer, in their then "**as-is, where-is condition, and with all faults**," all of Seller's right, title and interest, if any, in and to all Leases, Personal Property, Assumed

10

Contracts and the other Intangible Rights. The assignment and bill of sale (the **"Assignment and Bill of Sale"**) shall be in form and substance reasonably acceptable to Seller and Buyer, and shall contain no indemnity by Seller and shall include an assumption by Buyer of Seller's obligations under the Leases and Assumed Contracts (which assumption shall include, without limitation, an assumption of all obligations of landlord under the Leases with respect to the return of any refundable security deposits under the Leases);

(5)    Copies of all Leases received pursuant to **Article XII**, all keys, and books and records relating to the Property which are in the possession of Seller or reasonably available to Seller;

(6)    A letter to each Tenant, executed by Seller, notifying such Tenants of the transfer of the Property from Seller to Buyer and directing such Tenants to remit all rental payments and notices to Buyer (**"Notice to Tenant"**), together with updated payment instructions;

(7)    Such evidence of the authority and capacity of Seller and its representatives as the Escrow Agent and Title Company may reasonably require; and

(8)    Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement, including those set forth in Schedule B-1 of the title commitment.

(9)    A settlement statement executed by Seller in form acceptable to Seller and Buyer.

(10)    Seller shall deliver to Buyer a statement from the Philadelphia Department of licenses and inspections dated no earlier than ten (10) business days prior to the Closing Date, and in such Department's customary form stating that there are no notices of violations of the housing, building, safety or fire ordinances (**"Clean Certificate"**). If there are any violations, Seller must cure the same as a condition precedent to closing.

(b)    Buyer shall deliver to Seller the following:

(1)    Buyer shall deliver to the Escrow Agent and shall thereafter cause the Escrow Agent to deliver the balance of the Purchase Price required pursuant to **Article II** above, in immediately available U.S. funds by wire transfer, to Seller, plus or minus the prorations referred to in **Section 5.4** below;

(2)    Such evidence of the authority and capacity of Buyer and its representatives as the Escrow Agent and Title Company may reasonably require;

(3)    Such documents, certificates, affidavits and other instruments as may be reasonably required by the Escrow Agent and Title Company in order to close the transaction contemplated under this Agreement;

11

(4)    A counterpart of the Assignment and Bill of Sale duly executed by Buyer; and

(5)    A settlement statement executed by Buyer in form acceptable to Seller and Buyer.

5.3    Expenses.  Seller shall pay the cost of performing its obligations under this Agreement, its share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below), its own attorneys' fees, any fees to effectuate the assignment of the Assumed Contracts, one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing and one-half of any transfer taxes due in connection with the recording of the Deed.

Buyer shall pay its proportionate share of the prorations as set forth in **Section 5.4** hereof (including its prorated portion of taxes and special assessments as set forth in **Section 5.4** below) and, in addition, Buyer shall be responsible for and shall pay all other costs that are the responsibility of Buyer under the provisions of this Section or **Section 5.4,** including the full amount of the premium for the Title Policy and the premium for the issuance of any endorsements thereto,  any fees for a loan policy of title insurance issued by the Title Company or any other title insurance company, one-half of any transfer taxes due in connection with the recording of the Deed, all recording fees and charges for the recording of the Deed, one-half of any customary escrow fee charged by the Escrow Agent in connection with the Closing, and all other fees or charges of the Escrow Agent and Title Company (not payable by Seller) in connection with the Closing of the transactions contemplated under this Agreement, all due diligence and investigation expenses, the cost of any survey and the cost and expense of Buyer performing its obligations under this Agreement, and its own attorneys' fees.

5.4    Prorations and Credits.

(a)    Real estate taxes and installments of special assessments, Business Improvement District Taxes and supplemental and personal property taxes and assessments for the Property shall be prorated by the parties as of the Closing Date on the basis of a three hundred sixty-five (365) day year on the basis that Seller is responsible for (i) all such taxes and installments of special assessments for the fiscal year of the applicable taxing authority occurring prior to the Current Tax Period (as such term is hereinafter defined) and (ii) that portion of such taxes and installments of special assessments for the Current Tax Period through 11:59 p.m., Philadelphia, Pennsylvania time on the date immediately preceding the Closing Date, whether or not the same shall be payable prior to the Closing Date, provided, however, that Seller shall not be responsible for any portion of an increase in real, supplemental or personal property taxes or assessments resulting from the sale of the Property to Buyer (whether for taxes or assessments that accrued before or after the Closing) and Buyer shall be solely obligated for payment of the same and agrees to hold Seller harmless from any liability relating to the same.  The phrase "**Current Tax Period**" refers to the calendar year of the applicable taxing authority in which the Closing occurs. All tax and assessment prorations shall be based upon the latest available tax and assessment statement(s) and, accordingly, if the amount of any such real estate taxes or special assessments for the Current Tax Period cannot be ascertained at the Closing as the result of the unavailability of any tax or assessment statement for such period, then the proration shall be computed on the amount of the

12

preceding fiscal year's tax or assessment, with no adjustment to be made post-closing. Since the 2026 taxes are currently subject to an appeal, the parties agree to prorate taxes based upon the 2025 assessed value that Seller has agreed upon with the City of Philadelphia.

(b)    At the Closing, Buyer shall receive a credit against the Purchase Price with respect to the Security Deposits. All obligations under the Assumed Contracts shall be prorated between the parties so that Seller shall be responsible for all such expenses and obligations thereunder to the extent the same have accrued through and including the date immediately preceding the Closing Date and Buyer shall be responsible for all such expenses and obligations under the Assumed Contracts that accrue from and after the Closing Date. At Closing, Buyer shall receive a credit against the Purchase Price with respect to any prepaid base rent or additional rent from any Tenants actually paid to Seller.

(c)    All rent payable under the Leases shall be prorated for the month of Closing as if paid in full when due (irrespective of whether such rent has not been previously collected by Seller) and Buyer shall be entitled to a credit for the same for such month inclusive of, and after, the Closing Date. With respect to any delinquent rents or other revenue (including any amounts unpaid on the Closing Date for the month in which the Closing Date occurs), following Closing (i) Buyer shall use reasonable and good faith efforts to collect the same for a period of ninety (90) days after Closing, but shall not be required to institute any proceedings to collect the same and (ii) Seller may attempt to collect any such delinquent rent or other revenue directly from any tenant or other party owing such amounts after the expiration of such ninety (90) day period after Closing, but may not institute any proceedings to collect the same. All such collections, less costs of collection, including reasonable attorney fees, shall be remitted promptly after receipt to the party entitled to the same, but in any event not later than 10 days after receipt, after giving effect to the following order of payment priority: the collected amounts shall be applied first to the current month's rents and any other amounts due to Buyer; second, to the rents and other revenues for the month of the Closing, prorated accordingly; and third, to rents and other revenues delinquent as of the Closing Date until the delinquency has been satisfied. The provisions of this Section shall survive Closing for the Survival Period.

(d)    Utility costs with respect to the Property and for which Seller is liable shall be prorated at the Closing upon the basis of utility readings, with Seller responsible for utility expenses through and including the date immediately preceding the Closing Date. If Seller does not obtain such reading(s) for any or no reason for any utility serving the Property, Seller shall furnish a reading for such utility as of a date not more than thirty (30) days prior to the Closing Date and the unknown charges shall be apportioned on the basis of an estimate computed by utilizing such reading and the most recent bill from the utility provider. All other income and operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) not hereinabove described and prorated shall be prorated in connection with the Closing and through the date of the Closing (and with respect to operating expenses, with Seller being responsible for operating expenses through and including the date immediately preceding the Closing Date and with Buyer responsible for all time periods from and after the Closing Date), and if any such income or operating expenses (excluding taxes and assessments and utility charges apportioned as aforesaid) are not determinable as of the Closing, then at the earliest possible opportunity following the Closing, but in no event later than thirty (30) days after the Closing,

Seller and Buyer shall make any interim and final adjustments, which obligation shall survive the Closing.

