**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-MKST, THE RR INTEREST OWNER AND THE FUTURE ADVANCE LENDER,** *Plaintiff,* | : | **CIVIL ACTION** |
| **v.** | : | **NO. 23-146** |
| **NG 1500 MARKET ST. LLC,** *Defendant.* | : | |

NITZA I. QUIÑONES ALEJANDRO, J. JULY 27, 2026

# MEMORANDUM OPINION

## INTRODUCTION

On January 13, 2023, Plaintiff Wells Fargo Bank, ("Plaintiff" or "Lender"), filed this suit against Defendant NG 1500 Market St. LLC, ("Defendant" or "Borrower"), seeking to foreclose on a loan Defendant allegedly defaulted. (ECF 1). Upon consent of the parties and pursuant to this Court's Order, (the "Receivership Order"), CBRE, Inc., ("Receiver" or "CBRE"), was appointed as the receiver of certain real property located at 1500 Market Street, Philadelphia, Pennsylvania, 19102 and the improvements, (the "Real Property"), and the personal property (excluding cash) owned by Defendant, (the "Personal Property"), (collectively, the "Property"). (ECF 20).

Pursuant to the Receivership Order, CBRE was given the authority to sell the Property with the prior approval of this Court. (*See* ECF 20 at p. 5, 10; ECF 43). On May 1, 2026, CBRE filed motions under seal seeking an Order to sell the Property,[1] (ECF 74), and an expedited hearing on that motion, (ECF 75).

In response to CBRE's sealed motions, and before this Court is Universal Group Company Inc., ("Universal"), a third-party that had previously been in negotiations with CBRE regarding the purchase/sale of the Property, underlying emergency motion, requesting, *to wit*: (1) permission to intervene; (2) a temporary restraining order and preliminary injunction to, *inter alia*, prevent the sale of the Property to another entity; (3) the unsealing of documents on the docket related to the sale of the Property; (4) expedited targeted discovery; (5) a declaration that the purchase and sale agreement involving another entity related to the sale of the Property is invalid; (6) an order requiring CBRE to file amended and supplemented reports in compliance with its receivership order; (7) an order requiring CBRE to file certain documents on the public docket; (8) an evidentiary hearing; and (9) the reservation of certain rights. (ECF 82 at pp. 33-36). On May 26, 2026, CBRE filed the same May 1, 2026 motions in the public domain as unsealed, (ECF 91, 92). CBRE filed a response to Universal's underlying motion on June 16, 2026, (ECF 98), and Universal filed a reply brief on June 29, 2026,[2] (ECF 99). The issues have been fully briefed and are ripe for disposition. For the reasons set forth herein, Universal's motion is denied.

---

[1] Once the motions were filed unsealed, this Court denied the motions filed under seal as duplicative to those in the public domain. (*See* ECF 94, 95).

[2] Pursuant to Local Civil Rule, ("Local Rule"), 7.1(c), a moving party must seek leave from the Court to file a reply. L. Civ. R. 7.1(c). Plaintiff filed a reply to Defendant's response without seeking leave from this Court in violation of Local Rule 7.1(c). However, for this matter only, this Court will consider Universal's reply.

**FACTUAL BACKGROUND**

The following is a recitation of the relevant facts and procedural history gleaned from Universal's emergency motion, (ECF 82), the sworn declaration submitted by Universal's Chief Executive Officer, Shamikh Kazmi, ("Kazmi"), (Shamikh Kazmi Dec., ECF 82-4), CBRE's response, (ECF 98), and Universal's reply:

***I. Initiation of Case***

On January 13, 2023, Plaintiff Wells Fargo filed a complaint against Defendant NG 1500 Market St. LLC, to foreclose on certain real property located at 1500 Market Street, Philadelphia, Pennsylvania 19102, and the improvements therein, (the "Real Property"), and the personal property (excluding cash) owned by Defendant, (the "Personal Property"), (collectively, the "Property"). (ECF 1). With the parties' consent, this Court entered a Receivership Order on April 14, 2023, appointing CBRE, Inc., (the "Receiver" or "CBRE"), as the Receiver for the Property. (ECF 20). Pursuant to the Receivership Order, CBRE was authorized to sell the Property with the prior approval of this Court,[3] (*see* ECF 20 at p. 5, 10; ECF 43), and

---

[3] The initial Receivership Order vested CBRE with:

(1) . . . the power and authority to . . . and without further approval of the Court:

. . . .