(e)    Charges which are payable by any Tenant to a third party shall not be apportioned hereunder, and Buyer shall accept title subject to any of such charges unpaid and Buyer shall look solely to the Tenant responsible therefor for the payment of the same. If Seller shall have paid any of such charges on behalf of any Tenant and shall not have been reimbursed therefor by the time of Closing, Buyer shall credit to Seller an amount equal to all such charges so paid by Seller.

(f)    Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water rates or sewer rents. Buyer acknowledges that Seller may be appealing the valuation of the Property and agrees that Seller shall be entitled, at Seller's cost and expense, to pursue such appeal to completion and to receive (i) any tax refunds or reductions attributable to the years prior to the year of the Closing, and (ii) any tax refund or reduction attributable to the year of the Closing, shall be prorated between Seller and Buyer after deducting (or crediting Seller, as applicable) any expenses, (including attorneys' fees) relating to the appeal, and Buyer shall remit such amounts to Seller within ten (10) days following Buyer's receipt thereof. Notwithstanding anything to the contrary set forth in this Agreement, (A) prior to Closing, Seller may not settle or terminate any assessment appeal for the Property that is pending for tax year 2026 (the "**Pending 2026 Appeal**") without Buyer's prior written consent, which shall be in Buyer's sole discretion and (B) at Closing, Seller shall reasonably cooperate with Buyer to transition the Pending 2026 Appeal to counsel of Buyer's choosing; provided, however, the foregoing notwithstanding, Seller shall be permitted to settle or terminate the Pending 2026 Appeal without Buyer's consent if the resulting 2026 Total Assessed Value is less than or equal to the Purchase Price. In the event the Pending Appeals are not resolved on or before Closing, the Pending 2026 Appeal shall remain open, and counsel of Buyer's choosing may enter its appearance and represent Buyer solely with respect to the Pending 2026 Appeal and Buyer shall have full control over the Pending 2026 Appeal. This Section 5.4(h) shall survive Closing.

(g)    The Personal Property is included in this sale, without further charge, except that Buyer shall pay to the applicable taxing authority the amount of any and all sales or similar taxes, if any, payable in connection with the Personal Property which is to be transferred to Buyer under this Agreement and Buyer shall execute and deliver any tax returns required of it in connection therewith, said obligations of Buyer to survive Closing.

5.5    <u>Possession</u>. Possession of the Property, subject to all Leases, shall be delivered and surrendered by Seller to Buyer at the Closing.

ARTICLE VI
<u>Damage to Property and Condemnation</u>

6.1    Promptly after obtaining knowledge thereof, Seller agrees to give to the Buyer written notice of any casualty affecting the Property or any actual or threatened taking or condemnation of all or any portion of the Property between the Effective Date and the Closing Date. If prior to the Closing there shall occur damage to the Property caused by casualty or the taking or condemnation of all or any portion of the Property, then the Closing shall take place as provided herein without abatement of the Purchase Price, and there shall be assigned to Buyer at

14

the Closing all of Seller's interest in and to all insurance proceeds to which Seller is entitled to receive from the insurance carrier or condemnation awards pertaining to the Property to which Seller may be entitled to receive, and Buyer shall receive a credit against the Purchase Price in an amount equal to Seller's deductible under such insurance policy; provided, however, that if any casualty causes ten percent (10%) or more of the square footage of the leasable square footage of the buildings located on the Property to become uninhabitable for a period of over nine (9) months (a "**Material Casualty**"), then either Seller or Buyer may terminate this Agreement by written notice to the other, in which case the Earnest Money shall be returned to Buyer and all other rights and obligations of either party under this Agreement (other than any indemnification rights and obligations under this Agreement and any other obligations which by the express terms of this Agreement are intended to survive any cancellation or termination of this Agreement (collectively, the "**Continuing Obligations**")) shall be terminated and this Agreement shall be of no further force or effect. If neither Seller nor Buyer elects to terminate this Agreement within ten (10) days after Seller sends Buyer written notice of the occurrence of a Material Casualty, then Seller and Buyer shall be deemed to have elected to proceed with Closing as provided in this Section.

ARTICLE VII
Termination, Default and Remedies

7.1     <u>Default by Seller</u>.  Seller shall be in default under this Agreement upon the occurrence of any one or more of the following events:

(a)     Any of Seller's warranties or representations set forth in this Agreement are untrue or inaccurate in any material respect.

(b)     Seller shall fail to (i) meet, comply with or perform any material covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Buyer under this Agreement or (ii) deliver at the Closing any of the items required of Seller in **Article V** hereof, for any reason other than a default by Buyer under this Agreement.

7.2     <u>Default by Buyer</u>.  Buyer shall be in default under this Agreement if Buyer shall fail to (i) meet, comply with or perform any material covenant, agreement or obligation on its part required within the time limits and in the manner required in this Agreement for any reason other than a default by Seller under this Agreement or (ii) deliver at the Closing any of the items required of Buyer in **Article V** hereof, for any reason other than a default by Seller under this Agreement.

7.3     <u>Remedies</u>.  In the event of a default by Buyer, if the Earnest Money is delivered to Escrow Agent as required under this Agreement, Seller's sole and exclusive remedy shall be to terminate this Agreement and to receive and retain the Earnest Money and all interest thereon, if any, as liquidated damages, and Seller shall not be entitled to any other damages of any kind, whether actual, consequential, special or punitive. The parties acknowledge and agree that (a) it would be extremely difficult and impracticable to ascertain Seller's actual damages resulting from such default by Buyer under this Agreement; (b) that the Earnest Money represents a reasonable estimate of Seller's actual damages resulting from such default by Buyer under this Agreement; and (c) Seller's retention of the Earnest Money pursuant to this Section 7.3 is not a penalty. In the event of a default by Seller, the Buyer may, at its option, do either of the following (but not both)

15

as its sole and exclusive remedy under this Agreement, under applicable law or in equity, and Buyer shall not be entitled to any damages of any kind, whether actual, consequential, special or punitive:

(1)     Terminate this Agreement by written notice delivered to Seller at or prior to the Closing, whereupon (a) the Earnest Money shall be immediately returned to Buyer and (b) Seller shall reimburse Buyer for Buyer's Costs (as hereinafter defined), in an amount not to exceed $150,000.00, within thirty (30) days following receipt of paid invoices therefor, whereupon such payment this Agreement shall be deemed null and void, and the parties shall have no further rights or obligations to each other hereunder except for the Continuing Obligations.  The term "Buyer's Costs" is defined for purposes of this Agreement as the documented out-of-pocket third party expenses actually incurred by Buyer for: (i) title examination, survey and searches, including issuance of Buyer's title commitment; (ii) fees paid to Buyer's engineers and consultants for preparing any environmental and engineering reports with respect to the Property; and (iii) actual costs incurred by Buyer in connection with the negotiation of this Agreement, Buyer's due diligence with respect to the Property and limited predevelopment feasibility work directly related to evaluating the Property for Buyer's intended use, such as preliminary site planning, code or zoning analysis or building systems evaluation, but expressly excluding  any architectural, engineering, permitting, entitlement, tenant improvement or other design-related costs associated with Buyer's proposed redevelopment or occupancy of the Property; or

(2)     Commence an equitable action for specific performance of this Agreement.

In the event of the failure to obtain Lender Approval and/or Court Approval prior to Closing, this Agreement shall terminate, whereupon the Earnest Money shall be immediately returned to Buyer within thirty (30) days following receipt of paid invoices therefor, whereupon such payment this Agreement shall be deemed null and void, and the parties shall have no further rights or obligations to each other hereunder except for the Continuing Obligations

Notwithstanding the foregoing, if the Earnest Money is not delivered to Escrow Agent as required under this Agreement, then this Agreement shall automatically terminate and be of no further force or effect, except for the Continuing Obligations.