> (n) if directed by the Lender, engage a sales broker and sell the Property (in each case with the prior approval of the Court and on such terms as may be set out in a separate and subsequent order of the Court, it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order)[.]

(ECF 20 at p. 5, 10) (hereinafter, "Subsection (1)(n)"). Pursuant to an Order entered on February 18, 2025, (ECF 43), Subsection (1)(n) of the Receivership Order was revised as follows:

> (n) if directed by the Lender, (i) engage a sales broker (provided (A) that such sales broker shall provide all offering materials to the Borrower and (B) that the Borrower (and any affiliates of the Borrower and its direct and indirect partners) shall have the right to make offers for the purchase of the Property (which may take the form of a discounted payoff of the Loan) and participate in any bidding process) and (ii) with the prior approval of the Court and on such terms as may be set out in a separate and subsequent order of the Court (it being understood that nothing in this Order shall constitute a waiver of Borrower's right

required to submit monthly reports. (*Id.* at pp. 19-20) (hereinafter, "Subsection (11).

## *II. CBRE's Efforts to Market the Property*

Over a ten-month period, CBRE, acting as a broker, marketed the Property by, *inter alia*: sending 3,285 targeted e-mails to prospective buyers identified as strong candidates to acquire the Property, of which 1,983 recipients viewed CBRE's marketing e-mail; writing articles in the Philadelphia Inquirer, Philadelphia Business Journal and other national real estate periodicals regarding the sale of the Property; executing ninety-six prospective purchasers confidentiality agreements to access additional information concerning the Property; and coordinating and conducting tours of the Property with twenty-one distinct interested buyers. (ECF 98 at p. 5; ECF 92-1 at ¶ 21).

In October 2025, Universal engaged directly with CBRE regarding the purchase/sale of the Property. (ECF 82-4 at ¶ 4). According to Kazmi, CBRE coordinated property tours, distributed offering materials, and conducted multiple buyer qualification activities involving Universal. (*Id.*). On November 21, 2025, Kazmi personally attended a formal "1500 Market St Buyer Interview" hosted via Zoom by CBRE. (ECF 82 at p. 16; ECF 82-4 at ¶ 5). On December 12, 2025, Universal received an email from CBRE personnel confirming that KeyBank had provided "the green light" to continue the purchase/sale process with a limited set of potential buyers. (ECF 82 at p. 16; ECF 82-4 at ¶ 6). The email included a draft sale purchase agreement for the Property and formally confirmed Universal as a lender-approved qualified buyer. (*Id.*).

As a result of its marketing efforts, CBRE received nine first round bids, six second round bids, and three best and final bids for the Property. (ECF 98 at p. 6; ECF 92-1 at ¶ 22). Universal states that it first submitted an initial offer of $61,000,000 for the Property on December 17, 2025. (ECF 82 at p. 17; ECF 82-4 at ¶ 8). The three final offers received were as follows: (1) an offer of $70,000,000.00 from CSC 1500 Market Prop Co, LLC, ("CSC"), with $11,812,700 in cash and the balance in assumed debt; (2) a similar offer of $70,000,000.00 from Universal, with $11,812,700 in cash and the balance in assumed debt, (*see also* ECF 82 at p. 17; ECF 82-4 at ¶ 9); and, (3) an offer of $73,000,000 from PMC Property Group ("PMC Property Group"). (ECF 98 at p. 6; ECF 92-1 at ¶ 23-25).

On February 17, 2026, the Receiver executed a purchase and sale agreement, (the "PMC PSA"), with PMC Property Group. (ECF 82 at pp. 18-19; ECF 82-4 at ¶ 19; ECF 98 at p. 7; ECF 91-1, Exh. E). CBRE informed Universal that a "higher offer was signed . . . ." (ECF 82 at p. 17; ECF 82-4 at ¶ 10). On that same day, Universal, through Kazmi, emailed CBRE offering $75,000,000 all-cash

to raise objections to any motion seeking Court approval of any such separate and subsequent order) sell the Property[.]

with no financing contingency, no due diligence contingency, and a ten-business-day closing period following court approval. (ECF 82 at p. 17; ECF 82-4 at ¶ 11; ECF 98 at p. 7; ECF 92-1 ¶ 27). CBRE rejected Universal's offer on February 23, 2026, advising that the Property was "currently under agreement" and that "the Receiver cannot entertain any offers at this time." (ECF 82 at pp. 17, 19; ECF 82-4 at ¶ 12; ECF 98 at p. 7).