ARTICLE VIII
Brokerage Commission

8.1     Seller represents to Buyer that Seller has engaged the services of CBRE, Inc. (the "**Broker**"), as a broker in connection with this transaction and that Seller shall be responsible for and shall pay all sums due Broker pursuant to the terms of a separate written agreement between Broker and Seller.  Seller further represents to Buyer that Seller has not engaged the services of any other broker in connection with this transaction and shall indemnify and save Buyer harmless from any claims of Broker or any other broker claiming through Seller as a result of this transaction.  Buyer represents to Seller that Buyer has not engaged the services of any broker in connection with this transaction and Buyer shall indemnify and save Seller harmless from any claims of any broker claiming through Buyer (excluding Broker) as a result of this transaction.

16

The foregoing indemnification obligations shall survive any termination of this Agreement or the Closing.

ARTICLE IX
Miscellaneous

9.1    Notices. All notices, demands, requests and other communications required or permitted by this Agreement by any party hereto to any other party or to Escrow Agent or to Title Company shall be in writing and shall be validly given or made by any party, or any party's attorney on behalf of such party, only if deposited in the United States mail, sent by certified or registered mail, postage prepaid, return receipt requested, or if made by Federal Express or other similar reputable national courier service keeping records of deliveries and attempted deliveries. Service by mail or courier shall be conclusively deemed made on the first Business Day delivery is attempted or upon receipt, whichever is sooner. Notices may also be given by e-mail to the e-mail address of the intended recipient as hereinafter set forth, provided that in connection therewith a responsive e-mail is returned to the party giving notice that acknowledges receipt of such e-mailed notice. Notices may be given by the attorneys for the respective parties hereto.

All such notices, demands, requests and other communications shall be addressed to the addressee at its address set forth below or at such other address as such party may have previously specified by notice delivered in accordance with this Section:

| | |
|---|---|
| If to Seller: | CBRE, Inc., as Receiver<br>One Oxford Centre<br>301 Grant Street<br>Pittsburgh, PA 15219<br>Attn: John Svorcek<br>Attn: Joseph Petak<br>email: John.Svorcek@cbre.com<br>email: Joseph.Petak@cbre.com |
| With a copy to: | Buchanan Ingersoll & Rooney P.C.<br>501 Grant St., Suite 200<br>Pittsburgh, PA 15219<br>Attn: Christopher P. Schueller, Esquire<br>email: christopher.schueller@bipc.com |
| With a copy to Lender: | Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST<br>c/o KeyBank National Association<br>8117 Preston Road, Suite 400<br>Dallas, TX 75225<br>Attn: Steve Britt<br>email: steve_britt@keybank.com |

|  |  |
|---|---|
| If to Buyer: | c/o CSC RE, <br> 459 Columbus Avenue, Unit #1802 <br> New York, New York 10024 <br> Attention: Salomon Smeke Saba <br> and Alberto Smeke Saba |
| With a copy to: | Vedder Price P.C. <br> 1633 Broadway, 31st Floor <br> New York, New York 10019 <br> Attention: Robert Salame, Esq. |
| If to Escrow Agent / <br> Title Company: | Commonwealth Land Title Company CWOC-042 <br> 4400 MacArthur Blvd, Suite 800 <br> Newport Beach, CA 92660 <br> Phone: (949)724-3140 |

Any person or entity may change their address for the purpose of receiving notices or demands as herein provided by a written notice given in the manner aforesaid to the others, which notice of change of address shall not become effective, however, until the actual receipt thereof by the others.

9.2     Governing Law; Venue.  The laws of the Commonwealth of Pennsylvania shall govern the validity, enforcement and interpretation of this Agreement.  Any dispute or cause of action under this Agreement shall be resolved in a court of competent subject matter jurisdiction in the County in which the Property is located.

9.3     Integration; Modification; Waiver.  This Agreement constitutes the complete and final expression of the agreement of the parties relating to the Property, and supersedes all previous contracts, agreements and understandings of the parties, either oral or written, relating to the Property.  This Agreement cannot be modified, nor may any of the terms hereof be waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification or waiver is sought.

9.4     Counterpart Execution; Copies of Signatures.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.  A photocopied, scanned, telecopied or other electronic signature of any party to this Agreement shall have the same force and effect as an original signature for all purposes.

9.5     Headings; Construction.  The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement.  Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.  The words "herein,"

18

"hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section. If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania. As used in this Agreement, the term "**Business Day**" shall mean any day other than a Saturday, Sunday or legal holiday in the Commonwealth of Pennsylvania.

9.6    Invalid Provisions. If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby.

9.7    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and, with respect to the provisions of **Article XI** of this Agreement, the Escrow Agent, and with respect to **Section 3.2** of this Agreement, the persons and entities receiving the benefits provided in such **Section 3.2**, and, in each case, their respective heirs, executors, personal and legal representatives, successors and permitted assigns. Except as provided below, this Agreement may not be assigned by Buyer without the consent of Seller. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, if Buyer desires to assign its interest in this Agreement to one or more affiliates of Buyer, Seller agrees to enter into a novation agreement with Buyer and such affiliate(s) pursuant to which this Agreement will be cancelled and Seller and such affiliate(s) shall enter into a new agreement on the same terms as this Agreement (and such affiliate(s) shall be the "buyer" under such new agreement); provided, however, Buyer and such affiliate(s) shall be jointly and severally liable for the obligations under such new agreement from and after such novation.  Notwithstanding the foregoing or any other provision of this Agreement or any Closing Document to the contrary, if Buyer assigns its rights under this Agreement, or if Buyer and Seller enter into a novation agreement pursuant to this **Section 9.7**, Buyer shall be solely responsible for any additional transfer taxes assessed as a result thereof, and shall pay such additional taxes upon demand from the Commonwealth of Pennsylvania. The provisions of this Section shall survive the Closing or termination of this Agreement. If Seller shall consent to any assignment of this Agreement by Buyer other than any assignment/novation which is permitted by the express terms of this Agreement without Seller's consent, then Buyer shall nonetheless not be relieved of any of its obligations under this Agreement and shall remain jointly and severally liable under this Agreement with the assignee of Buyer.

9.8    Further Acts; Survival of Continuing Obligations. In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to promptly perform or cause to be performed at the Closing or after the Closing all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.  The obligations described in this **Section 9.8** and the Continuing Obligations shall in all respects survive the Closing and transfer of the Property by Seller to Buyer.

9.9    Time of the Essence. Time is of the essence of this transaction and all of the terms and provisions of this Agreement.

19

9.10    <u>Legal Expenses</u>. In the event of litigation arising out of the terms and conditions of this Agreement, the prevailing party in such litigation shall have the right to recover from the non-prevailing party reasonable attorneys' fees and court costs incurred as a result of such litigation.

9.11    <u>Interpretation of Agreement</u>. The preparation of this Agreement has been a joint effort of Buyer and Seller, each of whom have had an adequate opportunity to consult with counsel of their choice, and this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. If any words or phrases in this Agreement shall have been stricken out or otherwise added, this Agreement shall be construed as if the words or phrases so stricken out are otherwise eliminated or never included in this Agreement. No implication or inference shall be drawn from the fact that such words or phrases were so stricken out or otherwise eliminated.

9.12    <u>Limitation of Liability upon Seller</u>. Subject to **Section 4.7** hereof, all of Seller's obligations and liabilities under this Agreement, under any of the documents or instruments delivered in connection with the consummation of the transaction contemplated under this Agreement or with respect to the Property shall be without recourse to Seller or any of its assets (including any of the monies received by Seller as the result of the consummation of the purchase and sale transaction contemplated under this Agreement).