According to Universal, after the February 23, 2026 rejection and subsequent trade-press reports suggesting PMC Property Group's ownership of the Property, counterparties paused, withdrew from, or ceased advancing discussions with Universal concerning the Property. (ECF 82 at pp. 22-23; ECF 82-4 at ¶ 16). Kazmi alleges that counterparties believed Universal could no longer purchase the Property. (ECF 82-4 at ¶ 16).

### *III. CBRE's Motions for Private Sale of the Property*

On May 1, 2026, CBRE filed three separate motions under seal: (1) a motion to file documents under seal, (the "Sealing Motion"), (ECF 73); (2) a motion for expedited hearing on Receiver's motion to approve the private sale of the receivership property and granting related relief, (the "Expedited Hearing Motion"), (ECF 74); and (3) a motion for an Order approving the private sale of receivership property and granting related relief, (the "Sale Confirmation Motion"), (ECF 75). CBRE also published in The Philadelphia Inquirer a "Notice of Private Sale of Real and Personal Property," (the "Sale Notice"). (ECF 76 at p. 2). The Sale Notice indicated:

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
Case No.: 2:23-cv-00146-NIQA

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2020-MKST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-MKST, THE RR INTEREST OWNER AND THE FUTURE ADVANCE LENDER,
Plaintiff,
vs
NG 1500 MARKET ST. LLC,
Defendant.

**NOTICE OF PRIVATE SALE OF REAL AND PERSONAL PROPERTY**

PLEASE TAKE NOTICE THAT CBRE, Inc., the court-appointed receiver (the "**Receiver**"), has entered into an agreement for the private sale of the property located at 1500 Market Street, Philadelphia, Pennsylvania 19102, including all real and personal property associated therewith, and improvements located thereon (all such real and personal property being referred to herein collectively as the "**Property**").

**All competing bids are due by May 12, 2026. Any person or entity wishing to submit a competing bid for the Property must submit a written bid in an amount of not less than $77,000,000.00. All competing bids must be submitted to the Receiver's counsel: Mark Pfeiffer, Two Liberty Place, 50 S. 16th Street, Ste. 3200, Philadelphia, PA 19102, mark.pfeiffer@bipc.com. The Receiver reserves the right to accept any bid or to reject any and all bids that it deems not to be in the best interest of the receivership estate.**

PLEASE TAKE FURTHER NOTICE THAT the Receiver will appear before the Honorable Judge Nitza I. Quinones Alejandro, in the United States District Court for the Eastern District of Pennsylvania, located at 601 Market Street, Courtroom 8-B, Philadelphia, Pennsylvania 19106, and will seek confirmation of the private sale of the Property pursuant to written motion (the "**Sale Confirmation Motion**").

PLEASE TAKE FURTHER NOTICE THAT all sales will be free and clear of all liens, claims, encumbrances, rights of redemption, and other interests pursuant to the Court's entry of an order confirming and approving the final sale of the Property. All sales will be "AS IS" and "WHERE IS AND WITH ALL FAULTS" with no representations or warranties of any type.

Dated: May 1, 2026.

CBRE sent the sale notice to CSC and Universal. (ECF 98 at p. 8; ECF 89).

On May 11, 2026, CSC filed a "Letter of Intent to Acquire the Property," offering to purchase the Property for $80,000,000 on terms set forth in the Letter of Intent, (ECF 79), and CBRE sent Universal the executed PMC PSA and a redline of CSC's proposed purchase and sale agreement, (ECF 82-4 at ¶ 18). Upon receipt of the PMC PSA and CSC's bid, Universal filed the underlying motion on May 12, 2026.[4] (*See generally* ECF 82). Universal has not made an offer for the Property.

On May 19, 2026, CBRE filed a status report indicating that it would be withdrawing its Sealing Motion, (ECF 89), and, on May 26, 2026, CBRE filed unsealed copies of its Expedited Hearing Motion and Sale Confirmation Motion. (ECF 91, 92).

[4] This Court approved Universal's withdrawal of its initial motion, (ECF 93), and considers only the underlying motion, (ECF 82).

**LEGAL STANDARD**

As noted, Universal filed the underlying emergency motion, which is opposed, and seeks, *in part*: (1) permission to intervene; and (2) a temporary restraining order and preliminary injunction to, *inter alia*, prevent the sale of the Property to another entity.