9.13    <u>Discharge of Obligations</u>. The acceptance of the Deed by Buyer shall be deemed to be a full performance and discharge of every representation, warranty and covenant made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those, if any, which are herein specifically stated to survive Closing.

9.14    <u>Intentionally Deleted.</u>

9.15    <u>No Third Party Beneficiary</u>. Except as expressly provided herein to the contrary, the provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Buyer only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

9.16    <u>Exhibits and Schedules</u>. The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

<u>Exhibit A</u> - Legal Description of the Property

9.17    <u>Intentionally Deleted.</u>

9.18    <u>Intentionally Deleted.</u>

9.19    <u>Effective Date</u>. The date of delivery to Escrow Agent of a fully executed counterpart of this Agreement, as evidenced by Escrow Agent's notation in the space set forth below, shall be deemed the effective date of this Agreement (the "**Effective Date**").

9.20    Pennsylvania-Specific Provisions.

(a)    Intentionally Deleted.

(b)    Sewage Facilities:  In accordance with the Pennsylvania Sewage Facilities Act of January 24, 1996, No. 537 P.L. 1535, as amended, the following statement regarding the availability of a community sewage system is included:  the Property is connected to or serviced by a Community Sewage System.

(c)    Pennsylvania Bulk Sales Law:  Buyer hereby waives the requirement for Seller's delivery by Closing of the tax clearance certificates to be issued in compliance with Pennsylvania's Bulk Sales Statutes ("**Tax Clearance Certificates**").    As used herein, "Pennsylvania's Bilk Sales Statutes shall mean 43 P.S. § 788.3, 69 P.S. § 529 and 72 P.S. § 1403, 72 P.S. § 7240 and 72 P.S. § 7321.1.

(d)    Waiver of Tender.  Tender at the time of Closing of an executed Deed and the balance of the Purchase Price by Buyer are hereby mutually waived, but nothing herein contained shall be construed as to relieve Seller from the obligation to deliver the Deed or to relieve Buyer from the concurrent obligation to pay the balance of the Purchase Price.

ARTICLE X
Confidentiality and Public Disclosure

10.1    Confidentiality.  Buyer agrees that it shall keep this Agreement, the terms and conditions of this Agreement and all materials, documents and information pertaining to the Property or the Leases that is at any time delivered or made available by Seller or any of its agents or representatives to the Buyer or any of its agents or representatives (collectively, the "**Confidential Information**") confidential and that Buyer shall not disclose the Confidential Information to any person or entity for any reason whatsoever except as specifically permitted herein or except as may be necessary to comply with the order of any court of competent jurisdiction.   Buyer shall restrict dissemination of Confidential Information within its own organization and to Buyer's representatives, advisors, consultants or lenders and to the Title Company and Escrow Agent so that the Confidential Information shall be revealed only to the extent necessary to enable Buyer to fulfill the terms of this Agreement. In the event this Agreement is terminated or Buyer defaults hereunder, Buyer shall promptly return to Seller any and all Confidential Information.  In the event of a breach or threatened breach by Buyer or its agents under this Section, Seller shall be entitled to an injunction restraining Buyer or its agents from disclosing, in whole or in part, any Confidential Information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach.

10.2    Public Disclosure.  Prior to Closing, any release to the public of information by Buyer with respect to any matters set forth in this Agreement, including the existence of this Agreement, will be made only in the form approved by Seller and its counsel.

21

ARTICLE XI
Escrow Provisions

11.    Provisions Pertaining to Escrow Agent and Earnest Money.    The following provisions pertain to the Earnest Money, the maintenance of the account into which the Earnest Money is to be placed by the Escrow Agent and the Escrow Agent's limitation of liability:

11.1    Except as hereinafter provided in this **Section 11.1** to the contrary, in the event that the Escrow Agent receives conflicting instructions from the parties or determines in good faith that a bona fide dispute exists as to whether the Escrow Agent is obligated to deliver the Earnest Money, or as to whom the Earnest Money is to be delivered, the Escrow Agent, at its option, (a) may refuse to comply with any claims or demands on it and continue to hold the Earnest Money until (i) the Escrow Agent receives written notice signed by Seller and Buyer directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (ii) the Escrow Agent receives a certified copy of a final non-appealable judgment of a court of competent jurisdiction directing the release and delivery of the Earnest Money, in which event the Escrow Agent shall then release and deliver the Earnest Money in accordance with said direction, or (b) may deliver the Earnest Money to the Philadelphia County Court of Common Pleas, or (c) may take such affirmative steps as the Escrow Agent may elect in order to substitute another impartial party reasonably satisfactory to Seller and Buyer (whose consents to such substitution shall not be unreasonably withheld), to hold the Earnest Money, including, without limitation, the deposit thereof in a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be the joint obligation of Buyer and Seller (but notwithstanding the foregoing, as between Seller and Buyer, such costs shall be borne by whichever of Seller or Buyer is the losing party, or in accordance with any mutual agreement of Seller and Buyer if neither party is the losing party).

11.2    Escrow Agent is acting as a stakeholder only with respect to the Earnest Money.  It is agreed that the duties of the Escrow Agent are only as herein specifically provided in this Agreement, are purely ministerial in nature, and that Escrow Agent shall incur no liability whatsoever except for its own willful misconduct or gross negligence.  Seller and Buyer each hereby release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

11.3    Except as and only to the extent otherwise provided elsewhere in this Agreement to the contrary, all out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred by Escrow Agent as the result of its serving as escrow agent under this Agreement (other than any of such costs and expenses incurred as the result of the Escrow Agent taking any action or omitting to take any action in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of Escrow Agent) and all escrow fees charged by Escrow Agent in connection with its acting as escrow agent with respect to the Earnest Money shall be paid for one-half by Buyer and the other one-half by Seller.

11.4    Buyer and Seller agree and acknowledge that the Escrow Agent has no liability in connection with the Earnest Money in the event of the failure or insolvency of the financial institution in which the Earnest Money is deposited.

22

11.5    All notices and demands to Escrow Agent or from Escrow Agent to Seller or Buyer shall be in writing and shall be governed by **Section 9.1** of this Agreement. Escrow Agent shall be entitled to rely on all communications which purport to be on behalf of the party giving such communication and purporting to be signed by an authorized party or any attorney of any party as may be designated from time to time by Seller or Buyer.

11.6    Escrow Agent may resign from serving as escrow agent under this Agreement at any time by giving ten (10) Business Days prior written notice to that effect to each of Seller and Buyer.  In such event, the successor escrow agent shall be selected by Seller and approved by Buyer, such approval not to be unreasonably withheld or delayed.  Escrow Agent shall then deliver the Earnest Money to the successor escrow agent, to be held by such successor escrow agent pursuant to the terms of this Agreement and thereupon such successor escrow agent shall thereafter be deemed to be the "Escrow Agent" under this Agreement.

11.7    In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained in this Agreement, and Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by Buyer or Seller and believed by Escrow Agent to have been signed by the proper person.  Escrow Agent may assume that any person purporting to give any notice under this Agreement and representing that they have authority to do so has been duly authorized to do so.

11.8    Escrow Agent shall have no duties or responsibilities other than those expressly set forth in this Agreement and that pertain to its duties as escrow agent.  Escrow Agent shall have no duty to enforce any obligation of any person or entity to make any payment or delivery or to enforce any obligation of any person or entity to perform any other act.  Escrow Agent shall be under no liability to Buyer or Seller or to anyone else by reason of any failure on the part of Buyer or Seller to perform its obligations under any document.

11.9    Escrow Agent shall be entitled to approve (not to be unreasonably withheld or delayed) legal counsel who may be retained to defend or prosecute any action on behalf of Escrow Agent under or arising out of this Agreement.