***I. Intervention***

Federal Rule of Civil Procedure, ("Rule"), 24 governs intervention of third parties. Fed. R. Civ. P. 24. A party may move for mandatory intervention under Rule 24(a) or for permissive intervention under Rule 24(b). Specifically, Rule 24 (a) provides:

> [o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(1)-(2). "A party that has filed a timely motion has a right to intervene under Rule 24(a) if it can show: (1) a sufficient interest in the litigation; (2) 'a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action'; and (3) that its interest is not adequately represented by the existing parties to the litigation." *Pennsylvania v. President United States*, 888 F.3d 52, 57 (3d Cir. 2018) (quoting *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)).

Under Rule 24(b), for parties other than a government officer or agency seeking permissive intervention, "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(A)-(B). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

### *II. Injunctive Relief*

Rule 65 governs the issuance of injunctions and restraining orders. Fed. R. Civ. P. 65. Injunctive relief is extraordinary in nature and available only in limited circumstances. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."). "Whether a plaintiff can get [a preliminary injunction] depends on whether (1) he is likely to succeed on the merits, (2) he will suffer irreparable harm without preliminary relief, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

In *Reilly v. City of Harrisburg*, the United States Court of Appeals for the Third Circuit, (the "Third Circuit"), clarified a movant's burden when seeking a preliminary injunction and held that a movant must first demonstrate "a better than negligible chance" of prevailing on the merits and that "it is more likely than not" that the movant will suffer irreparable harm in the absence of a preliminary injunction. 858 F.3d 173, 179 (3d Cir. 2017). If a movant meets these two gateway requirements, the court then "considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*.

## DISCUSSION

As noted, Universal seeks intervention to contest the process by which CBRE executed the purchase and sale agreement, (the "PMC PSA"), with PMC Property Group. (*See generally* ECF 82). Universal argues that CBRE's process to execute the PMC PSA violated the Receivership Order and 28 U.S.C. § 2001(b), the federal statute governing the judicial sale of realty. (*Id.*). To

determine whether such violations occurred, Universal requests: (1) a stay of the judicial sale process pursuant to a temporary restraining order and preliminary injunction; (2) the unsealing of CBRE's various motions related to the request for sale;[5] (3) CBRE's filing of supplemental reporting required under the Receivership Order; and (4) permission to conduct discovery into CBRE's process of formalizing the PMC PSA. Universal also seeks a declaration from this Court that the PMC PSA does not authorize the sale of the Property, an evidentiary hearing, and the reservation of its rights to bring certain claims against CBRE, either here or in state court.

***I. Intervention***

Universal argues that it has met all the factors for mandatory intervention and, therefore, it is entitled to intervene as of right pursuant to Rule 24(a)(2). In the alternative, Universal requests that this Court permit it to intervene pursuant to Rule 24(b). In its opposition, CBRE argues that neither mandatory nor permissive intervention are appropriate here. The arguments are addressed in turn.

*A. Timeliness*

"A district court's timeliness inquiry for both types of Rule 24 motions requires considering the totality of the circumstances arising from three factors: '(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay.'" *Wallach v. Eaton Corp.*, 837 F.3d 356, 371 (3d Cir. 2016) (quoting *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005)). When evaluating the stage of the proceedings to determine timeliness, "the critical inquiry is: what proceedings of substance on the merits have occurred?" *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995). "This is because

[5] Universal's request for the unsealing of documents has been mooted by CBRE's decision to file unsealed copies of its Expedited Hearing Motion and Sale Confirmation Motion. (ECF 91, 92).

the stage of the proceeding is inherently tied to the question of the prejudice the delay in intervention may cause to the parties already involved." *Id.*

Here, Plaintiff initiated a foreclosure action against Defendant on January 13, 2023, (ECF 1), and, as a result and pursuant to Rule 66, CBRE was appointed on April 14, 2023, as Receiver to, *inter alia*, manage the ultimate sale of property, (ECF 20). In October 2025, CBRE began discussing the sale of the Property with numerous prospective buyers, including Universal, and, on February 23, 2026, CBRE officially declined Universal's offer to purchase the Property because it had received a higher bid. On May 1, 2026, CBRE filed with the Court its sealed Sale Confirmation Motion pursuant to 28 U.S.C. § 2001, bringing this case into its final stage. On May 11, 2026, upon receiving from CBRE proposed purchase offers, Universal filed the underlying motion to intervene.