11.10    The duties, obligations and liabilities of Buyer, Seller and Escrow Agent as set forth in this **Article XI** of this Agreement shall be interpreted, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

ARTICLE XII
Buyer's Closing Conditions

12.1    Notwithstanding anything in this Agreement to the contrary, Buyer's obligation to consummate the purchase of the Property is expressly contingent upon the satisfaction of the following conditions as of the Closing Date ("**Buyer's Closing Conditions**"):

(a)    All representations and warranties of Seller under this Agreement continue to be materially true and correct.

(b)     The Title Company shall issue or be irrevocably and unconditionally committed to issue to Buyer an owner's title insurance policy in the full amount of the Purchase Price insuring that good and marketable, fee simple title to the Property is vested in Buyer subject only to the Permitted Exceptions (the "**Title Policy**").

(c)     Seller shall have executed and delivered all documents required hereunder and complied with its obligations under this Agreement, provided however, that Buyer shall proceed to close even if the final Sale Order does not contain language set forth in Sections 4.6(ii), (iii) and (iv) and Buyer's Closing Conditions do not include the delivery of a final Sale Order which contains the language set forth in Sections 4.6(ii), (iii) and (iv).

(d)     Neither NG 1500 Market St. LLC, a Delaware limited liability company ("**Owner**") nor any party on behalf of Owner files a voluntary petition or an involuntary petition under the Title 11 of the United States Code *et. seq.*, as amended, or any other federal or state debtor relief law which affects the Property or Owner or the Court Order.

12.2    If any of Buyer's Closing Conditions are not satisfied on or prior to the Closing Date (except as a result of a default by Seller, in which case Section 7.1 and Section 7.3 shall apply), Buyer may, by delivering written notice at or prior to the Closing Date, to Seller, elect to either (i) waive any such condition; or (ii) terminate this Agreement. If Buyer elects to terminate this Agreement, the Earnest Money will be returned to Buyer and neither party will have any further obligations or liabilities hereunder, except as expressly provided in this Agreement. Time is agreed to be strictly of the essence with respect to terminating this Agreement.  Buyer's failure to timely deliver written notice of termination prior to the Closing Date shall be conclusively deemed a waiver of Buyer's right to terminate this Agreement pursuant to the terms of this Section 12.2.

THE REMAINDER OF THIS PAGE
INTENTIONALLY BLANK

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Agreement on the dates set forth next to their signatures below.

**SELLER:**

**CBRE, INC.**, solely in its capacity as receiver under the Order entered on April 14, 2023 in a case in the United States District Court for the Eastern District of Pennsylvania, entitled *Wells Fargo Bank, National Association, as Trustee, for the Benefit of Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance Lender v. NG 1500 Market St. LLC*, Case No. 23-146 and not in its personal capacity

By: _____

Name: _____

Title: _____

**BUYER:**

**CSC COLIVING LLC**, a
Delaware limited liability company

By: _____

Name:           Salo Smeke

Title:           Managing partner

25

## JOINDER BY ESCROW AGENT

The undersigned, Commonwealth Land Title Company, has joined in the execution of this Agreement solely for the purpose of evidencing its agreement to serve as the "Escrow Agent" under and in accordance with the terms and provisions of this Agreement. Escrow Agent acknowledges receipt of a fully executed counterpart of this Agreement as of February __, 2026, which date shall be deemed the "Effective Date" of this Agreement.

**ESCROW AGENT**:

Commonwealth Land Title Company

By: _____
Name:
Title:

## EXHIBIT A

Legal Description of Property

ALL THAT CERTAIN lot or piece of ground with buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and described as follows, to wit:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

Subject to the rights of the City of Philadelphia in that portion of the hereinbefore described premises conveyed by Deed from the Redevelopment Authority of the City of Philadelphia to The City of Philadelphia in Deed Book JRS 456 page 258.

BEING known as 1500-42 Market Street. BEING Parcel No.: 88-3-3200-00.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust, by Deed dated 6/28/2017, effective 7/14/2017 and recorded 7/18/2017 in Philadelphia County in Document No. 53239762, conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company, in fee.

Exhibit A – Page 1

## EXHIBIT 3.1(a)

## ALTA COMMITMENT FOR TITLE INSURANCE

issued by:

**Commonwealth**
LAND TITLE INSURANCE COMPANY

Commitment Number:

**PIT260026 - 1st
Revised**

### NOTICE

**IMPORTANT - READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Commonwealth Land Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

AMERICAN
LAND TITLE
ASSOCIATION

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)                     Printed: 02.12.26 @ 02:31 PM
Page 1                                    PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 2

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

Countersigned By:

_____
Jeffrey Junstrom
Authorized Officer or Agent

**Commonwealth Land Title Insurance Company**

By:

_____
Michael J. Nolan, President

Attest:

_____
Marjorie Nemzura, Secretary

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

Exhibit 3.1(a) – Page 3

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

## NOTICES

1.  PLEASE BE ADVISED THAT COMMONWEALTH LAND TITLE INSURANCE COMPANY ("COMPANY") AND COMMONWEALTH LAND TITLE INSURANCE COMPANY ("AGENT") HAVE NO KNOWLEDGE, TRAINING OR EXPERIENCE IN MATTERS THAT ARE UNRELATED TO TITLE INSURANCE, INCLUDING, BUT NOT LIMITED TO, SUCH MATTERS AS BULK SALE TRANSFERS, BULK SALE CLEARANCE CERTIFICATE REQUIREMENTS (IF APPLICABLE), ZONING/SUBDIVISION, STRUCTURAL REPAIRS, ENVIRONMENTAL, WATER INFILTRATION, WETLANDS, TERMITES OR ONSITE SEWAGE SYSTEMS, AND WE DO NOT INTEND TO, AND CANNOT, PROVIDE SERVICES OR ADVICE TO YOU ON SUCH MATTERS.  IF YOU ARE FACED WITH ISSUES REGARDING SUCH MATTERS, YOU SHOULD CONSULT A LAWYER, ENGINEER, ARCHITECT OR OTHER APPROPRIATE CONSULTANT OR PROFESSIONAL OF YOUR CHOICE.

2.  ALSO BE ADVISED THAT YOU MAY PURCHASE AT ADDITIONAL COST ENHANCED COVERAGES FROM THE BASIC POLICY OF TITLE INSURANCE.  IF YOU WISH AN EXPLANATION OF THE ENHANCED COVERAGES AND THE COST FOR THESE ADDITIONAL COVERAGES, PLEASE CONTACT THE PARTY LISTED BELOW.

3.  THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF INSURANCE REQUIRES THAT WE SEND THE FOLLOWING NOTICE TO YOU, OUR APPLICANT, PRIOR TO CLOSING.  IF APPLICABLE, THE DEPARTMENT FURTHER REQUIRE THAT YOU, THE APPLICANT, FORWARD THIS NOTICE TO THE ULTIMATE CONSUMER IN ADVANCE OF THE DAY OF CLOSING:

    YOUR TITLE INSURANCE FEE COVERS THE COST OF CLOSING ON THE INSURED REAL ESTATE PROPERTY IF IT TAKES PLACE DURING REGULAR OFFICE HOURS AND AT THE OFFICE OF THE TITLE INSURANCE AGENT OR UNDERWRITER.  IF YOUR CLOSING TAKES PLACE AT A LOCATION OR TIME OF YOUR CHOOSING, OR THAT OF YOUR LENDER OR REALTOR, THE TITLE INSURANCE AGENT OR UNDERWRITER MAY IMPOSE AN ADDITIONAL CHARGE FOR THIS SPECIAL SERVICE.  YOU MAY DETERMINE THE AMOUNT OF THIS ADDITIONAL CHARGE, IF ANY, BY CONTACTING THE PARTY LISTED BELOW.