Based on these facts, alone, allowing Universal to intervene at this late stage of a foreclosure action threatens the sale of the Property and would prejudice the parties. Further, "[t]o the extent the length of time an applicant waits before applying for intervention is a factor in determining timeliness, it should be measured from the point at which the applicant knew, or should have known, of the risk to its rights." *Wallach.*, 837 F.3d at 375-76 (quoting *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1183 (3d Cir. 1994)). Given that Universal has not articulated any rights in this case, nor has it offered a higher bid or asserted a right to purchase the Property, it is not clear when Universal would have known its rights were at risk. However, assuming Universal's "rights" were put at risk by CBRE's motions to sell the Property, Universal's motion to intervene is timely and this Court will now consider whether Universal meets the requirements of either mandatory or permissive intervention.

*B. Rule 24(a)(2): Mandatory Intervention*

For an applicant to intervene as of right pursuant to Rule 24(a)(2), the intervenor must show "(1) a sufficient interest in the litigation; (2) 'a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action'; and (3) that its interest is not adequately represented by the existing parties to the litigation." *Pennsylvania*, 888 F.3d at 57 (quoting *Kleissler,* 157 F.3d at 969).

*1. Sufficient Interest*

"To meet [the sufficient interest] prong, the Supreme Court has held that an applicant must assert an interest that is 'significantly protectable.'" *Pennsylvania*, 888 F.3d at 57-58 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). "An applicant must therefore demonstrate that its interest is 'specific to [it], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought.'" *Id.* at 58 (alteration in original) (quoting *Kleissler,* 157 F.3d at 972).

Here, Universal argues that it has a

> direct, substantial, and legally protectable interests in (i) the procedural integrity of the sale process for receivership realty under 28 U.S.C. § 2001(b), [Subs]ection (1)(n) of the Receivership Order, and the Court's inherent supervisory authority over the Receiver; (ii) the disclosure obligations of CBRE in its corporate capacity as Receiver under Section 11; and (iii) the equal treatment of qualified bidders in any Court-supervised process under § 2001(b), including its provision permitting bona fide written offers guaranteeing at least a 10% increase over the private sale price.

(ECF 82 at p. 24). While this argument may have some merit, Universal has not shown it has a direct, substantial, and legally protectable interests.

The interests that Universal articulates – "process integrity," "disclosure obligations," and "equal treatment of qualified bidders" – are shared by Plaintiff, Defendant, and CBRE *only.* To the extent that Universal claims that it has rights from the Receivership Order, it is mistaken, as it

was never a party to that Order and, thus, cannot derive an interest from it. As for its argument regarding 28 U.S.C. § 2001(b), the statute sets out the requirements for the sale of the Property, which is the Court's responsibility to evaluate upon consideration of CBRE's Expedited Hearing Motion, (ECF 91), and Sale Confirmation Motion, (ECF 92).[6] It is not an interest that belongs or pertains to Universal.

Notably, Universal does not claim that it has any interest in the Property. Universal does not contend that it was the successful bidder for the Property, does not seek confirmation that it can purchase the Property for any amount it bids, and has not committed to participating further in the bidding process. Therefore, Universal has not demonstrated an interest, let alone a sufficient interest, in this lawsuit.

*2. Interests in Jeopardy in the Lawsuit*

Assuming that Universal could demonstrate a sufficient interest in this case, which it has not, in order to demonstrate that their interest "is in jeopardy in the lawsuit[,]" "an applicant 'must demonstrate that [its] legal interests may be affected or impaired[] as a practical matter by the disposition of the action.'" *Pennsylvania*, 888 F.3d at 59 (quoting *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992)). Universal contends that:

> [a]bsent intervention, [its] interests in a procedurally regular, Court-supervised sale process will be impaired by (i) the proposed approval of a transaction concluded in violation of Section 1(n); (ii) the continued sealing of ECF 73-75, which may contain material undisclosed to Universal; (iii) the absence of any § 2001(b) appraisal or compliant publication of the PMC PSA's underlying terms; and (iv) the potential for the May 12, 2026 deadline to be applied to Universal without the disclosures necessary for meaningful participation.

(ECF 82 at p. 24).

[6] Having found that Universal has no interest in CBRE's reports, this Court will deny Universal's request for CBRE to file supplemental reporting.

Here, to the extent that Universal could have an interest in "process integrity," "disclosure obligations," and "equal treatment of qualified bidders," those interests are protected by this Court in its evaluation of the sale of the Property pursuant to 28 U.S.C. § 2001(b). Therefore, Universal's "interests", if any, would not be jeopardy.