    Commonwealth Land Title Insurance Company
    603 Stanwix Street
    Pittsburgh, PA 15222
    (412)281-8080

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use  All other uses are prohibited. Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)

Page 3

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 4

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

*Transaction Identification Data, for which the Company assumes no liability as set forth in Commitment Condition 5.e.:*

| ISSUING OFFICE: |
| --- |
| Commonwealth Land Title Insurance Company<br>603 Stanwix Street<br>Pittsburgh, PA 15222<br>Main Phone: (412)281-8080 |

**Order No.:** PIT260026
**Reference No.:** 932600097

## SCHEDULE A

1.  Commitment Date: December 17, 2025

2.  Policy to be issued:

    (a) ALTA Owner's Policy (as modified by TIRBOP 07/01/2021)
    Proposed Insured:                 Purchaser with contractual rights under a purchase agreement with the vested owner identified at Item 4 below
    Proposed Amount of Insurance:    $63,500,000.00
    The estate or interest to be insured: Fee Simple

    (b) ALTA Loan Policy (as modified by TIRBOP 07/01/2021)
    Proposed Insured:                 Lender with contractual obligations under a loan agreement with the proposed insured owner identified in Item 2 above.
    Proposed Amount of Insurance:    $100,000.00
    The estate or interest to be insured: Fee Simple

3.  The estate or interest in the Land at the Commitment Date is:

    Fee Simple

4.  The Title is, at the Commitment Date, vested in:

    NG 1500 Market St. LLC, a Delaware limited liability company

    NOTE: Wells Fargo Bank, National Association, as Trustee, for the benefit of registered holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 4

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 5

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

## SCHEDULE A
(continued)

Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR Interest Owner, and the Future Advance Lender, appointed Receiver by Consent Order Appointing Receiver in Case # 2:23-CV-00146-NIQA.

5.   The Land is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

FOR INFORMATIONAL PURPOSES ONLY:

1500 Market St., Philadelphia, PA 19102, City of Philadelphia, County of Philadelphia

**END OF SCHEDULE A**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 5

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 6

## EXHIBIT "A"

Legal Description

For APN/Parcel ID(s):  88-3320000

All that certain lot or piece of ground situate in the 8th Ward of the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania and described as follows:

BEGINNING at a point of intersection formed by the Westerly side of 15th Street (variable width) and the Southerly side of Market Street (100 feet wide); thence extending Southwardly along the said Westerly side of 15th Street the distance of 265 feet 0 inches to a point on the Northeasterly end of a corner cut off which connects the said Westerly side of 15th Street and the Northerly side of Ranstead Street (20 feet wide), said point also being on the Northwesterly side of an easement for cutback which easement for cutback applies only to certain land and/or space between an elevation of +/- 38.50 and an elevation of +/- 68.50; thence Southwardly along the Westerly side of said 15th Street extended and along the Easterly side of said Easement for cutback 21 feet 0 inches to a point on the Northerly side of said Ranstead Street extended and on the Southerly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street extended and along the Southerly side of said Easement for cutback 30 feet 0 inches to a point on the Southwesterly end of said corner cut off and on the Northwesterly side of said Easement for cutback; thence Westwardly along the Northerly side of said Ranstead Street (part 20 feet wide and part 30 feet wide) 346 feet 0 inches to a point on the Easterly side of 16th Street (70 feet wide); thence Northwardly along the said Easterly side of 16th Street 286 feet 0 inches to a point on the said Southerly side of Market Street; thence Eastwardly along the said Southerly side of Market Street 376 feet 0 inches to a point on the said Westerly side of 15th Street, being the first mentioned point and place of beginning.

LESS AND EXCEPT the portion of the herein before described premises by Deed of Dedication from the Redevelopment Authority of the City of Philadelphia to the City of Philadelphia dated June 20, 1969 and recorded in the Department of Records in and for the City of Philadelphia in Deed Book J.R.S. No. 456, Page 258.

Being Tax Parcel No. 88-3320000.

BEING the same premises which EQC Operating Trust, a Maryland real estate investment trust formerly known as Hub Properties Trust by Special Warranty Deed dated 06/28/2017 and recorded 07/18/2017 in the Office of the Recorder of Deeds in and for the County of Philadelphia as Document No. 53239762, granted and conveyed unto NG 1500 Market St. LLC, a Delaware limited liability company.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association.  All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)

Page 6

Printed:  02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 7

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

## SCHEDULE B, PART I
## REQUIREMENTS

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.  The following instruments must be submitted for review and recording:

    a.  Deed from NG 1500 Market St. LLC, a Delaware limited liability company, to a Purchaser with contractual rights under a purchase agreement with the vested owner.

    b.  Mortgage from a Purchaser with contractual rights under a purchase agreement with the vested owner to a Lender with contractual obligations under a loan agreement with the proposed insured owner.

6.  If any construction materials have been delivered to the premises or any construction has occurred within the past six months, please notify us.

7.  A driver's license or other photo identification must be provided for any individual who will sign the instruments identified in Item No. 5 above or any other closing documents.

8.  An owner's affidavit must be submitted at closing. The form of owner's affidavit will be provided by the Company.

9.  This Commitment is based on an examination of title covering the period through the Effective Date shown in Schedule A. In addition to the Requirements and Exceptions set forth herein, this Commitment is subject to all matters appearing in the public records between the Effective Date and the time the insured acquires of record the estate or

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)                                   Printed: 02.12.26 @ 02:31 PM
Page 7                                   PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 8

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

interest to be insured.

10. The following mortgages:

    a. Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by NG 1500 Market St. LLC to JPMorgan Chase Bank, National Association, in the amount of $388,000,000.00, dated as of 11/6/2019 and recorded 12/12/2019 in Document Number 53604614.

    b. First Amendment to Mortgage made by and between NG 1500 Market St. LLC and JPMorgan Chase Bank, National Association, dated as of 12/20/2019 and recorded 1/7/2020 in Document Number 53615245.

    c. Assignment of Leases and Rents made by and between JPMorgan Chase Bank, National Association and Wells Fargo Bank, National Association, as Trustee, for the benefit of holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage Pass-Through Certificates, Series 2020-MKST, the RR interest owner, dated as of 2/26/2019 and recorded 4/30/2020 in Document Number 53662686.

    d. Subordination, Nondisturbance and Attornment Agreement between Wells Fargo Bank, National Association, as Trustee, for the benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage PassThrough Certificates, Series 2020-MKST, the RR Interest Owner and the Future Advance, Oceanfirst Bank N.A. and NG 1500 Market Street. LLC, dated 1/21/2021 and recorded 3/9/2021 in Document ID No. 53801077.

    e. Notice of Lis Pendens dated 2/21/2023 and Recorded 2/22/2023 in Document 54151872.

11. The following judgments:

    a. Wells Fargo Bank, National Association, as Trustee, vs. NG 1500 Market St. LLC, filed on January 12, 2023 at Case No. 2:23-cv-00146-NIQA, in the amount

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

AMERICAN LAND TITLE ASSOCIATION

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 8

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 9

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

## SCHEDULE B, PART I
## REQUIREMENTS
(continued)

of $378,597,000.00.

12. Real estate tax certificates, covering the current year and three prior years, must be obtained.  Tax lien certificates will be ordered by our office.

13. Sewer and water charges, if any.  Certificates covering sewer and water charges will be ordered by our office.

14. Unfiled municipal claims, if any.  Municipal lien letters, showing whether there are any municipal claims affecting the premises, will be ordered by our office from the municipality in which the land is located and any municipal water or sewer authorities which service the community.

15. Certification to be obtained from Philadelphia Gas Works ("PGW") as to amounts due for gas service to the subject property.  All outstanding gas charges up to and including the date of settlement must be paid in full.  Reading required in the event of sale of property.