*3. Inadequate Representation of Interests*

Finally, "an applicant's interests are not adequately represented if they diverge sufficiently from the interests of the existing party, such that 'the existing party cannot devote proper attention to the applicant's interests.'" *Pennsylvania*, 888 F.3d at 60 (quoting *United States v. Terr. of the V.I.*, 748 F.3d 514, 520 (3d Cir. 2014)).

Universal argues that the parties in this case – Plaintiff, Defendant, and CBRE – do not represent its (Universal's) interests in this case. (ECF 82 at p. 24). Specifically, Universal contends that:

> [Plaintiff], as foreclosing lender, has economic interests aligned with the highest realizable sale price but does not represent any competing bidder's interest in procedural integrity. [Defendant] is, for all practical purposes, defunct: its counsel withdrew in August 2025 [ECF 54], and this Court has entered substantial contempt sanctions against it [ECF 59]. The Receiver, CBRE in its corporate capacity, has institutional interests adverse to Universal . . . .

(*Id.*).

Universal is correct its interest and the parties' interest in this case are different. However, the parties to this case have an inherent interest to comply with their obligations under the Receivership Order and 28 U.S.C. § 2001(b), as any violation would jeopardize the sale of the Property, an interest the parties share. Universal's interest is unclear since it has not made any attempts to surpass the highest bid to purchase the property.

Having failed to satisfy the requirement of mandatory intervention, Universal's motion to intervene pursuant to Rule 24(a)(2) is denied.

*C. Rule 24(b): Permissive Intervention*

Having found that Universal may not intervene *as of right*, this Court turns to Universal's arguments for permissive intervention pursuant to Rule 24(b). Specifically, Rule 24(b) provides that a "court may permit anyone to intervene who … has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion, the [district court] must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). "[D]istrict courts have broader discretion in making a determination about whether permissive intervention is appropriate as opposed to intervention as of right." *Terr. of the V.I.*, 748 F.3d at 524 (citing *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992)).

Here, the parties will be prejudiced if Universal was permitted to intervene prior to the completion of the sale of the Property. *Cf. id.* (citing *United States v. Tennessee*, 260 F.3d 587, 591-92 (6th Cir. 2001)) (finding that intervention prior to a court's ruling on a settlement agreement would be prejudicial). Additionally, this Court has already found that Universal does not have an interest in CBRE's compliance with the Receivership Order or with 28 U.S.C. § 2001(b), or even with the bidding process. *See Brody*, 957 F.2d at 1124 ("[I]f intervention as of right is not available, the same reasoning would indicate that it would not be an abuse of discretion to deny permissive intervention as well."). As such, Universal's request for permissible intervention is denied..

***II. Temporary Restraining Order***

As noted, Rule 65 governs the issuance of injunctions and restraining orders. Whether a preliminary injunction is warranted depends on (1) the likely to succeed on the merits, (2) a irreparable harm will be suffered without preliminary relief, (3) the balance of equities favors an

injunction, and (4) an injunction is in the public interest. Here, Universal requests a temporary restraining order and a preliminary injunction prohibiting the following:

> (i) consummation of any sale of the Property; (ii) the recording of any deed transferring the Property; (iii) payment of any sale commission to CBRE in its corporate capacity, including under the Article VIII separate broker-compensation agreement; (iv) distribution of any sale proceeds; (v) termination of any tenant lease at the Property except in the ordinary course; and (vi) destruction or alteration of any document, communication, or record relevant to the conduct described in this Motion — until further order of this Court.

(ECF 82 at p. 25). Since this Court has denied Universal its request to intervene in this matter, it need not address Universal's request for a temporary restraining order. However, in the interest of judicial economy, it will briefly address its request.

*A. Likelihood of Success on the Mertis*

For this initial factor, "a sufficient degree of success for a strong showing exists if there is 'a reasonable chance or probability, of winning.'" *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (*en banc)*).