16. Determination to be made regarding Solid Resources Fee assessed by the Streets Department of the City of Philadelphia and all fees due to be paid.  Note:  The Solid Resources Fee for an entire calendar year becomes a lien on title as of January 1st of that calendar year.

17. When it is presented for recording, the deed must be accompanied by a completed and signed Philadelphia real Estate Transfer Tax Certification (in duplicate); the form is available online at http://www.phila.gov/pdfs/82-127.pdf

18. Proof that Special Service District Tax Assessments have been paid in full, if applicable.

19. NOTICE TO SELLER (S):  You are required by law to provide the Company with your correct taxpayer identification number.  If you do not provide the Company with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

20. The names of all relevant parties to the within real estate transaction will be searched

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)

Page 9

Printed:  02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 10

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

prior to closing to verify that they are not Specially Designated Nationals who are subject to the provisions of the President's Executive Order Targeting Terrorist Assets.

21. NOTE: Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of an agent, an authorized employee of the insured lender, or by using Bancserv or other approved third party service. If the above requirement cannot be met, please call the Company at the number provided in this report.

22. In Pennsylvania, a document will not be accepted for recording if it is dated subsequent to the date of its earliest acknowledgment. If the dating of a document presents a problem, please contact our office to discuss the wording of the caption of the document.

23. The Company may make other requirements or exceptions upon its review of the proposed documents creating the estate or interest to be insured or otherwise ascertaining details of the transaction.

24. Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

25. The transaction contemplated in connection with this Commitment is subject to the review and approval of the Company's Corporate Underwriting Department. The Company reserves the right to add additional exceptions or notes and to make further requirements after such review.

26. Proof must be furnished of the legal existence of the proposed insured entity. If a mortgage will be insured, proof of authority requirements will be added to this Commitment when the borrower is identified.

27. Confirmation from the office closing this transaction that all requirements of this Commitment and of the Company have been met.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 10

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 11

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

28. If the lender or owner in the subject transaction requires the removal of the survey exception in the title policies to be issued, the Company requires receipt of an acceptable ALTA Survey and further, the Company reserves the right to include any matters shown thereon as exceptions in Schedule B of said policies to be issued.

29. In Pennsylvania, the standard survey exception (Schedule B, Section 2, Item No. 1) is deleted from the policy only by issuing an endorsement. For a loan policy, the appropriate endorsement is a PA 300 and the cost is $100.00. For an owner's policy, the appropriate endorsement is a PA 301 endorsement and the cost is 20% of premium.

30. For each policy to be issued as identified in Schedule A, Item 2; the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. As provided in Commitment Condition 4, the Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

31. The following requirements apply to the grantor limited liability company:

a. A certificate of good standing for the grantor limited liability company must be submitted from the state in which it is organized.

b. A certified copy of the certificate of organization and operating agreement of the grantor limited liability company must be submitted.

c. Proof must be submitted that a majority of the managers (or members, if applicable) have consented to the proposed conveyance.

d. If the proposed conveyance contravenes the certificate of organization or operating agreement, proof must be submitted that all managers (or members, if applicable) have consented to the conveyance.

e. Proof of authority to execute the proposed deed must be submitted.

f. If any of the members or managers of the limited liability company in title are other than a natural person, include the above organizational and authority documents for each

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 11
Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 12

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

nested entity until reaching all natural persons as owners of the entity.

g.   Taxes settled by the Commonwealth of Pennsylvania against the grantor limited liability company, if any.  A lien certificate will be ordered by our office from the Department of Revenue.

h.   NOTICE ONLY:  If this transaction involves a conveyance of 51% or more of the grantors assets, a Bulk Sales Clearance Certificate (Certificate) must be obtained from the Pennsylvania Department of Revenue by the Grantor and presented to the Grantee. The Certificate will indicate taxes owed to the Commonwealth by the Grantor.  FAILURE OF THE GRANTEE TO OBTAIN THE CERTIFICATE FROM THE GRANTOR SHALL RENDER THE GRANTEE LIABLE TO THE COMMONWEALTH FOR TAXES OWED BY THE GRANTOR UP TO AND INCLUDING THE DATE OF THE TRANSFER.  Such a lien would be post-policy and, therefore, NOT INSURED AGAINST BY THIS POLICY. Professional counsel should be sought to contractually establish the rights and obligations of the parties of this transaction with respect to any such tax lien.

32.   The mortgage listed at Schedule B, Part 1, Item 10 above is subject to the following in Rem Action:

Wells Fargo Bank, National Association, as Trustee, for the benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2020-MKST, Commercial Mortgage Pass-Through Certificates, Series 2020-MKST as filed in United States District Court for the Eastern District of Pennsylvania Civil Action No. 23-cv-00146-NIQA; CBRE, Inc was appointed Receiver of the real property 1500 Market Street.

33.   Notice of Lis Pendens dated February 21, 2023, and recorded February 22, 2023 in Document 54151872 to be stricken of record.

34.   If the proposed sale is to be made by CBRE, Inc., Receiver pursuant to Order of Court filed in the United States District Court for the Eastern District of Pennsylvania Civil Action No. 23-cv-00146-NIQA, CBRE, Inc was appointed Receiver of the real property 1500 Market Street the following requirements apply:

a. Proof must be filed in the proceedings to document that NG 1500 Market St. LLC was

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association.  All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)                                         Printed: 02.12.26 @ 02:31 PM
Page 12                                         PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit  3.1(a) – Page 13

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

given notice of the proposed appointment of the Receiver.

b. Proof must be filed in the proceedings to document that NG 1500 Market St. LLC was given notice of the proposed sale by the Receiver.

c. Proof must be filed in the proceedings to document that NG 1500 Market St. LLC has consented to the proposed sale by the receiver.

d. An order of court must be entered approving the sale.

e. The proposed deed to be recorded must recite the order of court approving the sale.

f. The open mortgage and any other filed liens of record as set forth in this Report must be satisfied of record.

g. All unpaid real estate taxes, water and sewer charges and municipal liens must be paid in full.

h. Additional questions and requirements may be raised.

**END OF SCHEDULE B, PART I**

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 13

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 14

| COMMONWEALTH LAND TITLE INSURANCE COMPANY | COMMITMENT NO. PIT260026 - 1st Revised |
|---|---|

## SCHEDULE B, PART II
## EXCEPTIONS

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The Policy will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Unrecorded easements, discrepancies or conflicts in boundary lines, shortages in area and encroachments which an accurate and complete survey would disclose.

2. Rights or claims of parties in possession not shown by the public records.

3. Real estate taxes for the current and prior tax years which may be hereafter assessed, not yet due and payable.

4. Any lien or right to a lien for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

5. Possible outstanding City of Philadelphia Municipal Liens for work done prior to closing but not indexed as a lien as of Date of Policy.

6. Covenants as set forth in Deed Book JRS 604 page 132, excluding paragraph c (i), (e) and (f) thereof, and excluding Supplement II to Redevelopment Agreement recorded in Deed Book JRS 604 page 67 referred to therein.

7. Deed of Dedication to Redevelopment Authority of the City of Philadelphia and The City of Philadelphia dated 6/20/1969 and recorded in Deed Book JRS 456 page 258.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

AMERICAN
LAND TITLE
ASSOCIATION

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)                                      Printed: 02.12.26 @ 02:31 PM
                                                      Page 14                      PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 15

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

8. Deed of Dedication to Redevelopment Authority of the City of Philadelphia and The City of Philadelphia dated 6/20/1969 and recorded in Deed Book JRS 456 page 262.

9. Agreement between Redevelopment Authority of the City of Philadelphia and The City of Philadelphia dated 6/20/1969 and recorded in Deed Book JRS 456 page 279.

10. Intentionally omitted.
11. Intentionally omitted.
12. Intentionally omitted.
13. Rights granted to Bell Telephone Company in Deed Book DCC 43 page 235.