Universal argues that it will be likely to succeed on the merits of its case because

> (i) the prior-Court-approval requirement of Section 1(n) is clear on its face and the Receiver's noncompliance is reflected by the absence of any such approval on the docket; (ii) the strong presumption of public access to ECF 73-75 under Hotel Rittenhouse and Cendant is overcome only by particularized findings the Receiver has not made; (iii) the unauthorized sale commission and Article VIII separate broker-compensation agreement exceed the Section 20 ceiling on their face; (iv) Universal contends that the certifications at ECF 71 and ECF 72 are materially misleading by direct comparison of the sworn certifications to the events documented elsewhere in this Motion, and discovery is required as to what CBRE knew and when; (v) the procedural irregularities under § 2001(b) (no appraisal, inadequate publication) appear on the docket itself; and (vi) the conflict described in Section IV.D-E is established by CBRE's own sworn ECF 41-2 affidavit, the executed PSA's identification of the five Buyer SPEs, and public reporting on Dean S. Adler's role as buyer principal, and requires disclosure and inquiry.

(ECF 82 at p. 32).

Universal's claims are difficult to discern. Confusingly, Universal argues that it "does not . . . seek to prevent the sale of the Property[,]" "does not . . . commit to submit any specific competing bid at any specific number[,]" and "expressly reserves its rights, including under 28 U.S.C. § 2001(b), and under any Court-supervised qualifying-overbid procedure this Court may establish, to participate in or decline to participate in any competing-bid process at the time and on the terms this Court orders." (ECF 82 at 5). Universal further argues that its only seeks "to preserve the option of a fair, supervised process before any sale is confirmed," (*id.* at 37), and that "[t]he issue before this Court is whether its Receiver's sale process was fair, complete, and properly disclosed before the Court confirms a transfer of receivership property[,]" (*id.* at 6). To the extent that Universal's "claims" rest on the theory that CBRE violated the Receivership Order and/or 28 U.S.C. § 2001(b), this Court finds that Universal is unlikely to succeed on the merits of its claims. Further, this Court finds that Universal's arguments are a veiled attempt to usurp the Court's ability to manage and oversee the ultimate sale of the Property.

*1. Subsection 1(n) of the Revised Receivership Order*

Universal argues that "CBRE in its corporate capacity executed the PMC PSA in February 2026 without prior Court approval" in violation of Subsection 1(n) of the revised Receivership Order. (*Id.* at p. 26). This Court disagrees.

Pursuant to Subsection 1(n) of the revised Receivership Order, CBRE requires this Court's approval to *sell* the Property.[7] However, nothing in Subsection 1(n) requires CBRE to seek

---

[7] The Receiver has the power and authority to:

> (n) if directed by the Lender, (i) engage a sales broker (provided (A) that such sales broker shall provide all offering materials to the Borrower and (B) that the Borrower (and any affiliates of the Borrower and its direct and indirect partners) shall have the right to make offers for the purchase of the Property (which may take the form of a discounted payoff of the Loan) and participate in any bidding process) and (ii) with the prior approval of the

approval from this Court to execute a purchase and sale agreement *prior* to the sale of the Property. Because CBRE has sought approval for the sale of the Property through its Sale Confirmation Motion, this Court finds that Universal would be unlikely to succeed on its claim that CBRE violated Subsection 1(n) in executing the PMC PSA.

*2. Violation of 28 U.S.C. § 2001(b)*

Universal also contends that CBRE did not satisfy any of the mandatory requirements for the private sale of the Property set forth in 28 U.S.C. § 2001(b) when it executed the PMC PSA. (ECF 82 at p. 12). Universal is mistaken.

The private sale of realty is governed by 28 U.S.C. § 2001(b), which provides:

> After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest or any part thereof at private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby. Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale.

"[T]he statute . . . includes mandatory language stating that (1) the court 'shall appoint' three appraisers, (2) '[n]o private sale shall be confirmed at a price less than two-thirds of the appraised value,' (3) the sale 'shall be published' in newspapers at least ten days before confirmation, and

---

> Court and on such terms as may be set out in a separate and subsequent order of the Court (it being understood that nothing in this Order shall constitute a waiver of Borrower's right to raise objections to any motion seeking Court approval of any such separate and subsequent order) sell the Property[.]"

(ECF 43).

(4) the sale 'shall not be confirmed' if a bona fide offer guaranteeing 'at least a 10 per centum increase' is made." *Huntington Nat. Bank v. Najero, Inc.*, 2014 WL 5473054, at *1 (E.D. Mich. Oct. 27, 2014) (quoting 28 U.S.C. § 2001(b)).

While Universal is correct that these mandatory requirements apply to the sale of the Property, it fails to proffer any support for the assertion that the requirements also apply to executing purchase and sale agreements *prior* to the sale. Interestingly, the sale of a property generally requires a signed purchase/sale agreement. Therefore, this Court finds that Universal would be unlikely to succeed on a claim that CBRE violated 28 U.S.C. § 2001(b) in executing the PMC PSA. Having found that Universal is unlikely to succeed on any of its claims, the requests for a temporary restraining order and preliminary injunction are denied.