14. Intentionally omitted.
15. Intentionally omitted.
16. Intentionally omitted.
17. Intentionally omitted.
18. Intentionally omitted.
19. Temporary and Permanent Easements as set forth in Eminent Domain Proceeding In Rem Notice of Condemnation recorded 07/09/2016 as Document No. 53081811.

**END OF SCHEDULE B, PART II**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)
Page 15

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 16

| COMMONWEALTH LAND TITLE INSURANCE COMPANY | COMMITMENT NO. PIT260026 - 1st Revised |
|---|---|

## COMMITMENT CONDITIONS

1. **DEFINITIONS**
   a. "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.
   b. "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.
   c. "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   d. "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.
   e. "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   f. "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.
   g. "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   h. "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.
   i. "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.
   j. "Title": The estate or interest in the Land identified in Item 3 of Schedule A.
2. If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.
3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   a. the Notice;
   b. the Commitment to Issue Policy;
   c. the Commitment Conditions;
   d. Schedule A;
   e. Schedule B, Part I-Requirements;
   f. Schedule B, Part II-Exceptions; and
   g. a counter-signature by the Company or its issuing agent that may be in electronic form.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)    Printed: 02.12.26 @ 02:31 PM
Page 16    PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 17

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

(continued)

4.  **COMPANY'S RIGHT TO AMEND**

    The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

5.  **LIMITATIONS OF LIABILITY**

    a.  The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

        i.   comply with the Schedule B, Part I-Requirements;

        ii.  eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or

        iii. acquire the Title or create the Mortgage covered by this Commitment.

    b.  The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

    c.  The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

    d.  The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.

    e.  The Company is not liable for the content of the Transaction Identification Data, if any.

    f.  The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.

    g.  The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6.  **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM**

    a.  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

    b.  Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.

    c.  This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

    d.  The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)

Page 17

Printed: 02.12.26 @ 02:31 PM

PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 18

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

**COMMITMENT NO. PIT260026 - 1st Revised**

(continued)

   e.   Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

   f.   When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT**
   The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

8. **PRO-FORMA POLICY**
   The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **CLAIMS PROCEDURES**
   This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

10. **CLASS ACTION**
   ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

11. **ARBITRATION**
   The Policy contains an arbitration clause. All arbitrable matters when the Proposed Amount of Insurance is Two Million And No/100 Dollars ($2,000,000.00) or less may be arbitrated at the election of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

## END OF CONDITIONS

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

ALTA Commitment for Title Insurance w-PA Mod (07/01/2021)

Page 18

Printed: 02.12.26 @ 02:31 PM
PA-CW-FA59-02600.488245-SPS-1-25-PIT260026

Exhibit 3.1(a) – Page 19



Inquire before you wire!

## WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
http://www.fbi.gov

*Internet Crime Complaint Center:*
http://www.ic3.gov

Wire Fraud Alert
Original Effective Date:  5/11/2017
Current Version Date:  5/11/2017

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

Page 1

PIT260026

Exhibit 3.1(a) – Page 20

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2026

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information

FNF may collect the following categories of Personal Information:

- contact information (e.g., name, address, phone number, email address);
- demographic information (e.g., date of birth, gender, marital status);
- identity information (e.g., Social Security Number, driver's license, passport, or other government ID number);
- financial account information (e.g., loan or bank account information);
- biometric data (e.g., fingerprints, retina or iris scans, voiceprints, or other unique biological characteristics; and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Device and Browsing Information

FNF automatically collects the following categories of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser information, such as version, language, and type;
- device type and operating system;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics

Website Analytics. We use Google Analytics to understand how visitors interact with FNF Websites. Google Analytics may collect information such as your IP address, device type, and pages visited to help us analyze site traffic and to personalize your browsing experience on our site. If you don't want Google Analytics to be used in your browser, you can install the Google Analytics browser add-on, which Google makes available online.

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.

Exhibit 3.1(a) – Page 21

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for these main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To prevent and detect fraud;
- To maintain the security of our systems, tools, accounts, and applications;
- To verify and authenticate identities and credentials;
- To communicate with you about our, and our affiliates' services, jointly or independently;
- To provide reviews and testimonials about our services, with your consent.

## When Information Is Disclosed

We may disclose the categories of Personal Information and Browsing Information listed above for the following purposes:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

## State-Specific Consumer Privacy Information:

For additional information about your state-specific consumer privacy rights, to make a consumer privacy request, or to appeal a previous privacy request, please follow the link Privacy Request, or email privacy@fnf.com, or call (888) 714-2710.

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.

Exhibit 3.1(a) – Page 22

Certain state privacy laws require that FNF disclose the categories of third parties to which FNF may disclose the Personal Information and Browsing Information listed above. Those categories are:

- FNF affiliates and subsidiaries;
- Non-affiliated third parties, with your consent;
- Businesses in connection with the sale or other disposition of all or part of the FNF business and/or assets;
- Service providers;
- Law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order.

For California Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (fnf.com/california-privacy) or call (888) 413-1748.

For Nevada Residents:  We are providing this notice pursuant to state law.  You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice.  For further information concerning Nevada's telephone solicitation law, you may contact:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  aginquiries@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.  For additional information about your Oregon consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710

FNF is the controller of the following businesses registered with the Secretary of State in Oregon:
Chicago Title Company of Oregon, Fidelity National Title Company of Oregon, Lawyers Title of Oregon, LoanCare, Ticor, Title Company of Oregon, Western Title & Escrow Company, Chicago Title Company, Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, Fidelity National Title Insurance Company, Liberty Title & Escrow, Novare National Settlement Service, Ticor Title Company of California, Exos Valuations, Fidelity & Guaranty Life, Insurance Agency, Fidelity National Home Warranty Company, Fidelity National Management Services, Fidelity Residential Solutions, FNF Insurance Services, FNTG National Record Centers, IPEX, Mission Servicing Residential, National Residential Nominee Services, National Safe Harbor Exchanges, National Title Insurance of New York, NationalLink Valuations, NexAce Corp., ServiceLink Auction, ServiceLink Management Company, ServiceLink Services, ServiceLink Title Company of Oregon, ServiceLink Valuation Solutions, Western Title & Escrow Company

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.

Exhibit 3.1(a) – Page 23

Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent to this Privacy Notice; Notice Changes**
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**
If you have questions or would like to correct your Personal Information, visit FNF's Privacy Request website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

Copyright © 2026. Fidelity National Financial, Inc. All Rights Reserved.
Privacy Statement
SSCORPD0911.doc                                    Page 4                    Printed: 02.12.26 @ 02:32 PM by JJ
                                                                            PA-CW-FA59-02600.488245-PIT260026

Exhibit 3.1(a) – Page 24

## EXHIBIT 3.1(b)

Schedule of Permitted Title Exceptions

1.  Rights of tenants in possession, as tenants only, under prior unrecorded leases.

2.  Taxes for the year 2027 and thereafter, not yet due and payable

3.  Right of Way as contained in Deed Book DCC 43 page 235.

4.  Agreement as contained in Deed Book JRS 456 page 279.

5.  Conditions as contained in Deed Book JRS 604 page 132; Excluding paragraph c (i), (e) and (f) thereof, and excluding Supplement II to Redevelopment Agreement recorded in Deed Book JRS 604 page 67 referred to therein.

6.  Temporary and Permanent Easements as set forth in Eminent Domain Proceeding in Rem Notice of Condemnation recorded 7/8/2016 as Document No. 53081811.

7.  Rights of The City of Philadelphia conveyed by Deed from the Redevelopment Authority of the City of Philadelphia to The City of Philadelphia in Deed Book JRS 456 page 258.

4912-1765-5466, v. 3

Exhibit 3.1(b) – Page 1