***III. Expedited Discovery***

Universal also seeks expedited discovery related to CBRE's efforts to sell the Property. It argues that the discovery is needed because:

> (i) the Receiver, CBRE in its corporate capacity, has exclusive control of the institutional records concerning the sale process, the conduct of both CBRE Functions, the rejection of Universal's offers, the negotiation of the PMC PSA, the qualification of CSC, and any additional commercial arrangements between CBRE in its corporate capacity and any of PMC, Adler & Co., Dean S. Adler, the Buyer SPEs, Lubert-Adler, or any affiliate; (ii) the Article VIII separate broker-compensation agreement is referenced in CBRE's own PSA but has not been produced; (iii) the contents of ECF 73-75 as filed at the Court are sealed; and (iv) Universal cannot meaningfully respond to or compete with any Sale Order motion the Receiver may file without disclosure of these materials.

(ECF 82 at p. 26).

The Federal Rules of Civil Procedure do not specify when a district court should grant leave to conduct expedited discovery, *see* Fed. R. Civ. P. 26, and the Third Circuit has not established such a standard, *see Stantec Consulting Servs. v. Arslan*, 2021 WL 4472875, at *4 (E.D. Pa. Sept. 30, 2021). However, "[t]he prevailing approach in this Circuit is to apply the 'good

cause' or reasonableness standard to resolve motions for expedited discovery." *Id.* (citation omitted). Under the good cause standard, "[t]he court should consider: (1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent." *Id.* (internal quotation marks and citation omitted). "Where the requests are overly broad and extend beyond the needs of the preliminary injunction, leave should be denied." *Chubb INA Holdings, Inc. v. Chang*, 2016 WL 3470291, at *4 (D.N.J. June 24, 2016).

Universal's request is beyond overbroad. It seeks discovery related to CBRE's entire process to obtain the PMC PSA. Some of the discovery Universal seeks stretches back to January 2023. Such production would be an unreasonably burdensome on CBRE. Additionally, because this Court finds that intervention and a temporary restraining order are not warranted here, there is no reason to permit such a fishing expedition. As such, this Court finds no good cause to permit expedited discovery here.

### ***IV. Declaration that the PMC PSA is Invalid***

Universal requests that this Court "[d]eclare that the executed PMC PSA, as a conditional, unapproved, unconsummated instrument subject to Court Approval and Lender Approval under its own Section 4.6, does not authorize the consummation of any sale of the Property absent prior Court approval after notice, opportunity to be heard by Universal and any other qualified bidder, and the procedural protections of 28 U.S.C. § 2001(b)[.]" (ECF 82 at p. 35). While not clear, this Court will construe Universal's request as a claim under the Declaratory Judgment Act.

The Declaratory Judgment Act permits any court of the United States to declare the rights and other legal relations of any interested party seeking such a declaration in a case of actual

controversy within its jurisdiction. 28 U.S.C. § 2201. Any such declaration shall have the force and effect of a final judgment or decree. *Id.*

As previously indicated, Universal has been denied intervention in this matter, and has been found would be unlikely to succeed on a claim that CBRE violated the Receivership Order or 28 U.S.C. § 2001(b) when it executed the PMC PSA. Therefore, any declaratory relief request is not warranted.

### *V. Evidentiary Hearing*

Finally, Universal seeks an evidentiary history concerning

> (i) the procedural integrity of the sale process; (ii) the equivalent-economic-terms comparison of all bona fide offers received during the relevant period, including Universal's January 22 written acceptance and Universal's February 17 $75 million all-cash offer; (iii) any conflicts of interest of CBRE in its corporate capacity, including any additional commercial arrangements between CBRE and the buyer-side parties; (iv) the legality and approval status of the Article VIII separate broker-compensation agreement under Section 20; (v) the candor of the Section 11 reporting at ECF 71 and ECF 72; and (vi) any other matter the Court deems necessary for the supervision of its Receiver and the protection of the Property as receivership realty[.]

(ECF 82 at p. 36). This Court finds no grounds to hold such a hearing on the request of Universal. Similar issues may be addressed when this Court reviews CBRE's request to approve any purchase/sale agreement.

## CONCLUSION

For the reasons set forth, Universal's emergency motion is denied, in its entirety. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.